1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3                        - - -

 4   EQUAL EMPLOYMENT          :
     OPPORTUNITY COMMISSION,  :
 5                            :
           PLAINTIFF,         :
 6                            :
           vs.                : CASE NO. 2:13-CV-00780
 7                            :
     OHIOHEALTH CORPORATION,  :
 8   D/B/A RIVERSIDE          :
     METHODIST HOSPITAL,      :
 9                            :
           DEFENDANT.         :
10

11                        - - -

12           Deposition of LAURA M. STONE, a witness herein,

13   called by the Defendant for cross-examination under the

14   applicable Federal Rules of Civil Procedure, taken

15   before Carol A. Kirk, a Registered Merit Reporter and

16   Notary Public in and for the State of Ohio, pursuant to

17   notice, at the Offices of Baker & Hostetler, 65 East

18   State Street, Suite 2100, Columbus, Ohio, commencing on

19   Wednesday, June 18, 2014 at 9:12 a.m.

20                        - - -

21

22              FRALEY COOPER & ASSOCIATES
             222 East Town Street, Second Floor
23                  Columbus, Ohio  43215
             (614) 228-0018 - (800) 852-6163
24                  Fax - (614) 224-5724
```

```
 1              DEPOSITION OF LAURA M. STONE

 2                    APPEARANCES

 3                     - - -

 4         KEYANA C. LAWS, ESQUIRE
           U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 5         Philadelphia District Office
           801 Market Street, Penthouse Suite 1300
 6         Philadelphia, PA  19107
           (215) 440-2642,
 7
                On behalf of the Plaintiff.
 8

 9         DAVID WHITCOMB, ESQUIRE
           LINDSEY D'ANDREA, ESQUIRE
10         BAKER & HOSTETLER
           65 East State Street
11         Columbus, OH  43215
           (614) 228-1541,
12
                On behalf of the Defendant.
13

14    ALSO PRESENT:

15         Tanisha Wilburn

16                     - - -

17

18

19

20

21

22

23

24
```

```
 1                      Wednesday Morning Session
                        June 18, 2014
 2                      9:12 a.m.

 3                           - - -

 4                        STIPULATIONS

 5          It is stipulated by and between counsel for

 6     the respective parties that the deposition of LAURA M.

 7     STONE, a Witness herein, called by the Defendant under

 8     the applicable Federal Rules of Civil Procedure, may be

 9     taken at this time in stenotype by the Notary, pursuant

10     to notice; that said deposition may thereafter be

11     transcribed by the Notary out of the presence of the

12     witness; that proof of the official character and

13     qualification of the Notary is waived; that the witness

14     may sign the transcript of her deposition before a

15     Notary other than the Notary taking her deposition;

16     said deposition to have the same force and effect as

17     though signed before the Notary taking it.

18                           - - -

19

20

21

22

23

24
```

4

```
 1              DEPOSITION OF LAURA M. STONE

 2                 INDEX TO EXHIBITS

 3    DEPOSITION    DESCRIPTION                    PAGE

 4       1         LEAVE OF ABSENCE APPLICATION,    24
                   DATED 6/11/09, BATES-STAMPED
 5                 EEOC V. OHC 161-162

 6       2         NOTE TO MS. MILLER FROM MS.      31
                   SIPES, DATED 8/31/09,
 7                 BATES-STAMPED EEOC V. OHC 487

 8       3         "DISABILITIES AND REASONABLE     39
                   ACCOMMODATIONS POLICY,
 9                 ASSOCIATE REQUEST FOR
                   ACCOMMODATION FORM," DATED
10                 9/18/09, BATES-STAMPED EEOC V.
                   OHC 168
11
         4         "DISABILITIES AND REASONABLE     39
12                 ACCOMMODATION POLICY,
                   DOCUMENTATION OF
13                 DISABILITY/FUNCTIONAL
                   LIMITATIONS FORM," DATED
14                 9/18/09, BATES-STAMPED EEOC V.
                   OHC 166-167
15
         5         LOG BATES-STAMPED EEOC V. OHC    44
16                 470-486

17       6         "TRANSCRIPT OF VOICE MESSAGES,"  63
                   BATES-STAMPED EEOC 159-160
18
         7         LISTING OF POSITIONS APPLIED     73
19                 FOR BY LAURA STONE,
                   BATES-STAMPED EEOC 165
20
         8         EMPLOYMENT APPLICATION OF LAURA  81
21                 STONE FOR A PATIENT SUPPORT
                   ASSISTANT POSITION,
22                 BATES-STAMPED EEOC V. OHC
                   438-440
23

24
```

```
 1      9              DOCUMENT ENTITLED, "OPENING,      82
                       POSITION TITLE: PATIENT SUPPORT
 2                     ASSISTANT," BATES-STAMPED EEOC
                       V. OHC 391-393
 3
         10            EMPLOYMENT APPLICATION OF LAURA    86
 4                     STONE FOR A CLINICAL
                       RECEPTIONIST POSITION,
 5                     BATES-STAMPED EEOC V. OHC
                       435-437
 6
         11            DOCUMENT ENTITLED, "JOB           86
 7                     OPENING, POSITION TITLE:
                       CLINICAL RECEPTIONIST,"
 8                     BATES-STAMPED EEOC V. OHC
                       394-396
 9
         12            EMPLOYMENT APPLICATION OF LAURA   89
10                     STONE FOR A SCHEDULING
                       COORDINATOR POSITION,
11                     BATES-STAMPED 450-452

12      13             DOCUMENT ENTITLED, "JOB           89
                       OPENING, POSTING TITLE:
13                     SCHEDULING COORDINATOR,"
                       BATES-STAMPED EEOC V. OHC
14                     397-399

15      14             EMPLOYMENT APPLICATION OF LAURA   92
                       STONE FOR AN ADMINISTRATIVE
16                     SERVICES COORDINATOR POSITION,
                       BATES-STAMPED EEOC V. OHC
17                     431-433

18      15             DOCUMENT ENTITLED, "JOB           92
                       OPENING, POSTING TITLE:
19                     ADMINISTRATIVE SERVICES
                       COORDINATOR, OPENING ID
20                     901958," BATES-STAMPED EEOC V.
                       OHC 400-402
21
         16            EMPLOYMENT APPLICATION OF LAURA   94
22                     STONE FOR A PATIENT SUPPORT
                       ASSISTANT POSITION,
23                     BATES-STAMPED 442-444

24
```

6

| | 17 | DOCUMENT ENTITLED, "JOB OPENING, POSTING TITLE: PATIENT SUPPORT ASSISTANT, JOB OPENING ID: 902162," BATES-STAMPED EEOC V. OHC 406-408 | 95 |

| | 18 | EMPLOYMENT APPLICATION OF LAURA STONE FOR A SENIOR MEDICAL RECORDS ASSOCIATE POSITION, BATES-STAMPED EEOC V. OHC 454-456 | 97 |

| | 19 | DOCUMENT ENTITLED, "JOB OPENING, POSTING TITLE: SENIOR MEDICAL RECORDS ASSOCIATE, JOB OPENING ID: 902090," BATES-STAMPED EEOC V. OHC 403-405 | 98 |

| | 20 | EMPLOYMENT APPLICATION OF LAURA STONE FOR A PATIENT SUPPORT ASSISTANT POSITION | 101 |

| | 21 | DOCUMENT ENTITLED, "JOB OPENING, POSTING TITLE: PATIENT SUPPORT ASSISTANT, JOB OPENING ID: 902672," BATES-STAMPED EEOC V. OHC 409-411 | 101 |

| | 22 | COMPUTER SCREEN SHOTS, BATES-STAMPED EEOC V. OHC 458-462 | 105 |

| | 23 | LETTER TO LAURA STONE FROM ASSOCIATE HEALTH AND WELLNESS, DATED 7/14/10, BATES-STAMPED EEOC V. OHC 488-489 | 106 |

| | 24 | LETTER TO LAURA STONE FROM NANCY MILLER, DATED FEBRUARY 8, 2010, BATES-STAMPED 161 | 113 |

| | 25 | PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES | 118 |

| 1  | 26 | LETTER TO MS. MILLER FROM MS. STONE, BATES-STAMPED EEOC 158 | 124 |
| 2  |    |                                                            |     |
|    | 27 | FIVE-PAGE DOCUMENT WITH THE "JOB INFORMATION" TAB FOR PATIENT SUPPORT ASSISTANT POSITION APPEARING | 126 |
| 3  |    |                                                            |     |
| 4  |    |                                                            |     |
| 5  | 28 | OHIO CIVIL RIGHTS COMMISSION CHARGE OF DISCRIMINATION, BATES-STAMPED EEOC 18 | 150 |
| 6  |    |                                                            |     |
| 7  | 29 | PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION | 152 |
| 8  |    |                                                            |     |
| 9  |    |                                                            |     |
| 10 | 30 | COMPLAINT                                                  | 158 |
| 11 | 31 | "U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION INTAKE QUESTIONNAIRE," BATES-STAMPED EEOC 187-195 | 165 |
| 12 |    |                                                            |     |
| 13 |    |                                                            |     |
|    | 32 | INTAKE NOTES, DATED MAY 10, 2010, BATES-STAMPED EEOC 186  | 171 |
| 14 |    |                                                            |     |
| 15 | 33 | LETTER TO PAT SINTIC FROM LAURA STONE, BATES-STAMPED EEOC 150-156 | 172 |
| 16 |    |                                                            |     |
| 17 | 34 | OHIOHEALTH TRANSFER POLICY, BATES-STAMPED EEOC 167-169    | 176 |
| 18 |    |                                                            |     |
|    | 35 | LETTER TO MR. SINTIC FROM MS. STONE, BATES-STAMPED EEOC 149 | 178 |
| 19 |    |                                                            |     |
| 20 | 36 | DOCUMENT PREPARED BY SABRINA AUSTIN, INVESTIGATOR, OCTOBER 4, 2011, BATES-STAMPED EEOC 8 | 181 |
| 21 |    |                                                            |     |
| 22 | 37 | PHONE RECORDS OF LAURA STONE, BATES-STAMPED EEOC 30-140   | 182 |
| 23 |    |                                                            |     |
|    | 38 | OHIOHEALTH CORPORATION PAY RECORDS, REDACTED, BATES-STAMPED EEOC V. OHC 357 | 184 |
| 24 |    |                                                            |     |

```
 1                    LAURA M. STONE

 2    being by me first duly sworn, as hereinafter certified,

 3    deposes and says as follows:

 4                    CROSS-EXAMINATION

 5    BY MR. WHITCOMB:

 6         Q.    Would you state your name for the record.

 7         A.    Laura M. Stone.

 8         Q.    Ms. Stone, my name is David Whitcomb.  I work

 9    here at the law firm of Baker & Hostetler, and we

10    represent the Defendants in the lawsuit that you

11    brought against -- or actually the EEOC brought in this

12    case.

13              I've asked you to appear today to take your

14    deposition.  It's my opportunity to ask you questions

15    while you're under oath to find out what your answers

16    to those questions are.

17              We have a court reporter here, and she's

18    taking down everything that's being said.  So there are

19    a couple ground rules that we both need to follow.

20    It's important that we don't speak over top of each

21    other.  So if I'm asking a question, if you could

22    please wait until I'm done asking my question before

23    you answer; and when you're answering, I'll try to wail

24    until you're done answering the question before I ask
```

1     another question.

2              It's also important that you answer audibly.

3     So if I ask you a yes or no question, you should say

4     yes or no as opposed to shaking your head, because the

5     court reporter can't take down shakes of the head.

6          A.   Um-hmm.

7          Q.   If you need a break at any time during the

8     day, just let me know and we can accommodate breaks.

9     And if you need a drink or anything, let me know.  We

10    have refreshments here as well.

11             Have you ever been deposed before?

12         A.   No.

13         Q.   Is there anything you did to prepare for your

14    deposition today?

15         A.   Yes.

16         Q.   What did you do?  And, by the way, I don't

17    want to know about conversations you had with your

18    lawyers or the EEOC's lawyers.

19         A.   I met with Ms. Laws to prepare.

20         Q.   Okay.  Can you tell me your current address?

21         A.   That would be 415 Liberty Lane, Westerville,

22    Ohio, and the Zip Code is 43081.

23         Q.   How long have you lived at that address?

24         A.   Since approximately five years now.

1  Q. Does anybody live with you at that address?

2  A. Yes.

3  Q. Who is that?

4  A. My mother.

5  Q. What is her name?

6  A. Donna.

7  Q. What is her last name?

8  A. Dalton.

9  Q. Is there a land line phone at that address?

10  A. Yes.

11  Q. What is the phone number for that address?

12  A. I don't use it.  I believe it's

13 (614)212-2060.

14  Q. What is your current phone number that you do

15 use?  I'm not going to call you.  There's some phone

16 records in issue in this case.

17  A. My personal phone number?

18  Q. Yes.

19  A. (614)395-3416.

20  Q. How long have you had that number?

21  A. I believe I switched to Verizon probably 2007

22 or 2008.

23  Q. Since 2009, July 2009, are there any other

24 phone numbers that you have used?

```
 1      A.    No.

 2      Q.    What is your date of birth?

 3      A.    May 9th, 1984.

 4      Q.    And are you married or single?

 5      A.    Single.

 6      Q.    Have you ever been involved in a lawsuit

 7  before?

 8      A.    Not personally, no.

 9      Q.    Have you ever been involved in a lawsuit that

10  wasn't your own lawsuit?

11      A.    No.

12      Q.    I'm just trying to pick up on what you said,

13  "not personally".

14            Other than traffic tickets, have you ever had

15  any criminal convictions?

16      A.    No.

17      Q.    Can you tell me your educational background

18  from high school moving forward chronologically?

19      A.    Do you mean when I attended or what degrees I

20  hold?  Can you specify a little bit?

21      Q.    Yes.  First of all, did you graduate from

22  high school?

23      A.    Yes.

24      Q.    Where did you graduate from high school?
```

```
 1       A.   Westerville North High School.

 2       Q.   What year was that?

 3       A.   2002.

 4       Q.   Did you go to college out of high school?

 5       A.   Yes.

 6       Q.   Where did you go?

 7       A.   Ohio State University.

 8       Q.   The main campus?

 9       A.   Yes.

10       Q.   What years did you attend Ohio State?

11       A.   I attended for part of the semester Fall

12  2002.

13       Q.   For part of the semester you said?

14       A.   Yes.

15       Q.   I take it that means you did not complete the

16  semester?

17       A.   No.

18       Q.   What was the reason for not completing the

19  semester?

20       A.   I had surgery.

21       Q.   Did you return to Ohio State at some point?

22       A.   I have returned to Ohio State, yes.

23       Q.   When did you return to Ohio State?

24       A.   In March of 2013.
```

1      Q.    So after you left Ohio State in the Fall of

2   2002, what is the next educational institution you

3   attended?

4      A.    I attended Columbus State Community College.

5      Q.    When did you attend Columbus State?

6      A.    I'm not entirely sure how long I attended,

7   but I started 2003, Spring 2003.

8      Q.    Did you get a degree from Columbus State?

9      A.    No.

10      Q.    I know you don't know exactly how long you

11   attended there.  Roughly, was it a semester?  Was it a

12   couple of years?

13      A.    I would say probably three semesters.

14      Q.    After Columbus State, what is the next

15   educational institution you attended?

16      A.    Bradford School of Columbus.

17      Q.    When did you attend Bradford School?

18      A.    I'm not sure of the exact date that I began

19   attending.

20      Q.    Did you attend Bradford School directly after

21   you stopped going to Columbus State, or was there --

22      A.    No.

23      Q.    How long was there a break between Columbus

24   State and Bradford School?

14

1    A.    Probably about four years maybe.

2    Q.    What is Bradford School?

3    A.    It is an accredited trade school I believe

4  would be the best way to describe it, career school.

5    Q.    Where is it located?

6    A.    Stelzer Road.

7    Q.    Did you get a degree from Bradford School?

8    A.    Yes.

9    Q.    What degree did you get from Bradford School?

10    A.    Associate of Applied Science as a veterinary

11  technician.

12    Q.    What year did you get that degree?

13    A.    2009.

14    Q.    And did you get that degree in the spring or

15  early summer of 2009?

16    A.    Yes, it would have been summer.

17    Q.    After Bradford School, did you attend any

18  other educational institutions before you returned to

19  Ohio State?

20    A.    No.

21    Q.    You indicated you returned to Ohio State in

22  March of 2013; is that correct?

23    A.    Yes.

24    Q.    Are you still attending Ohio State?

```
 1        A.    Yes.

 2        Q.    Are you working toward a particular degree?

 3        A.    Yes.

 4        Q.    What is that?

 5        A.    Bachelor's of Science in Zoology.

 6        Q.    Do you have a projected graduation date?

 7        A.    For the Bachelor's degree, projected after

 8   spring semester of 2016, I believe.

 9        Q.    Are you in school full time?

10        A.    Yes.

11        Q.    Is that a day program?

12        A.    Yes.

13        Q.    Are you currently working anywhere?

14        A.    Yes.

15        Q.    Where are you working right now?

16        A.    Right now I work for Healthy Pets of

17   Wedgewood.

18        Q.    How long have you worked at Healthy Pets of

19   Wedgewood?

20        A.    Since October of 2013.  Yeah, October of last

21   year.

22        Q.    What hours do you work at Healthy Pets of

23   Wedgewood?

24        A.    I work roughly, I'd say, varying 12 to 20
```

1    hours a week, day shift.

2         Q.   What is Healthy Pets of Wedgewood?

3         A.   It is a veterinary clinic.

4         Q.   Where is it located?

5         A.   In Powell.

6         Q.   Do you know what road it's on?

7         A.   Attucks Drive.

8         Q.   When did you begin working at OhioHealth?

9         A.   I believe it was March or April -- I'm sorry.

10   I have to count back.   2005, I believe.

11        Q.   What position did you begin employment at

12   OhioHealth?

13        A.   Clinical receptionist.

14        Q.   At what facility?

15        A.   At Riverside Hospital.

16        Q.   What department were you in?

17        A.   Community medicine.

18        Q.   Was that full time or part time?

19        A.   It was full time.

20        Q.   What shift was that?

21        A.   It was day shift, 7:30 to 4:00 p.m.

22        Q.   From clinical receptionist, did you move to

23   another position?

24        A.   Yes.

```
 1       Q.    What was your second position at OhioHealth?

 2       A.    I transferred to medical records.

 3       Q.    At what facility?

 4       A.    Riverside.

 5       Q.    What department?

 6       A.    Medical records.

 7       Q.    Was that full time or part time?

 8       A.    That was full time.

 9       Q.    What shift was that?

10       A.    It was night shift.

11       Q.    What hours was night shift?

12       A.    11:00 p.m. to 7:00 a.m.  I'm sorry.  Did you

13   ask me what my position was there or initially where I

14   transferred to?  I just want to clarify to make sure I

15   answered correctly.

16       Q.    Sure.  To tell you the truth, I couldn't

17   tell, but the record will reflect it, but I do want to

18   know when you were in medical records, what was your

19   position?

20       A.    Senior medical records associate.

21       Q.    When did you transfer to medical records?

22       A.    I was in community medicine for about a year

23   and a half, so I would say late 2006.

24       Q.    From senior medical records associate -- did
```

1    I get the title right?

2         A.    Um-hmm.

3         Q.    Did you move to a new position?

4         A.    Yes.

5         Q.    What was your next position?

6         A.    Unit coordinator, patient care technician.

7         Q.    What facility was that at?

8         A.    Riverside Hospital.

9         Q.    And what department?

10        A.    Labor and delivery.

11        Q.    When you moved there, was that full time or

12   part time?

13        A.    Full time.

14        Q.    What shift was that?

15        A.    Night shift, 11:00 p.m. to 7:30 a.m.

16        Q.    Is that the same position that you held up

17   until the events that give rise to this lawsuit?

18        A.    Yes.

19        Q.    At some point, did you switch from full time

20   to part time in that position?

21        A.    No, I don't believe so.

22        Q.    How many hours a week were you working in

23   that position?

24        A.    30-plus, I believe.

1    Q.   What does that mean, 30-plus?

2    A.   At least 30 hours a week.

3    Q.   It was not a 40-hour-a-week job, correct?

4    A.   It was most of the time, but I would

5    occasionally only get 30 or 32 hours.

6    Q.   So does 30-plus mean you would be guaranteed

7    30-plus hours per week?

8    A.   How are you using the term "guaranteed".

9    Q.   Was your expectation that you would be

10   scheduled for at least 30 hours per week?

11   A.   Yes.

12   Q.   And being a 30-plus job, there was no

13   expectation that you would be guaranteed 40 hours a

14   week, correct?

15   A.   The initial -- I guess the easiest way to

16   explain it is the initial position was 40 hours a week;

17   but on occasion, I would decrease to 30.

18   Q.   Why would you decrease to 30?

19   A.   Due to their scheduling needs, my scheduling

20   needs.

21   Q.   What days of the week would you work?

22   A.   It varied from week to week.  I didn't always

23   have a set schedule there.

24   Q.   If your records indicate you're a part-time

```
 1    employee, do you dispute that you were less than full

 2    time?

 3         A.   I don't recall ever being less than full

 4    time.

 5         Q.   But you did say you were in a

 6    30-plus-hour-a-week job, correct?

 7         A.   Yes.

 8         Q.   Not a 40-plus-hour-a-week, correct?

 9         A.   Correct.

10         Q.   Did you have benefits at OhioHealth?

11         A.   Yes.

12         Q.   Did you have health insurance benefits

13    through OhioHealth?

14         A.   Yes.

15         Q.   Do you remember what your employee

16    contribution toward the healthcare insurance was?

17         A.   I do not remember.

18         Q.   What other benefits did you have at

19    OhioHealth?

20         A.   Dental and vision coverage.  I had a

21    healthcare savings plan and a retirement plan.

22         Q.   Now, you indicated that during your

23    employment at OhioHealth, you transferred at least two

24    times, correct?
```

1        A.    Yes.

2        Q.    How would you find out about those positions

3   to transfer to?

4        A.    On the OhioHealth internal job postings

5   board.

6        Q.    So that was something that was available for

7   you to access on a computer, or is that something

8   that's actually posted on a bulletin board?

9        A.    On a computer.

10        Q.    And what type of jobs are listed in the

11   computer?

12        A.    I think the best answer to that question

13   would be any jobs that any hiring managers within the

14   hospital have posted to it.

15        Q.    And do you know whether that's just for the

16   Riverside facility, or is it for OhioHealth as an

17   organization?

18        A.    I believe it was for OhioHealth as an

19   organization.

20        Q.    So while you were employed at OhioHealth, you

21   had access to all the posted positions throughout the

22   organization, correct?

23        A.    Yes.

24        Q.    You indicated that you transferred twice.

1    Did you put in more than two transfer requests?

2        A.   I believe at one point I did have an

3    additional request, yes.

4        Q.   And I'm talking, just to be clear, prior to

5    August of 2009, had you applied for other positions

6    besides the two that you were able to transfer to?

7        A.   Yes.

8        Q.   Okay.  Do you know how many positions you

9    applied for over the course of your employment at

10   OhioHealth up until August of 2009?

11       A.   Up until August of 2009, I'm not sure of the

12   exact number over the entire course of my employment.

13       Q.   Do you have a rough estimate of whether it

14   was one hundred or ten or one?

15       A.   Or I would say to estimate, counting the two

16   that I transferred to, maybe four or five, if that.

17       Q.   How would you apply for those transfers?

18       A.   Do you mean what's the transfer process?

19       Q.   Yes.  What's the process you had to go

20   through to apply for a position that you found on the

21   computer?

22       A.   Early on, you had to fill out a hard copy

23   paper, transfer request form, and later it went to

24   being computerized.

```
 1        Q.   So you'd locate a job you wanted, and you'd

 2   fill out a form online saying "I'm interested in this

 3   position?"

 4        A.   Yes.

 5        Q.   Would you have to submit anything else with

 6   the transfer request other than just saying "I'm

 7   interested in the position?"

 8        A.   I believe it generated a transfer application

 9   that would be sent over.

10        Q.   Did you get interviews for all the transfer

11   requests you put in up until August of 2009?

12        A.   No.

13        Q.   Prior to August of 2009, had you taken any

14   medical leaves while you were at OhioHealth?

15        A.   Yes.

16        Q.   When did you take medical leave before August

17   of 2009?

18        A.   I'm not sure of the specific date.

19        Q.   How long did you take medical leave for?

20        A.   I believe it was for one to two days.

21        Q.   Did you ever take an FMLA leave before August

22   of 2009?

23        A.   Yes.

24        Q.   How long was that leave for?
```

```
 1        A.    For the one to two days.

 2                         - - -

 3              LEAVE OF ABSENCE APPLICATION, DATED

 4              6/11/09, BATES-STAMPED EEOC V. OHC

 5              161-162 WAS MARKED AS STONE

 6              DEPOSITION EXHIBIT 1.

 7                         - - -

 8        Q.    Showing you a document which was marked as an

 9   exhibit, Stone 1, do you recognize this document as a

10   leave of absence application that you submitted in June

11   of 2009?

12        A.    I do not recall this specific occurrence of

13   submitting this, but this is my handwriting and my

14   signature on the form.

15        Q.    But you have no recollection of being out for

16   this period of time in June of 2009?

17        A.    It was a long time ago, but I do, after

18   reviewing this, remember being out.

19        Q.    And OhioHealth allowed you to take this

20   leave, correct?

21        A.    I believe so, yes.

22        Q.    And when your leave was over, you came back

23   and returned to work; is that correct?

24        A.    To the best of my knowledge, yes.
```

```
 1        Q.   It looks like there's a signature of a

 2   Kimberly Stock, M.D.  Do you know who Dr. Stock is?

 3        A.   Yes.

 4        Q.   Who is Dr. Stock?

 5        A.   She is my primary care physician.

 6        Q.   How long have you been seeing Dr. Stock?

 7        A.   Probably for at least 15 years.

 8        Q.   Where is Dr. Stock's office located?

 9        A.   In Westerville.

10        Q.   Do you know what road in Westerville?

11        A.   I believe the name of the road is Huber

12   Village Boulevard.

13        Q.   If you look at the second page of this

14   document, it says, "Describe the medical facts that

15   support your certification," and it indicates

16   "Migraines, H/A, blurred vision."  Do you see that?

17        A.   Yes.

18        Q.   Dr. Stock had not diagnosed you with

19   narcolepsy, correct?  At least at this point, correct?

20        A.   Not at this point, no.

21        Q.   At some point, were you diagnosed with

22   narcolepsy?

23        A.   Yes.

24        Q.   And who diagnosed you with the narcolepsy?
```

```
 1        A.   Dr. Dan Jones.

 2        Q.   Do you remember when Dr. Jones diagnosed you

 3   with narcolepsy?

 4        A.   It was in 2009; August, I believe.

 5        Q.   How did you end up seeing Dr. Jones?

 6        A.   I followed up with him after an ER visit.

 7        Q.   So you had some sort of event that lead you

 8   to the ER?

 9        A.   Yes.

10        Q.   When was that?

11        A.   I know it was during the summer.  I'm not

12   sure of the specific date.

13        Q.   Were you admitted to the hospital at that

14   time?

15        A.   No.

16        Q.   Did the treaters in the ER refer you to

17   Dr. Jones, or did your primary care physician refer you

18   to Dr. Jones?

19        A.   They recommended I follow up with a

20   neurologist in the ER.

21        Q.   And which ER was that?

22        A.   I believe it was Riverside's ER.

23        Q.   Do you remember when you first saw Dr. Jones?

24        A.   Yes.
```

1        Q.    When was that?

2        A.    It was following a seizure that I had.

3        Q.    Was that seizure different than the event

4    that took you to the ER?

5        A.    Yes.

6        Q.    So just so I'm clear, when you left the ER

7    and they told you to see a neurologist, did you make an

8    appointment with a neurologist at that point in time?

9        A.    I'm sorry.  Can you repeat that?

10       Q.    Sure.  You said that you were in the ER.

11   They told you you should follow up with a neurologist.

12   So my question is, when you left the ER, did you make

13   an appointment with a neurologist at that point in

14   time, or did you wait until you had this seizure you

15   mentioned before you made an appointment?

16       A.    The seizure was prior to my hospitalization

17   that lead to me following up with Dr. Jones.  I had

18   seen him before.

19       Q.    So when did you first see Dr. Jones?

20       A.    The very first time I saw Dr. Jones, I

21   believe, would have been the Summer of 2005.

22       Q.    Why did you see him in the Summer of 2005?

23       A.    As a follow-up for the seizure that I had.

24       Q.    So you had a seizure in 2005?

1        A.    Yes.

2        Q.    Did Dr. Jones diagnose you back in 2005 with

3   any neurological condition?

4        A.    No.

5        Q.    So fast forward from 2005 to the Summer of

6   2009.  You said you had an episode that took you to the

7   ER, and they told you to follow up with a neurologist,

8   you then made an appointment with Dr. Jones at that

9   point in time?

10        A.    Yes.

11        Q.    So was this the first time you were scheduled

12   to see Dr. Jones since 2005?

13        A.    No.

14        Q.    Had you been treating with Dr. Jones between

15   2005 and 2009?

16        A.    I had followed up with him.

17        Q.    I want to focus now on the Summer of 2009 and

18   after you went to the ER and they said you needed to

19   follow up with a neurologist.  You said you made an

20   appointment with Dr. Jones.  So when did you see

21   Dr. Jones at that point?

22        A.    Again, I'm not sure of the specific date of

23   my original appointment following my ER visit.

24        Q.    Did Dr. Jones diagnose you with any condition

1  on your first visit to see him?

2      A.   You mean during the initial visit following

3  the emergency room?

4      Q.   Correct.

5      A.   No, I don't believe he did on the initial.

6      Q.   How many visits did you have with Dr. Jones

7  before he diagnosed you with a condition?

8      A.   I'd say maybe two or three.

9      Q.   Do you remember what condition he diagnosed

10  you as having?

11      A.   He diagnosed me with narcolepsy.

12      Q.   Did he put any restrictions on your ability

13  to engage in any activities at that point in time?

14      A.   The only restrictions he gave me was that I

15  could not work night shift.

16      Q.   Did you convey that restriction to

17  OhioHealth?

18      A.   Yes.

19      Q.   And who at OhioHealth did you first tell?

20      A.   To the best of my memory, I believe I

21  mentioned it to my department supervisor first and as

22  well as Employee Health and Wellness.

23      Q.   Who was your department supervisor?

24      A.   Department supervisor would have been Mary --

1    her last name was Englehart or Eaglehart.

2       Q.   When you told Ms. Englehart you had this

3    restriction, what was her response to you?

4       A.   That I needed to -- I believe her response

5    was that I needed to speak with Employee Health and

6    Wellness.

7       Q.   So did you go see Employee Health and

8    Wellness at the direction of Ms. Englehart, or had you

9    already done that?

10      A.   I'm not entirely sure which floor I visited

11   first in that building when I went to figure out what I

12   needed to do.

13      Q.   I take it if you don't know whether you saw

14   your supervisor or Employee Health and Wellness first,

15   you were familiar with Employee Health and Wellness

16   then?

17      A.   At that point in time, I was familiar with

18   the existence of the department.

19      Q.   When you requested your leave that's

20   reflected in Stone 1, did you visit Employee Health and

21   Wellness with respect to this leave?

22      A.   I do not recall if I actually visited

23   Employee Health and Wellness or not.

24      Q.   When you went to Employee Health and

1    Wellness, do you remember who you spoke with when you

2    first went there?

3         A.    There would have been a receptionist sitting

4    at the front desk.

5         Q.    What happened when you walked in and talked

6    to the receptionist?

7         A.    Specifically I don't remember exact

8    conversation.  I explained my diagnosis and told them

9    my doctor's instructions, and I was told that I would

10   need to meet with a caseworker.

11                    - - -

12             NOTE TO MS. MILLER FROM MS. SIPES,

13             DATED 8/31/09, BATES-STAMPED EEOC

14             V. OHC 487 WAS MARKED AS STONE

15             DEPOSITION EXHIBIT 2.

16                    - - -

17        Q.    I've placed before you what has been marked

18   as Stone 2, which is a document we have produced in

19   this case, and I realize this is not a message that was

20   sent to you, but I was wondering if this might help

21   refresh your memory about who you met and what

22   happened.  First of all, the date of this is August 31,

23   2009.  Does that seem about the time you first went to

24   Employee Health and Wellness or Associate Health and

1    Wellness?

2       A.   I missed the first part of that.  I'm sorry.

3    Could you repeat it?

4       Q.   Yes.  This document is dated August 31, 2009,

5    and I was wondering if that seems about the time that

6    you first went to Associate Health & Wellness?

7       A.   I believe the first time I went to Associate

8    Health & Wellness was August 10th, 2009.

9       Q.   Do you have any records that reflect that?

10      A.   I am not sure.

11      Q.   So why do you think it was August 10th, 2009?

12      A.   That was the day that I was diagnosed with

13   narcolepsy and was told that I could not work night

14   shift by Dr. Jones.

15      Q.   Why do you remember that being August 10th of

16   2009?

17      A.   I'm not sure.  It's just the date that I

18   remember.

19      Q.   When you first went into Associate Health and

20   Wellness, did you just speak with the receptionist, or

21   did you get to speak with anyone else there?

22      A.   As far as I remember, it was just the

23   receptionist on the initial date that I stopped in.

24      Q.   Was there a meeting set up with you to

```
 1   meet -- did the receptionist set up a meeting for

 2   somebody to meet with you?

 3        A.   I'm not sure.

 4        Q.   Do you know when you next went back to

 5   Associate Health & Wellness?

 6        A.   The next time I went back was to meet with my

 7   caseworker.

 8        Q.   Do you know when that was?

 9        A.   I believe it was roughly about a week after I

10   had stopped in.

11        Q.   Who was the caseworker that you met with?

12        A.   Nancy Miller.

13        Q.   So this document that I've shown you is from

14   Kathy Sipes.  Do you recall meeting Kathy Sipes?

15        A.   The name does not ring a bell, but she may

16   have been the person working at the reception desk when

17   I went in.

18        Q.   So do you believe that this is inaccurate

19   where she says on August 31, 2009, that she had a

20   walk-in conversation with you on that date?

21        A.   I am not sure.

22        Q.   So when you first informed Associate Health

23   and Wellness that you couldn't work nights, did

24   anything change about your employment?
```

1       A.   How do you mean?

2       Q.   Did they take you off the schedule for

3  nights?

4       A.   I did come off the schedule for night shift.

5       Q.   Do you remember when you came off the

6  schedule for night shift?

7       A.   I believe it was effective immediately.

8       Q.   Do you remember when that date was?

9       A.   No.

10       Q.   We'll look at some other documents later, but

11  I haven't seen -- I'm just sort of curious about this

12  August 10th date, and you say you have no documents

13  that support the fact that the first time you went to

14  the Associate Health and Wellness was August 10th?

15       A.   Not that I can think of right now.

16       Q.   Did you bring any documents to Associate

17  Health and Wellness with you when you first went?

18       A.   I believe I brought a note from my physician.

19       Q.   Do you have a copy of that note?

20       A.   No, I do not.

21       Q.   Does your doctor have a copy of that note?

22       A.   I do not know.

23       Q.   Have you requested your doctor's medical

24  records?

1        A.    Yes.

2        Q.    Have you received your doctor's medical

3    records?

4        A.    I have.

5        Q.    Have you produced your doctor's medical

6    records?

7        A.    What do you mean?

8        Q.    Well, we've requested your doctor's medical

9    records; and late last night, I received about ten

10   pages of records, but none of them which are very

11   helpful, and there's no note in here.  So I was

12   wondering -- how thick were the medical records you

13   received from your doctor?

14       A.    I do not know.  It was an electronic file.

15       Q.    So you have an electronic file somewhere of

16   your medical records?

17       A.    My doctor's office does.

18       Q.    And were they produced to you?

19       A.    Yes.

20       Q.    In electronic form or paper form?

21       A.    In electronic form.

22       Q.    So you have them on your computer somewhere?

23       A.    I do not believe I saved them to my computer.

24       Q.    Were they in an e-mail?  How did they

```
 1   communicate those to you?
 2        A.   I believe they sent it through e-mail.
 3        Q.   Did you review the medical records when you
 4   received them?
 5        A.   Not -- no.
 6        Q.   Did you have to pay for the records?
 7        A.   No.
 8        Q.   Did you ever provide this note to the EEOC?
 9             MS. LAWS:  Objection.
10        Q.   You can answer the question.
11        A.   To my knowledge, I -- honestly, I don't know
12   if I did or not.
13        Q.   So is it your testimony that the first
14   person, other than the receptionist, that you spoke to
15   was Nancy Miller in Associate Health and Wellness?
16        A.   I believe Nancy Miller was the second person
17   that I met with, spoke with in Employee Health and
18   Wellness.
19        Q.   Between the time that you walked into
20   Associate Health and Wellness and the time you met with
21   Nancy Miller, were you taken off the schedule?
22        A.   I believe so.
23        Q.   Were you offered any other hours other than
24   your night shift hours?
```

```
 1      A.    Yes.

 2      Q.    What hours were you offered?

 3      A.    Evening shift hours.

 4      Q.    And who offered you the evening shift hours?

 5      A.    My supervisor.

 6      Q.    And what hours were you offered?

 7      A.    It was evening shift, so it would be between

 8  the hours of 3:30 p.m. to 11:00 p.m.

 9      Q.    Did you work those hours?

10      A.    I believe I did work a few of the shifts.

11      Q.    Do you remember when you started working

12  those shifts?

13      A.    No, I don't remember.

14      Q.    Do you remember when you stopped working

15  evening shifts?

16      A.    I don't remember the date.

17      Q.    Do you remember why you stopped working

18  evening shifts?

19      A.    Yes.

20      Q.    Why is that?

21      A.    Because I followed up with my neurologist,

22  Dr. Jones, and he further specified day shift only.

23      Q.    Do you remember when that was?

24      A.    I'm not sure of the exact date.
```

 1      Q.   Do you remember when your first meeting with

 2   Nancy Miller was?

 3      A.   I believe it would have been on -- I believe

 4   it was September 10th.

 5      Q.   Tell me what you and Ms. Miller discussed in

 6   your first meeting.

 7      A.   We discussed my restrictions and discussed

 8   the plan as far as temporarily picking up in evenings

 9   in the department I was working in at the time.  I

10   believe the initial meeting with her was relatively

11   brief.

12      Q.   And your restrictions at that time as you

13   understood them were no night shift, correct?

14      A.   Correct.

15      Q.   So you did get set up on evening shift,

16   correct?

17      A.   Yes.

18      Q.   Did you have a follow-up meeting then with

19   Ms. Miller?

20      A.   I believe I met with her again when my doctor

21   specified day shift only.

22                          - - -

23           "DISABILITIES AND REASONABLE

24           ACCOMMODATIONS POLICY, ASSOCIATE

```
 1            REQUEST FOR ACCOMMODATION FORM,"

 2            DATED 9/18/09, EEOC V. OHC

 3            BATES-STAMPED 168 WAS MARKED AS

 4            STONE DEPOSITION EXHIBIT 3.

 5                         - - -

 6    Q.   I'm showing you what has been marked as

 7  Exhibit 3.  I'm going to also mark and show you Exhibit

 8  4.

 9                         - - -

10            "DISABILITIES AND REASONABLE

11            ACCOMMODATION POLICY, DOCUMENTATION

12            OF DISABILITY/FUNCTIONAL

13            LIMITATIONS FORM," DATED 9/18/09,

14            BATES-STAMPED EEOC V. OHC 166-167

15            WAS MARKED AS STONE DEPOSITION

16            EXHIBIT 4.

17                         - - -

18    Q.   Do you recognize Exhibits 3 and 4?

19    A.   Yes.

20    Q.   Exhibit 3 is titled "Disabilities and

21  Reasonable Accommodation Policy, Associate Request for

22  Accommodation Form;" is that correct?

23    A.   Yes.

24    Q.   And this is your signature at the bottom of
```

1    the form?

2         A.   Yes.

3         Q.   The date on the form is September 18th, 2009;

4    is that correct?

5         A.   Yes, that is correct.

6         Q.   Is this the date that you submitted this to

7    Associate Health and Wellness?

8         A.   I believe so, yes.

9         Q.   Where did you get this form?

10        A.   I believe -- I'm not entirely sure.  I don't

11   remember specifically where I got it from.

12        Q.   Did Ms. Miller provide you with a copy of

13   this form when you met with her the first time?

14        A.   She may have.

15        Q.   And the accommodation request that you were

16   seeking is a day shift position, correct?

17        A.   Yes.

18        Q.   And if you look at Exhibit 4, this form is

19   entitled "Disabilities and Reasonable Accommodation

20   Policy, Documentation Of Disability/Functional

21   Limitations Form."  Do you see that?

22        A.   Yes.

23        Q.   And this is to be completed by the diagnosing

24   professional?  Do you see that in the upper right-hand

1    corner?

2        A.   Yes.

3        Q.   Is this a form that you then had your doctor

4    complete?

5        A.   Yes.

6        Q.   Is this a form that Ms. Miller provided to

7    you in your first meeting with her?

8        A.   I believe I received this form when I

9    received the form that's labeled Stone 3.

10       Q.   But did you get these from Associate Health

11   and Wellness?

12       A.   Again, I'm not entirely sure.

13       Q.   You took Exhibit 4 to Dr. Jones and had him

14   complete it; is that correct?

15       A.   Yes.

16       Q.   And I notice that the restrictions, he

17   indicates "No work restriction except needs day shift

18   for sleep disorder/narcolepsy."  Do you see that?

19       A.   Yes.

20       Q.   Is this a time when you believe he changed

21   your restrictions from no night shift to you need to

22   work day shift?

23       A.   Yes.

24       Q.   And did you bring these forms in and talk

1    with Ms. Miller about the new diagnosis and

2    restrictions?

3        A.   I submitted them immediately upon completion.

4    I believe, to my understanding, Ms. Miller received

5    them the same day.

6        Q.   Do you remember how you submitted them?

7        A.   I believe I submitted them in person to

8    Associate Health and Wellness.

9        Q.   On the day you submitted them, do you recall

10   whether you talked with anybody?

11       A.   I do not recall.

12       Q.   At some point, did you meet with Ms. Miller

13   to discuss your need to work day shift?

14       A.   Yes.

15       Q.   Was that the next meeting you had with

16   Ms. Miller?

17       A.   Yes.

18       Q.   Tell me about -- first of all, do you know

19   when that conversation occurred?

20       A.   I am not sure of the exact date.

21       Q.   Tell me what you remember about that

22   conversation.

23       A.   I remember Ms. Miller explaining to me that

24   there were no day shift hours available in labor and

1  delivery.  She explained that I would need to be placed

2  in a different department for a day shift position, and

3  she recommended for me to take a leave of absence until

4  a position could be -- until I could be placed into a

5  position.  Mainly her focus for that was so that I

6  wasn't not receiving any pay during the time that I was

7  waiting to get back to work on day shift.

8          She was very confident that it would take a

9  few weeks, said there were plenty of positions open,

10  and I felt pretty confident in her commitment.  She

11  said she was making it a priority and that I would be

12  given priority for interviews because it was an

13  accommodation request.

14          She instructed me to check on the job board

15  and just browse through the internal job postings and

16  apply for any that I could.

17      Q.   Had you asked Nancy Miller or expressed to

18  Nancy Miller your desire to stay in labor and delivery?

19      A.   I believe that I was open to going to another

20  department since labor and delivery did not have day

21  shift available.

22      Q.   Right.  I was wondering whether you had asked

23  Ms. Miller if you could stay in labor and delivery and

24  that's how she knew there was nothing available in

44

1    labor and delivery.

2        A.    I'm not sure how she knew there was nothing

3    available in labor and delivery.

4                         - - -

5            LOG BATES-STAMPED EEOC V. OHC

6            470-486 WAS MARKED AS STONE

7            DEPOSITION EXHIBIT 5.

8                         - - -

9        Q.    Again, I placed before you a document that we

10   produced to you in discovery which has been identified

11   as Stone 5.  I realize that these are not your notes,

12   but wanted to at least let you follow along while I

13   asked you questions to see whether it refreshes your

14   memory or not.  This is a log that's in reverse

15   chronological order.  So actually to put it in

16   chronological order, I'm going to start at the back of

17   the document on page 17.

18           So the first note indicates that on

19   August 31, 2009 -- it's a note from Ms. Miller that

20   says that you had walked in and "Stated just came from

21   physician and was told can no longer work night shift

22   at all."  Do you recall having a conversation with

23   Ms. Miller at the end of August where you told her

24   that?

```
 1        A.   I remember having a conversation with
 2   somebody.  I'm not sure of the specific date or who it
 3   was when I went there, but I did go there right after
 4   seeing my doctor.
 5        Q.   And, actually, I realize looking at this the
 6   user name is N. Miller, but at the end it say K. Sipes.
 7   You don't recall Ms. Sipes?
 8             MS. LAWS:  Objection; asked and answered.
 9        Q.   You can answer.
10        A.   I don't recall the specific name.
11        Q.   Do you have any documentation to show that
12   the August 31st date is inaccurate?
13        A.   Not to my knowledge.
14        Q.   So after you presented Associate Health and
15   Wellness Exhibits 3 and 4 indicating you needed to work
16   day shift and you had your initial conversation with
17   Ms. Miller about that, did you continue to have
18   conversations with Ms. Miller about trying to find a
19   day shift position?
20        A.   I'm not sure what you mean by continue to
21   have conversations with her.  Do you mean did I meet
22   with her regularly?
23        Q.   Well, I'll break it down for you.  Did you
24   have any additional in-person meetings with Ms. Miller?
```

1        A.   I don't believe after the second meeting that

2   we met again in person.

3        Q.   And the second meeting, meaning the meeting

4   where you discussed Exhibits 3 and 4?

5        A.   Yes.

6        Q.   Okay.  You discussed your restriction to day

7   shift only?

8        A.   Correct.

9        Q.   So after that meeting, you don't believe you

10  had any more in-person meetings with Ms. Miller?

11       A.   No, I don't believe so.

12       Q.   Did you and Ms. Miller talk on the telephone?

13       A.   Yes.

14       Q.   How often did you and Ms. Miller talk on the

15  phone?

16       A.   Very infrequently.

17       Q.   How do you define very infrequently?

18       A.   I would say -- are you wanting a number, or

19  like just an explanation?

20       Q.   You used the term "very infrequently".  I'm

21  trying to find out what you mean by very infrequently.

22  Are we talking about once a week, once every other

23  week?

24       A.   I actually maybe heard from her once every

1    three to five weeks.

2        Q.    When you say you heard from her, what does

3    that mean; that you actually spoke on the phone or that

4    she left you a message or what?

5            MS. LAWS:  Objection; compound question.

6        Q.    You can answer.

7        A.    Most of our communication was through

8    voicemail.

9        Q.    So when you say you only heard from her once

10   every three to five weeks, are you saying you would

11   receive a voicemail every three to five weeks?

12       A.    Yes, I would receive a phone call and

13   voicemail roughly every three to five weeks, but not

14   strictly every three to five weeks.  That's an

15   estimate.

16       Q.    Was she calling you, or were you calling her?

17       A.    That's how often she would call me.  That's

18   how often I would hear from her.

19       Q.    Okay.

20       A.    I called her probably at least two or three

21   times a week, maybe sometimes multiple times in one

22   day.

23       Q.    What were the nature of your calls to her?

24       A.    To follow up -- she had instructed me to let

48

1    her know any positions that I had applied for, to find

2    out from her how things were progressing, if I needed

3    to do anything else to try and stay on top of things

4    and keep things progressing.

5        Q.   How many times did you actually speak with

6    her?

7        A.   Maybe -- over the course of what period of

8    time?  Start to finish?  The whole process?

9        Q.   Start to finish.

10       A.   I think maybe once or twice, possibly three

11   times.

12       Q.   Have you had a chance to review the document

13   that we produced in discovery that I've marked as

14   Exhibit 5?

15       A.   No.

16       Q.   Have you seen any of the documents that we've

17   provided as part of the litigation?

18            MS. LAWS:  Objection.

19       A.   Yes.

20       Q.   Did you keep any contemporaneous notes of the

21   times that you spoke with Ms. Miller?

22       A.   I'm sorry?

23       Q.   Did you keep notes -- did you keep a diary or

24   anything like that that reflected the times when you

1    called Ms. Miller and the times she called you?

2        A.   No.

3        Q.   If you look through this document, it

4    reflects several phone calls between you and

5    Ms. Miller, or voicemails.  For example, if you look on

6    page 16, it's indicates that there was communication on

7    September 15th; and if you look at page 15, it

8    indicates that there's communication on September 18th.

9    If you look at page 14, it indicates there's

10   communication on September 24th.  If you look at page

11   13, it indicates that there's communication on

12   October 2nd, October 5th, October 12th.  Do you see

13   that?

14       A.   Give me just one second.  I'm still looking

15   at the September 24th.  I do not see where there was

16   communication.

17       Q.   On page 14?

18       A.   Yes.

19            MS. LAWS:  Perhaps you could point out a

20   specific paragraph or segment.

21       Q.   It's underneath the first line.  It says, "PC

22   to EE.  Left voicemail to voicemail."

23       A.   I thought you were referring to instances

24   where we actually spoke.  So are you considering a

1    voicemail communication?

2        Q.   Yes.  You said you communicated a lot through

3    voicemail.

4        A.   Okay.

5        Q.   So in addition to actually speaking, I guess

6    my -- at least looking at this log here, which I

7    understand is not your log, but this log indicates that

8    Ms. Miller was in communication with you a lot more

9    frequently than you recall, and I was wondering whether

10   this changes your recollection?

11       A.   I do not recall her contacting me this

12   frequently.

13       Q.   Do you have any evidence that she fabricated

14   these entries?

15            MS. LAWS:  Objection.

16       A.   I believe my phone records would reflect how

17   often she actually called my phone.

18       Q.   If you look on page 12, there's an entry from

19   October 16th.  It's the first entry on the page.

20       A.   Okay.

21       Q.   And it's discussing a possible opportunity

22   for a job 3:00 to 7:00 p.m.  Do you remember there

23   being some discussion about putting you on a job 3:00

24   to 7:00 p.m.?

```
1        A.   This wasn't to put me in a job 3:00 to

2   7:00 p.m.  It was to pick up a four-hour shift in labor

3   and delivery from that time period during that time.

4        Q.   So was that something that Ms. Miller

5   identified for you?

6        A.   No.

7        Q.   How did that come about?

8        A.   The labor and delivery department manager

9   called me and said that her evening shift person had

10  called off, and wanted to know if I was able to come in

11  and work from 3:00 to 7:00 p.m.  I told her that I

12  wasn't sure, that I didn't think I was allowed to, and

13  I would have to check with Nancy Miller, and made

14  several attempts to reach Nancy, and didn't hear back

15  from her, so consequently told the manager that I could

16  not pick up the shift.

17       Q.   On page 11, there's a note from October 16th

18  that indicates that a call from you was transferred to

19  Rose Cacioppo.  Do you remember speaking with Rose?

20       A.   The name does not ring a bell.

21       Q.   So that's also on the 16th.  Was this shift,

22  this 3:00 to 7:00 shift -- is it your testimony that

23  was just to work one night, or was it to work multiple

24  nights?
```

1      A.    It was just to work one four-hour shift due

2    to a call-off.

3      Q.    And you say you don't recall talking to Rose?

4      A.    I may -- it may have been somebody I spoke

5    with when I was attempting to reach Ms. Miller.  I made

6    several attempts to call, and I don't recall the names

7    of each person I spoke with.

8      Q.    Looking back on page 13, do you see the

9    entry -- there's an entry, it's the fourth one down

10   from October 2nd, and it says, "Phone call to employee

11   to discuss job leads; however, an alternative emergent

12   phone call was received and case manager was unable to

13   complete phone conversation with associate.  Return

14   call to the associate approximately 20 minutes.  Left a

15   voicemail asking for return call to continue

16   conversations."  Do you see that?

17     A.    Yes, I see that.

18     Q.    Did that conversation occur?

19     A.    I do recall a phone call with Ms. Miller

20   where she had to -- within seconds of answering, she

21   immediately had to get off the line, and said she would

22   call me back, but I do not have any recollection -- I

23   don't have any memory of her calling me back.  I did

24   not receive any voicemail.

```
 1        Q.   If you look at page 10, there's an entry at

 2   the bottom of the page from October 20th where it says,

 3   "Contact with employee.  Reviewed jobs that were

 4   located.  Employee has applied for them and CM will

 5   follow up with ES contact."  Do you see that?

 6        A.   Yes.

 7        Q.   Do you recall that conversation occurring?

 8        A.   I do have some recollection of a conversation

 9   to that extent, yes.

10        Q.   Do you remember anything more about the

11   conversation than what is listed on page 10?

12        A.   Are you able to tell me what ES stands for

13   and what EE is referring to?

14        Q.   I believe EE is shorthand for employee.

15        A.   Okay.

16             MS. D'ANDREA:  ES is environmental services.

17        Q.   ES is -- I'm not exactly sure.  It may be

18   environmental services, but I can't say for sure.

19        A.   I do not remember any conversations regarding

20   environmental services.

21        Q.   Do you remember a conversation with Nancy

22   Miller, though, where you talked about you reviewed

23   jobs that were located and, in effect, you had applied

24   for some jobs?
```

1          A.    Yes.

2          Q.    Then if you look at page 9, at the bottom of

3     the page there's an entry from October 23rd, which

4     says, "I told Laura that it would be around 29/30

5     before we had more information about these positions.

6     So she is not expecting news any sooner.  I will hold

7     off talking with her until you let me know it's okay to

8     do so."

9              Do you remember having a conversation with

10    Ms. Miller where she told you that you wouldn't hear

11    any information until the 29th or 30th?

12         A.    No.

13         Q.    Right above that, there's an entry from

14    October 28th, and it says, "PC" -- which I believe

15    means phone call -- "to EE to see if she had been

16    contacted by EmmaLee P. re: Dublin job.  Left

17    voicemail."

18              Do you recall receiving a voicemail from

19    Ms. Miller to see if you had been contacted by EmmaLee?

20         A.    I remember receiving a voicemail from

21    Ms. Miller stating that I should be expecting a phone

22    call from someone at Dublin, but I do not remember a

23    voicemail on her following up to see if they actually

24    called me.

1       Q.   On page 8, there's an entry from November 5th

2   where it says, "Contact with EE.  Advised her that WAPS

3   has contacted Employment Spec, but that EmmaLee is out

4   of office until 11/9.  Will update her once response is

5   received from ES."  Do you see that?

6       A.   Yes.

7       Q.   Do you recall talking to Ms. Miller and

8   receiving that information?

9       A.   I recall receiving a voicemail from her

10   stating that the supervisor at Dublin was going to be

11   out of her office, and that she would let me know as

12   soon as she found out why I had not heard from her yet.

13       Q.   At the top of the page, same page, there's an

14   entry from November 16th that says, "Contact with

15   employee to provide update from HR at Dublin and to set

16   meeting date.  Need to update rehab plan and set new

17   goals, et cetera."  Do you see that?

18       A.   Yes.

19       Q.   Do you recall having a conversation with

20   Ms. Miller where that was discussed?

21       A.   I recall a -- I do remember a voicemail where

22   she wanted to update the rehab plan, and had mentioned

23   that Dublin was not going to be calling me.  I do not

24   recall exactly what date that was on.

1          Q.   If you look at page 7, there's a second phone

2     call from your entry from November 16th.  This one at

3     1:12 p.m., indicating "Spoke with employee.  She has

4     not applied for anything besides Dublin positions.  She

5     will look at JB on 11/18, as will WPAS."  Do you see

6     that?

7          A.   Yes.

8          Q.   Do you remember having a conversation with

9     Ms. Miller where this information was discussed?

10          A.   Absolutely not.

11          Q.   At the top of this page, there's an entry of

12     December 9th that says, "PC to employee.  Left

13     voicemail to see if she would be interested in job at

14     Grady."  Do you recall Ms. Miller calling you and

15     asking you if you'd be interested in a job at Grady?

16          A.   I recall that being mentioned in a voicemail,

17     but I believe it was the same voicemail where she had

18     mentioned updating my plan that you pointed out on the

19     previous page.

20          Q.   On page 6, there's an entry from

21     December 14th, 2009, which says "Received call from

22     employee.  Did not leave new phone number.  Tried to

23     call old number.  Left voicemail."  Do you see that?

24          A.   Yes.

1      Q.    So, first of all, did you change phone

2    numbers around this time?

3      A.    No.

4      Q.    Did you ever have a conversation with

5    Ms. Miller that you recall about not having your phone

6    number?

7      A.    No.

8      Q.    Did you ever have a discussion with

9    Ms. Miller where you indicated to her that you weren't

10   receiving messages from her?

11     A.    I don't believe we had a conversation in

12   person regarding that.  I may have mentioned it in a

13   voicemail that I left for her stating that I haven't

14   heard back from her.

15     Q.    If you look directly above that, after it

16   says "New phone 395-3416," and that's an entry of

17   12/21/2009.  Do you see that?  Do you see the entry I'm

18   looking at in the middle of the page?

19     A.    Yes.

20     Q.    Did you call Ms. Miller and give her a new

21   phone number for you?

22     A.    No.

23     Q.    Did Ms. Miller ever tell you that she was

24   leaving messages that weren't being returned?

```
 1        A.   No.

 2             MS. LAWS:  Dave, I'm sorry to interrupt.  I

 3   notice it's 11:00, and Ms. Stone alerted me earlier

 4   that she has to take medications a couple times a day,

 5   so if we could take a few minutes.

 6             MR. WHITCOMB:  Perfect.

 7             MS. LAWS:  Thank you.

 8             (Short recess taken.)

 9   BY MR. WHITCOMB:

10        Q.   We just took a break so you could take some

11   medication.  I'm not necessarily wanting to know what

12   medication you're taking, but does your medication in

13   any way affect your ability to testify truthfully?

14        A.   No.

15        Q.   And there's no reason you can't testify

16   truthfully today?

17        A.   No reason.

18        Q.   Going back to this log that we've been

19   looking at, Stone 5, there's an entry on page 5, which

20   is from -- it's actually a note from Nancy Miller to

21   Kerry Huston, but it says, "Feel free to contact Laura

22   Stone at 345-3476."  Are you familiar with that phone

23   number?

24        A.   No.
```

1      Q.    Have you ever used that phone number?

2      A.    No.

3      Q.    Do you know whose number that is?

4      A.    No.

5      Q.    On page 4, there's an entry which says

6  "Contact with employee."  It's 12/21/09, and it says,

7  "Contact with employee to confirm new phone number."

8  Do you recall having a conversation with Ms. Miller

9  where she confirmed your new phone number?

10      A.    No.

11      Q.    I was looking at the phone records that were

12  provided; although, they're substantially redacted, but

13  there are two numbers here that are listed on your

14  calling plan.  One is (614)395-3416.  Is that your cell

15  phone?

16      A.    Yes.

17      Q.    There's another number that's listed as

18  (614)395-2341.  What is that number?

19      A.    That was a second line that was on the

20  account.

21      Q.    And who uses that phone?

22      A.    My boyfriend at the time.

23      Q.    What is his name?

24      A.    Aaron Ward.

```
 1        Q.    How is that spelled?

 2        A.    A-a-r-o-n W-a-r-d.

 3        Q.    Did you ever live with Aaron Ward?

 4        A.    Yes.

 5        Q.    What was the address you lived at with Aaron

 6   Ward?

 7        A.    I am not sure.  It was off of East Broad

 8   Street in an apartment complex.  I believe it was on

 9   Rosalind Court.

10        Q.    What period of time did you live with Aaron

11   Ward?

12        A.    I lived with him for the duration of most of

13   my employment at Riverside.

14        Q.    When did you stop living with him?

15        A.    I believe I moved back in with my mother -- I

16   moved out, I believe, during the Summer of 2009.

17        Q.    So you stopped living with Aaron Ward before

18   you were diagnosed with narcolepsy?

19        A.    I believe so.

20        Q.    At the address that you lived with Aaron

21   Ward, was there a land line?

22        A.    No.

23        Q.    Did he have any other phones?

24        A.    No, not to my knowledge.
```

1        Q.    These phone bills are addressed to 1660

2   Milford Avenue.  Who lives at 1660 Milford Avenue?

3        A.    That's my father's address.

4        Q.    What is his name?

5        A.    Michael Stone.

6        Q.    Does he have a land line there?

7        A.    Currently, no.  I'm not sure if he did --

8        Q.    In 2009?

9        A.    No, I'm not sure.

10       Q.    So looking back at page 4 of our exhibit,

11  this entry on 12/21/09 where it says "Contact with

12  employee to confirm new phone number," is it your

13  testimony that you don't recall any conversations with

14  Nancy Miller about your phone number?

15       A.    I do not, no.

16       Q.    Is it possible that it happened and you just

17  don't recall it, or are you saying it didn't happen?

18       A.    I'm saying I do not remember it happening.

19       Q.    If you look at page 3 of our document,

20  there's an entry at the very top of the page from

21  January 15th, 2010.  It says, "PC to EE.  Left

22  voicemail to provide EE with job leads."  Do you recall

23  a conversation in January of 2010 where Ms. Miller left

24  you a voicemail with some job leads?

1        A.    No.

2        Q.    If you look at page 2, at the top, Nancy

3    Miller made a note about identifying you as somebody

4    who might be interested in an intern position.  Did you

5    have a conversation with Ms. Miller where she talked to

6    you about potentially interviewing for an intern

7    position?

8        A.    No.

9        Q.    You don't recall anything about an intern

10   position?

11       A.    I do not recall speaking with Ms. Miller

12   about an intern position.

13       Q.    Did you ever trade voicemail messages about

14   an intern position?

15       A.    I may have called her in regards to it, but I

16   did not receive any contact from her regarding an

17   intern position.

18       Q.    If you look at page 1 of the document,

19   there's an entry from January 28th, which says "Advised

20   employee that Amiel would be calling to set up

21   interview for work trial."  Do you recall that

22   conversation or message?

23       A.    No.

24       Q.    Do you remember Ms. Miller discussing with

```
 1    you the possibility of a work trial?

 2         A.   No.

 3         Q.   There's an entry on February 8th, 2010.  It

 4    says, "Follow up on any job leads provided by

 5    employee."  Did you provide Ms. Miller with job leads?

 6         A.   I always contacted her and left information

 7    about any positions I had applied for.

 8         Q.   Let's talk about the job you applied for in a

 9    second, but I want to show you another exhibit before

10    we get to that.

11                         - - -

12              "TRANSCRIPT OF VOICE MESSAGES,

13              BATES-STAMPED EEOC 159-160 WAS

14              MARKED AS STONE DEPOSITION EXHIBIT

15              6.

16                         - - -

17         Q.   Showing you what has been marked as Exhibit

18    6, which is a document that was produced to us in this

19    litigation.  On the top it says these are

20    transcriptions of voice messages.  Are you familiar

21    with this document?

22         A.   Yes.

23         Q.   Who transcribed the voice messages?

24         A.   My sister.
```

1      Q.   What is her name?

2      A.   Lindsay Stone.

3      Q.   Where does she live?

4      A.   She is in the process of moving back into my

5   mom's house.

6      Q.   Where was she living at the time that she

7   transcribed these messages?

8      A.   I'm not sure.  She was in school.

9      Q.   Why did she transcribe the messages?

10      A.   I'm not sure.  She offered to help me.

11      Q.   During this time period, were you living with

12   your sister?

13      A.   No.  She was home visiting.

14      Q.   These messages that she transcribed, what

15   phone or voicemail service did she transcribe them

16   from?

17      A.   From my cell phone voicemail.

18      Q.   And tell me the process she went through to

19   transcribe them.

20           MS. LAWS:  Objection.

21      A.   I played the voicemails on speaker phone, and

22   she typed word for word what was being said in the

23   voicemail.

24      Q.   And where are the voicemail messages

1    themselves right now?

2         A.   They were somehow deleted off the voicemail

3    history on my phone.

4         Q.   When do you believe that happened?

5         A.   Maybe a year and a half to two years ago I

6    noticed that they were no longer on there.

7         Q.   Had you taken any efforts to preserve them?

8         A.   Yes.

9         Q.   What efforts did you take to preserve them?

10        A.   I would say about once every one to two

11   weeks, I would listen to all of the messages and resave

12   them; because after so much time of being saved, they

13   automatically get deleted.

14        Q.   Did you make any efforts to have them saved

15   onto a hard drive or out of your voicemail box?

16        A.   Yes.

17        Q.   What became of those efforts?

18        A.   The recording would not pick up anything with

19   static, and you could not understand anything.  It was

20   just garble.

21        Q.   Did you provide the actual voice messages to

22   the EEOC at any time?

23        A.   No.

24        Q.   Did they ever ask you for your phone so they

1  could transcribe them and record them in a different

2  format?

3     A.   No.

4     Q.   This document is on your representation

5  transcriptions of six voicemail messages, correct?

6     A.   Yes, there's six voicemail messages

7  transcribed here.

8     Q.   Would you agree with me that the first

9  voicemail message transcribed was on November 5th?

10    A.   Yes.

11    Q.   Isn't it true that Ms. Miller had called you

12  several times before November 5th?

13    A.   I'm not sure.

14    Q.   This only reflects, I presume, the voicemail

15  messages that were in your phone at the time your

16  sister transcribed these, correct?

17    A.   This, I saved -- to the best of my knowledge,

18  I saved every voice message that ever came through on

19  my phone from Ms. Miller up until the point when it was

20  transcribed.

21    Q.   And you'd agree that your phone somehow is

22  automatically deleting calls, correct?

23    A.   It deleted these calls roughly two years,

24  maybe a year and a half, two years after they were

1    transcribed.

2        Q.   So is it your testimony you received no

3    voicemail messages from Ms. Miller before November 5th,

4    2009?

5            MS. LAWS:   Objection.

6        A.   I don't recall any voicemails before the

7    November 5th.

8        Q.   The December 17th voicemail indicates a job

9    at Grady that says was not on the job board so there's

10   only going to be you and one other person interviewing

11   for it.  Do you see that?

12       A.   Yes.

13       Q.   Is that something special that Ms. Miller set

14   up for you?

15       A.   I'm not sure if it was actually set up,

16   because I never heard from the person that she said

17   would be calling me.

18       Q.   If you look at the January 18th message, it

19   looks like she actually gave you more information, and

20   it says, "It looks like Grady is not going to fill that

21   position."  Do you see that?

22       A.   Yes.

23       Q.   And then she does indicate in a voicemail

24   recording by your sister, "So I did look on the board

1    and saw some other job opportunities and wanted to

2    discuss those with you."  Do you see that?

3        A.   Yes.

4        Q.   So Ms. Miller did call you and talk to you

5    about job opportunities, correct?

6             MS. LAWS:  Objection.

7        A.   This transcription reflects she left a

8    voicemail saying that she wished to discuss jobs.

9        Q.   Do you recall calling her back?

10       A.   I did attempt to call her back.

11       Q.   Do you have any documents that show you

12   called her back?

13       A.   My phone bills should reflect that I made

14   attempts to call her back.

15       Q.   If you look at the same entry on the 18th of

16   January, she also says according to the transcription

17   from your sister, "But if you want to look online and

18   check out the PCA jobs and unit coordinator jobs that

19   are available, take a look at them and inform me of the

20   ones that would fit, I would appreciate it."  Do you

21   see that?

22       A.   Yes.

23       Q.   So she was continuing to encourage you to

24   look at the job board, correct?

1      A.   Correct.

2      Q.   Did you call her back with any jobs that you

3   had identified that you were interested in?

4      A.   Yes.

5      Q.   Did you apply for those jobs?

6      A.   I was only -- I'm not sure if I was able to.

7      Q.   What do you mean by that?

8      A.   Through the computer system, you could only

9   have two active transfer requests at a time.  It

10  wouldn't let you submit more than that.

11     Q.   Do you have any documentation that said a

12  request was not acceptable because you had two active

13  transfer requests?

14     A.   I do not have any documentation of that, no.

15     Q.   Did you ever tell anybody that you were

16  unable to apply for a job because you had two active

17  transfer requests?

18     A.   I believe in one of the meetings with

19  Ms. Miller when she encouraged me to just keep applying

20  for them as I could, it was because I had mentioned to

21  her that I couldn't put more than two requests in at a

22  time.

23     Q.   Isn't it true in October you had three job

24  requests in?

1      A.   Not to my knowledge.

2      Q.   If you look at the 28th of January, do you

3  remember receiving this call from Emiel at McConnell?

4      A.   Yes.

5      Q.   Did you call Emiel back?

6      A.   Yes.

7      Q.   What became of that opportunity?

8      A.   Well, this is the first time that I had been

9  informed of any potential intern type capacity work,

10  and I immediately -- as soon as I received this

11  voicemail, I returned his phone call, and the same day

12  went and met with him and interviewed.

13      Q.   Were you selected?

14      A.   In the interview, we discussed that the

15  position was only for a few weeks and that it was an

16  intern position and not a position within OhioHealth,

17  and I did not at that time feel comfortable accepting

18  the position outside of OhioHealth.

19      Q.   Was it offered to you?

20      A.   He discussed -- we discussed if I were to

21  take the job what would happen.  It was my

22  understanding I would lose my OhioHealth benefits, as

23  well as my pay rate, and I didn't feel comfortable

24  making that decision without speaking with Nancy Miller

1    first.

2         Q.   Did you speak to Nancy Miller about that?

3         A.   I made several attempts to contact her that

4    day, but did not hear back from her.

5         Q.   Earlier in the day when I asked you how often

6    you talked with Nancy Miller, you said every three to

7    five weeks.  You would admit by looking at Stone

8    Exhibit 6 that your communications with Nancy Miller

9    were more frequent than that, correct?

10        MS. LAWS:  Objection; mischaracterizes prior

11   testimony.

12        A.   I estimated three to five weeks, because I

13   did not have the dates in front of me.

14        Q.   And now that you've been able to look at the

15   documents, would you agree that, in fact, your

16   communications with Nancy Miller were more frequent

17   than you originally had thought?

18        A.   It looks like a few of them, a couple of them

19   are closer than three weeks.  There are some that --

20   there's one that is four weeks apart, and one that is

21   about 28 days apart.

22        Q.   And these are just the voicemail messages

23   that were on your phone, correct?

24        A.   Those were the voicemails that I received

1    from her, correct.

2        Q.   These don't include voicemails you left her,

3    correct?

4        A.   No.

5        Q.   These don't include actual conversations you

6    had with her, correct?

7        A.   No, but the primary form of communication was

8    through voicemail.

9        Q.   Did you e-mail her ever?

10       A.   I sent one e-mail to her.

11       Q.   Why did you not communicate via e-mail?

12       A.   I'm not sure.  She never e-mailed me.  The

13   primary attempts for contact were always by phone.

14       Q.   When did you e-mail her?

15       A.   I believe it was around the beginning of

16   December 2009.

17       Q.   Why did you e-mail her at that time?

18       A.   I e-mailed her to express my concerns that I

19   had still not been placed into a day shift position.

20       Q.   Did she respond to that e-mail?

21       A.   Not directly, no.

22       Q.   Did she respond indirectly?

23       A.   She did not respond in reference to that

24   e-mail.

1     Q.   Is it fair to say you don't know what

2  Ms. Miller was doing, whatever she was taking on your

3  behalf while she was at work?

4        MS. LAWS:  Objection; calls for speculation.

5     A.   Can you rephrase that?

6     Q.   Yes.  You don't know what efforts Ms. Miller

7  was taking on your behalf when she was at work during

8  the day, correct?

9     A.   No, but I know that she did not communicate

10  to me any additional aside from the information I

11  received in these voicemails, additional information as

12  to what she was doing; and ultimately whatever she was

13  doing, nothing was accomplished by it.  I was

14  ultimately still not placed into a day shift position.

15                - - -

16        LISTING OF POSITIONS APPLIED FOR BY

17        LAURA STONE, BATES-STAMPED EEOC 165

18        WAS MARKED AS STONE DEPOSITION

19        EXHIBIT 7.

20                - - -

21     Q.   I'm showing you what has been marked as Stone

22  7.  This is a document that was produced to us by the

23  EEOC.  Are you familiar with this document?

24     A.   Yes.

1     Q.    In fact, isn't this a document that you

2  provided to the EEOC at some point?

3     A.    Yes.

4     Q.    Is this a document that reflects the

5  positions that you applied for?

6     A.    This is a list of positions that I submitted

7  transfer requests and applied for, yes.

8     Q.    The first position that you applied for

9  listed on here is 7/14/2009.  Do you see that?

10     A.    Yes.

11     Q.    Which was before your narcolepsy diagnosis,

12  correct?

13     A.    Yes, that is correct.

14     Q.    And before your request for an accommodation,

15  correct?

16     A.    Yes.

17     Q.    And the last job listed here is on page 2 on

18  December 29th, 2009, correct?

19     A.    Yes.

20     Q.    Isn't it accurate that this document reflects

21  all jobs you applied for from July of 2009 through the

22  end of your employment at OhioHealth?

23     A.    Yes.

24     Q.    So if we look at just the jobs that you

```
 1    applied for after you sought an accommodation, is it
 2    accurate that you only applied for six jobs following
 3    your request for an accommodation?
 4         A.   Yes.  But like I said before, I was only able
 5    to have two active applications at a time.
 6         Q.   Well, I'm glad you raised that; because if
 7    you look here, isn't it true that you applied for a
 8    position on October 3rd and then two positions on
 9    October 14th?
10         A.   Yes.  On October 14th, when I applied for
11    those two positions, both the July 14th position
12    request and the 10/3 request had either been filled or
13    removed from the job board, which made those two slots
14    available.
15         Q.   So is it your testimony that the system made
16    it impossible to apply for a job?
17         A.   I did not know any way around how the system
18    worked to apply for more than two jobs.
19         Q.   Did you ever tell Ms. Miller that there were
20    positions you wanted to apply for that the system did
21    not allow you to apply for?
22         A.   Yes.
23         Q.   When did you do that?
24         A.   In a voicemail that I left for her after
```

1    applying for any and all of these positions, I would

2    call her and say, "These are the positions that I've

3    applied for.  There's others on there that I would have

4    applied for if I could have."

5        Q.   Do you have any documentation of your

6    attempts to apply for those positions?

7             MS. LAWS:  Objection; asked and answered.

8        A.   I don't think I would be able to get

9    documentation if I can't select the option to apply for

10   a position because it's blocked.

11       Q.   So tell me how it blocks you.  Tell me how

12   you know you're blocked from applying.

13       A.   I can't remember specific wording; but when

14   you're searching positions, if you click select a

15   position and select to apply for a transfer, it would

16   either alert you and say you already have two active

17   transfer requests, please try again, please check back

18   later, something like that.

19       Q.   You didn't do a screen print or anything like

20   that when you were denied?

21       A.   No.

22       Q.   Do you have a list of the jobs you wanted to

23   apply for but were not able to?

24       A.   No.

1  Q. Can you tell me what jobs you wanted to apply

2 for but weren't able to?

3  A. I can describe the positions that were ones

4 that I would have applied for if I could have.

5  Q. Jobs that you tried to apply for but

6 couldn't; is that what you're saying?

7  A. Jobs that I couldn't apply for, yes.

8  Q. What jobs did you want to apply for that you

9 couldn't?

10  A. Had I been able to apply for them, I would

11 have applied for any and all of the PCA unit

12 coordinator positions that were posted at any given

13 period of time on the job board.

14  Q. Do you know particular positions that were

15 available?

16  A. All I know is that there were several PCA

17 unit coordinator positions, but that's the only details

18 about the specific positions that I have.

19  Q. But you didn't apply for any PCA unit

20 coordinator positions, did you?

21  A. The PCA abbreviation also refers to patient

22 support assistant, and most patient support assistant

23 positions within the hospital involve unit coordinator

24 duties.

1      Q.   So sitting here today, are you aware of

2  particular PCA unit coordinator positions that were

3  available?

4      A.   I am aware that each time I did a search,

5  there was usually at least maybe ten positions

6  available each time I did a search, but I cannot

7  reference specific positions.

8      Q.   And the PCA unit coordinator was the position

9  you held prior to going on leave, correct?

10     A.   Yes.

11     Q.   Is that the position that you most desired?

12     A.   I desired day shift.  I would have come back

13  and done anything to be back at work, but I enjoyed

14  working as a PCA unit coordinator.

15     Q.   Can you tell me why if a PCA unit coordinator

16  was the job that you had been in and wanted to go back

17  to, why the first time you applied for a similar

18  position, the PSA position wasn't until November 17th,

19  2009?

20     A.   I would have to speculate a little bit as to

21  why.  There may have been very few, if any, PSA

22  positions on 10/14 when I submitted applications.  So I

23  would have -- scheduling coordinators and

24  administrative service coordinators are positions as

1    close to the description of a unit coordinator as you

2    can get.

3        Q.   I thought you had just told me that each time

4    you did a search, there were at least ten open

5    positions, PCA unit coordinator positions?

6        A.   I said most of the time when I did searches,

7    there were at least -- I mean I searched so many times

8    that I can't remember exactly what the results were on

9    10/14.

10       Q.   The first job here is a job on 7/14, but that

11   job was filled before you were diagnosed with

12   narcolepsy, wasn't it?

13       A.   I'm not sure if it was filled or not.

14       Q.   And you said you first went to Associate

15   Health at the end of -- or I think you actually said --

16   you told me that you went I believe it was on

17   August 10; is that correct?  Is that the date you told

18   me?  August 10?

19       A.   I believe I did say that.  I may have been

20   recalling my September 10th, the 9/10 appointment with

21   Ms. Miller.

22       Q.   But the first job you applied for after you

23   requested an accommodation wasn't until October 3rd,

24   2009, correct?

1          A.    Yes, that's correct.

2          Q.    And, clearly, from the time that you were

3    diagnosed with narcolepsy until October 3rd, you at

4    most had one job application pending, if one, correct?

5          A.    That is correct.

6          Q.    So nothing would have prevented you from

7    applying for a job up until October 3rd, correct?

8                MS. LAWS:  Objection.

9          A.    I did not initially -- after meeting with

10   Ms. Miller, I was supposed to be on evenings in labor

11   and delivery.  It wasn't until after 9/18 that I knew

12   that I had to be day shift only, and I made attempts to

13   apply as soon as I was able to.

14         Q.    So the first application would have been,

15   what, two weeks after 9/18?

16         A.    I believe that was a little bit less than two

17   weeks, yeah.

18         Q.    And at the time that you applied for that job

19   on 10/3, wasn't that the only application that was

20   pending because the July position was no longer open?

21         A.    I'm sorry.  Can you repeat that?

22         Q.    When you applied on 10/3 for the clinical

23   receptionist job, that was the only job application you

24   had outstanding at that time, correct?

1          A.    No.  I believe that the 7/14 position was

2     still on my profile at that time.

3          Q.    Let's take a look at the jobs that you

4     applied for.

5          A.    Okay.

6                          - - -

7                EMPLOYMENT APPLICATION OF LAURA

8                STONE FOR A PATIENT SUPPORT

9                ASSISTANT POSITION, BATES-STAMPED

10               EEOC V. OHC 438-440 WAS MARKED AS

11               STONE DEPOSITION EXHIBIT 8.

12                         - - -

13         Q.    So the first document I'm showing you is

14    Stone 8, which is an employment application you filled

15    out for the patient support assistant position in July,

16    correct?

17         A.    I can see that it is for a patient support

18    assistant position, but I do not see any date on here

19    that specifies when I submitted my application for this

20    position.

21                         - - -

22               DOCUMENT ENTITLED, "OPENING,

23               POSITION TITLE: PATIENT SUPPORT

24               ASSISTANT, JOB POSTING ID: 900764,"

1          BATES-STAMPED EEOC V. OHC 391-393

2          WAS MARKED AS STONE DEPOSITION

3          EXHIBIT 9.

4                          - - -

5      Q.   I'm showing you what has been marked as Stone

6   9, which is a job posting; and if you look at the top,

7   it has a job opening ID of 900764.  Do you see that?

8      A.   Yes.

9      Q.   If you look at your employment application,

10  Stone 8, about three quarters of the way down the page

11  on the left-hand side, it has the job opening ID number

12  right next to the title of the position, and it's

13  900764.  Do you see where I'm looking?

14     A.   Yes.

15     Q.   So would you agree that this application,

16  Stone 8, is applying for the position posting, Stone 9?

17     A.   I'm sorry.  Can you rephrase that?

18     Q.   Yes.  Your application that I've shown you as

19  Exhibit 8 is an application for the job opening which I

20  showed you as Exhibit 9, correct?

21     A.   Can I take just a moment to compare the other

22  information on these?

23     Q.   Absolutely.

24     A.   I would say Stone 8 is an application for the

1    same job opening ID number; but on Stone 8, it states

2    that it's a night shift position; and on Stone 9, it

3    states that it is day shift.  So I'm not sure how

4    accurate this job opening description is in reference

5    to the application that I submitted.

6        Q.   In the application you submitted, it says

7    "Desired shift:  3."  Is that what you're referring to?

8        A.   That would be the shift of what I was

9    applying for, I believe.

10       Q.   This posting was created on 7/8/09.  Do you

11   see that?

12       A.   Yes.

13       Q.   And if you look at Exhibit 7, it says that

14   you applied for the patient support assistant position

15   on 7/14/09, looking at Exhibit 7?

16       A.   It says I applied for a patient support

17   assistant position on September 14, yes, but neither of

18   these state which date I applied for this job opening.

19       Q.   Well, do you have any reason to believe that

20   the application on 7/14/09 was not for -- that the

21   application, Stone 8, is not an application submitted

22   on 7/14 for the job description that's listed in Stone

23   9?

24            MS. LAWS:  Objection; calls for speculation.

```
 1       A.   Can you rephrase that?  I'm sorry.

 2       Q.   It's clear you applied for a patient support

 3  assistant position on July 14th, '09, correct?

 4       A.   Yes.

 5       Q.   You don't dispute that?

 6       A.   No.

 7       Q.   And we have a job application, which is Stone

 8  8, which is for a patient support assistant position,

 9  correct?

10       A.   Yes.

11       Q.   Which has a job ID number of 900764, correct?

12       A.   Yes.

13       Q.   And we have a job posting for an ID of

14  900764, correct?

15       A.   Yes.

16       Q.   That was created in July of 2009, correct?

17       A.   Yes.

18       Q.   Is there any reason to believe -- isn't it

19  true that the application you submitted on July 14th

20  was for the opening that is in Stone 9?

21            MS. LAWS:  Objection.

22       A.   To the best of my memory, the patient support

23  assistant position applied for on 7/14 of 2009 was a

24  position in the behavioral health department, not in
```

1    the medical/surg department.

2        Q.    Your job application indicates that you

3    desire 24 hours a week.  Do you see that?

4        A.    Yes.

5        Q.    Were you only working 24 hours a week at this

6    time?

7        A.    I believe at this time, I was still working

8    32 hours a week, to the best of my memory.

9        Q.    Do you type the information on Exhibit 8?

10       A.    From what I remember, questions are

11   presented, and then it auto fills it.  This isn't how

12   it appears on the website when you're applying.

13       Q.    Would you have typed in the job opening ID

14   number?

15       A.    No, I don't believe so.

16       Q.    Would you have clicked a button for that, to

17   select that job opening?

18       A.    I do not remember.

19       Q.    Do you know who received this position --

20       A.    No.

21       Q.    -- the position you applied for, since you

22   don't agree it's the same position that the job ID

23   opening matches?

24       A.    I do not know who received either position,

1     or who was offered either position.

2         Q.   Were you notified when the position was

3     filled?

4         A.   No.

5         Q.   But you believe you applied for a night shift

6     position, night shift PSA position in July of 2009?

7         A.   I believe so, yes, because it was before my

8     diagnosis.

9                         - - -

10              EMPLOYMENT APPLICATION OF LAURA

11              STONE FOR A CLINICAL RECEPTIONIST

12              POSITION, BATES-STAMPED EEOC V. OHC

13              435-437 WAS MARKED AS STONE

14              DEPOSITION EXHIBIT 10.

15                        - - -

16              DOCUMENT ENTITLED, "JOB OPENING,

17              POSITION TITLE: CLINICAL

18              RECEPTIONIST, JOB OPENING ID:

19              901730," BATES-STAMPED EEOC V. OHC

20              394-396 WAS MARKED AS STONE

21              DEPOSITION EXHIBIT 11.

22                        - - -

23         Q.   I'm showing you two documents, Stone 10 and

24     11.  Would you agree Stone 10 is an employment

1   application you submitted for a clinical receptionist

2   position?

3       A.   Yes.

4       Q.   And looking at Exhibit 7, you applied for

5   that clinical receptionist position on October 3rd,

6   2009, correct?

7       A.   I believe so, yes.

8       Q.   And if you look at your application, the job

9   opening ID was 901730, correct?

10      A.   Yes.

11      Q.   And if you look at the job opening posting,

12  the opening ID in Exhibit 11 is the same number 901730,

13  correct?

14      A.   Yes.

15      Q.   Is it fair to say that Exhibit 11 is the

16  posting for the job you applied for in Exhibit 10?

17      A.   I believe it is, yes.

18      Q.   And if you look at the job opening for this

19  position on the second page, this clinical receptionist

20  position was a day shift position, correct?

21      A.   Yes.

22      Q.   And was a 40-hour-a-week position, correct?

23      A.   Yes.

24      Q.   On the front page of the posting, it says,

1    "Status code canceled."  Do you know whether this

2    position was ever filled?

3        A.    Where are you seeing the status code

4    canceled?

5        Q.    The fourth line up from the bottom.

6        A.    No, I do not know if this position was ever

7    filled.

8        Q.    I notice on this application, it has

9    geographic preferences on Exhibit 10, and it gives you

10   the opportunity to put first choice and second choice.

11   Do you see that?

12       A.    Yes.

13       Q.    So your first choice was Riverside Methodist

14   Hospital and your second choice was Riverside Methodist

15   Hospital, correct?

16       A.    I do not recall filling in my geographic

17   preferences.  I believe it may have auto filled the

18   geographic preference based on which position I was

19   applying for the transfer to, but I do see where it

20   says first choice and second choice.

21       Q.    Isn't it true that you were only looking at

22   jobs at Riverside?

23            MS. LAWS:  Objection.

24       A.    No.

1      Q.    Is it true you only applied for jobs at

2    Riverside?

3      A.    Yes, but that is because I was only able to

4    have two applications at once.

5                      - - -

6              EMPLOYMENT APPLICATION OF LAURA

7              STONE FOR A SCHEDULING COORDINATOR

8              POSITION, BATES-STAMPED EEOC V. OHC

9              450-452 WAS MARKED AS STONE

10             DEPOSITION EXHIBIT 12.

11                     - - -

12             DOCUMENT ENTITLED, "JOB OPENING,

13             POSTING TITLE: SCHEDULING

14             COORDINATOR, OPENING ID: 901864"

15             BATES-STAMPED EEOC V. OHC 397-399

16             WAS MARKED AS STONE DEPOSITION

17             EXHIBIT 13.

18                     - - -

19     Q.    Showing you what has been marked as Exhibit

20    12 and Exhibit 13, would you agree that Exhibit 12 is

21    an employment application for a scheduling coordinator

22    position that you completed?

23     A.    Yes.

24     Q.    And it indicates on Exhibit 7 that you

1    applied for the scheduling coordinator position on

2    October 14th, 2009, correct?

3         A.   Yes.

4         Q.   So would you agree with me that this is your

5    application for the position that you applied for on

6    October 14th, 2009?

7         A.   As far as I can tell, yes.

8         Q.   If you look at your employment application,

9    the job opening ID is the 901864, correct?

10        A.   Yes.

11        Q.   And if you look at Exhibit 13, would you

12   agree this is a job opening posting for a scheduling

13   coordinator position?

14        A.   Yes.

15        Q.   And would you agree that the job opening ID

16   of this posting matches the job opening ID on your

17   employment application?

18        A.   Yes.

19        Q.   Is it fair to say that the job opening

20   posting, which is marked as Exhibit 13, is the posting

21   for the job that you applied for as a scheduling

22   coordinator in Exhibit 12?

23        A.   As far as I can tell, yes.

24        Q.   If you look at the posting on the second page

```
 1    of the posting, it indicates that the scheduling

 2    coordinator position was a day shift position, correct?

 3         A.   Yes.

 4         Q.   And it was a 40-hour-a-week position,

 5    correct?

 6         A.   Yes.

 7         Q.   And this was at Riverside, correct?

 8         A.   Yes.

 9         Q.   Do you know what happened to this position?

10    Was it filled or not?

11              MS. LAWS:  Objection.

12         A.   I can only assume that it was --

13              MS. LAWS:  Don't guess.

14         A.   No, I don't know.

15         Q.   I just want to know whether you know if it

16    was filled; and if so, if you know who got it.  If you

17    don't know, that's fine.

18         A.   No, I don't know.

19                         - - -

20              EMPLOYMENT APPLICATION OF LAURA

21              STONE FOR AN ADMINISTRATIVE

22              SERVICES COORDINATOR POSITION,

23              BATES-STAMPED EEOC V. OHC 431-433

24              WAS MARKED AS STONE DEPOSITION
```

```
 1          EXHIBIT 14.

 2                     - - -

 3          DOCUMENT ENTITLED, "JOB OPENING,

 4          POSTING TITLE: ADMINISTRATIVE

 5          SERVICES COORDINATOR, OPENING ID:

 6          901958," BATES-STAMPED EEOC V. OHC

 7          400-402 WAS MARKED AS STONE

 8          DEPOSITION EXHIBIT 15.

 9                          - - -

10     Q.   I've placed before you what has been marked

11   as Exhibits 14 and 15, and I'm also going to refer to

12   Exhibit 7 which looks like you have handy as well.  The

13   next position that Exhibit 7 indicates you applied for

14   was an administrative services coordinator position on

15   October 14th, 2009, correct?

16     A.   Yes.

17     Q.   If you look at Exhibit 14, would you agree

18   this is an employment application that you submitted

19   for an administrative services coordinator position?

20     A.   Yes.

21     Q.   And seeing how Exhibit 7 indicates you only

22   applied for one administrative services coordinator

23   position, is it fair to say that Exhibit 14 is your

24   application for the administrative services coordinator
```

1    position on October 14th, 2009?

2        A.   Yes, I think so.

3        Q.   And this position was at Riverside, correct?

4        A.   This was, I believe, an off-campus position.

5    I'm not sure exactly where it was located.  I don't

6    believe it was on Riverside campus.  The location is

7    listed as Preserve Building 3.  I'm not sure where that

8    is.

9        Q.   So when you select first choice and second

10   choice and it says Riverside Methodist Hospital, does

11   that change your recollection as to whether that's

12   information that you typed in or whether that was

13   information you believe that was auto filled?

14       A.   No, I do not remember ever filling that in.

15       Q.   On your employment application, the job

16   opening ID is 901958, correct?

17       A.   Yes.

18       Q.   And if you look at Exhibit 15, the posting,

19   the opening ID is 901958, correct?

20       A.   Yes.

21       Q.   So is it fair to say that this posting is the

22   posting for the position you applied for in Exhibit 14?

23       A.   As far as I can tell, yes.

24       Q.   If you look at the second page of the

```
1    posting, it indicates that this was a day shift

2    position, correct?

3         A.   Yes.

4         Q.   And it was a 40-hour-per-week position,

5    correct?

6         A.   Yes.

7         Q.   The salary range for this position was $16.03

8    to $25.65, correct?

9         A.   I believe so, yes.

10        Q.   What was your rate of pay?

11        A.   I am not sure of the exact amount, but I

12   believe I was making just over $13 an hour.

13                       - - -

14             EMPLOYMENT APPLICATION OF LAURA

15             STONE FOR A PATIENT SUPPORT

16             ASSISTANT POSITION, BATES-STAMPED

17             442-444 WAS MARKED AS STONE

18             DEPOSITION EXHIBIT 16.

19                       - - -

20             DOCUMENT ENTITLED, "JOB OPENING,

21             POSTING TITLE: PATIENT SUPPORT

22             ASSISTANT, JOB OPENING ID: 902162,"

23             BATES-STAMPED EEOC V. OHC 406-408

24             WAS MARKED AS STONE DEPOSITION
```

1            EXHIBIT 17.

2                        - - -

3        Q.    I've placed before you what has been marked

4    as Exhibits 16 and 17, and I'm also going to refer to

5    Exhibit 7 as we've done with the other positions.   The

6    next position on Exhibit 7 that you applied for is a

7    patient support assistant position on November 17th,

8    correct?

9        A.    Yes, that is correct.

10       Q.    And Exhibit 16 is an application for a

11   patient support assistant position, correct?

12       A.    Yes, it is.

13       Q.    And the job opening ID is 902162, correct?

14       A.    Correct.

15       Q.    And if you look at Exhibit 17, the job

16   opening ID is 902162, correct?

17       A.    Yes, that is correct.

18       Q.    And this is a job posting for a patient

19   support assistant, correct?

20       A.    Yes.

21       Q.    And it indicates that this position was

22   created on 10/29/2009, correct?

23       A.    Yes.

24       Q.    Is it fair to say that Exhibit 16 is the

1    application you submitted for a patient support

2    assistant on November 17th, 2009?

3        A.    I'm sorry.  Can you repeat that?

4            MR. WHITCOMB:  Can you read it back?

5            (Record read back as follows:

6            "Question:  Is it fair to say

7            that Exhibit 16 is the application

8            you submitted for a patient

9            support assistant on November

10           17th, 2009?")

11       A.    I believe so, yes.

12       Q.    And it clearly, you would agree, is the

13   application -- Exhibit 16 is the application you

14   submitted for the job posting that's reflected in

15   Exhibit 17, correct?

16       A.    As far as I can tell, yes.

17       Q.    They have the same job opening ID, correct?

18       A.    Yes, they do.

19       Q.    If you look at the second page of this

20   exhibit, this was an evening shift position, correct?

21       A.    On the description, it does state that it is

22   an evening shift position.

23       Q.    And this was a 40-hour-per-week position,

24   correct?

1      A.   Yes.

2      Q.   As of your application, had anything changed

3  with respect to your restrictions that would have

4  allowed you to work evening shifts?

5      A.   No, but at the time that I applied for this,

6  to the best of my knowledge, it was posted as a day

7  shift position.

8      Q.   Do you know who received this position?

9      A.   No.

10      Q.   I'm not sure whether I asked you this, so

11  just to make sure I haven't on the record, this is a

12  position at Riverside, correct?

13      A.   I believe so, yes.

14                       - - -

15             EMPLOYMENT APPLICATION OF LAURA

16             STONE FOR A SENIOR MEDICAL RECORDS

17             ASSOCIATE POSITION, BATES-STAMPED

18             EEOC V. OHC 454-456 WAS MARKED AS

19             DEPOSITION EXHIBIT 18.

20                       - - -

21             DOCUMENT ENTITLED, "JOB OPENING,

22             POSTING TITLE: SENIOR MEDICAL

23             RECORDS ASSOCIATE, JOB OPENING ID:

24             902090," BATES-STAMPED EEOC V. OHC

```
 1            403-405 WAS MARKED AS DEPOSITION

 2            EXHIBIT 19.

 3                          - - -

 4       Q.   I've placed before you Exhibits 18 and 19,

 5   and I'm also going to continue to refer to Exhibit 7.

 6       A.   Okay.

 7       Q.   If you start there, after the patient support

 8   position that you applied for on November 17th, if you

 9   could flip to the next page, it indicates that the next

10   position you applied for was senior medical records

11   associate on November 17th as well, correct?

12       A.   That is correct.

13       Q.   With respect to the patient support assistant

14   position and the senior medical records associate

15   position that you applied for on November 17th, did you

16   have to do anything special to allow the system to let

17   you apply for those positions?

18       A.   I'm sorry.  I don't understand.

19       Q.   You said that the system would only allow you

20   to apply for two positions at a time.  So the question

21   is, knowing that you had applied for two jobs on

22   October 14th, which may or may not have been active,

23   the question is whether you needed do anything special

24   for the system to allow you to apply for these jobs on
```

1    November 17th?

2         A.   I believe that the two positions on 10/14

3    would not have been active on the 17th, which is why I

4    was able to.

5         Q.   What is the basis of your belief that those

6    positions were not active?

7         A.   The fact that I was able to put in two

8    applications on the 17th.

9         Q.   Other than being able to apply, do you have

10   any other reason to believe that those positions were

11   no longer active?

12        A.   As of right now, no.

13        Q.   Exhibit 18 is an application for a senior

14   medical records associate position, correct?

15        A.   You said for an employment application,

16   right?

17        Q.   I can rephrase my question.

18        A.   Okay.  Please.  Thank you.

19        Q.   Exhibit 18 is an employment application for a

20   senior medical records associate, correct?

21        A.   Yes.

22        Q.   And you only applied for one senior medical

23   records associate position, and that was on

24   November 17th, 2009, correct?

1        A.    Yes.

2        Q.    So is it fair to say that Exhibit 18 is the

3    employment application you put in for the position on

4    November 17th, 2009?

5        A.    Yes, I believe so.

6        Q.    And the job opening ID of this position is

7    902090, correct?

8        A.    Yes.

9        Q.    If you look at Exhibit 19, that's a job

10    opening posting for a senior medical records associate,

11    correct?

12        A.    Yes.

13        Q.    And the job opening ID is 902090, correct?

14        A.    Yes.

15        Q.    And that matches your employment application,

16    correct?

17        A.    Yes.

18        Q.    Is it fair to say that the job opening

19    posting, Exhibit 19, is the job that you're applying

20    for through the employment application marked as

21    Exhibit 18?

22        A.    I believe that would be fair, yes.

23        Q.    If you look at Exhibit 19, on the second

24    page, this looks like this was a day shift position,

```
 1   correct?

 2        A.   Yes.

 3        Q.   And this was a 40-hour-per-week position?

 4        A.   Yes.

 5                          - - -

 6             EMPLOYMENT APPLICATION OF LAURA

 7             STONE FOR A PATIENT SUPPORT

 8             ASSISTANT POSITION WAS MARKED AS

 9             STONE DEPOSITION EXHIBIT 20.

10                          - - -

11             DOCUMENT ENTITLED, "JOB OPENING,

12             POSTING TITLE: PATIENT SUPPORT

13             ASSISTANT, JOB OPENING ID: 902672,"

14             BATES-STAMPED EEOC V. OHC 409-411

15             WAS MARKED AS STONE DEPOSITION

16             EXHIBIT 21.

17                          - - -

18        Q.   I'm showing you what has been marked as

19   Exhibits 20 and 21; and, again, I will also refer to

20   Exhibit 7 which it looks like you've got in front of

21   you.  The next and last position that you applied for

22   was a patient assistant support position on

23   December 29th, 2009, correct?

24        A.   Yes.
```

1      Q.   If you look at the employment application

2  that's marked as Exhibit 20, this is an employment

3  application for a patient support assistant, correct?

4      A.   Yes.

5      Q.   And I see it has a desired start date of

6  December 30th, 2009.  Do you see that?

7      A.   Yes.

8      Q.   Which is the day after you applied for a

9  position.  Is it fair to say that this application,

10 Exhibit 20, is the application you submitted for the

11 patient support assistant position on December 29th,

12 2009?

13     A.   Yes, I think that's fair.

14     Q.   And the job opening ID on the employment

15 application is 902672, correct?

16     A.   Yes.

17     Q.   If you look at Exhibit 21, that's a job

18 posting for a patient support assistant position, and

19 the job opening ID is 902672, correct?

20     A.   No.

21          MS. LAWS:  I'm sorry.  Were you referring to

22 Exhibit 21 or 20?

23     Q.   I will start over.  I'm referring to Exhibit

24 21.  We've looked at the employment application, so let

1  me just go back.

2        MS. LAWS:  We have the application as 21.

3     A.  I have two employment applications with two

4  different IDs.

5        (Discussion off the record.)

6  BY MR. WHITCOMB:

7     Q.  So just to make sure the record is clear, I

8  think we've established, correct, that Exhibit 20 is

9  the employment application that you submitted on

10  December 29th, 2009 for the patient support assistant

11  position, correct?

12     A.  Yes.

13     Q.  And the job opening ID on your employment

14  application is for 902672, correct?

15     A.  Yes.

16     Q.  If you look at Exhibit 21, you do now have in

17  front of you a posting, correct --

18     A.  Yes.

19     Q.  -- for a patient support assistant position,

20  correct?

21     A.  Yes.

22     Q.  And the job opening ID is 902672, correct?

23     A.  Yes.

24     Q.  And that matches the job opening ID on the

1    application, Exhibit 20, correct?

2         A.    Correct.

3         Q.    So is it fair to say that the posting,

4    Exhibit 21, is the job that you're applying for with

5    the application that's marked as Exhibit 20?

6         A.    I believe so.

7         Q.    If you look at the second page of this

8    exhibit, it indicates that this was a night shift

9    position?

10        A.    Are you talking about 20 or 21?  I'm sorry.

11        Q.    21.  If you look at the posting, it indicates

12   it's a night shift position, correct?

13        A.    Yes, that is what it indicates.

14        Q.    Do you have any reason to believe that this

15   job posting is not accurate?

16        A.    To the best of my knowledge, the patient

17   support assistant position when I viewed it and applied

18   for it was a day shift position.

19        Q.    Did you print the postings that you applied

20   for?

21        A.    Aside from this list, no.

22        Q.    Do you have any documents that say that it is

23   a day shift position?

24        A.    Not to my knowledge, no.

1                        - - -

2              COMPUTER SCREEN SHOTS,

3              BATES-STAMPED EEOC V. OHC 458-462

4              WAS MARKED AS STONE DEPOSITION

5              EXHIBIT 22.

6                        - - -

7         Q.   I'm showing you what has been marked as

8    Exhibit 22.  This looks like there are several messages

9    that were sent to you with respect to transfer updates.

10   Do you recognize these?

11        A.   No.

12        Q.   Did you ever receive e-mails or other

13   communication indicating the status of your on-line

14   submissions for particular positions?

15        A.   No.

16        Q.   How would you receive e-mail when you worked

17   at OhioHealth?

18        A.   What do you mean?

19        Q.   Did you have a work e-mail account?

20        A.   Yes.

21        Q.   Were you able to access that work e-mail

22   account at home?

23        A.   Yes.

24        Q.   When you were out on leave, were you checking

```
 1   your work e-mail account?

 2        A.   Yes.

 3        Q.   And you don't recall receiving any

 4   notifications through your e-mail about certain

 5   positions?

 6        A.   No, I do not.

 7        Q.   How frequently were you checking your work

 8   e-mail?

 9        A.   I'm not entirely sure how frequently.  I

10   would say probably one to two times a week.

11             MR. WHITCOMB:  Let's go off the record for a

12   second.

13             (Discussion off the record.)

14                        - - -

15             LETTER TO LAURA STONE FROM

16             ASSOCIATE HEALTH AND WELLNESS,

17             DATED 7/14/10, EEOC V. OHC

18             BATES-STAMPED 488-489 WAS MARKED AS

19             STONE DEPOSITION EXHIBIT 23.

20                        - - -

21   BY MR. WHITCOMB:

22        Q.   Showing you what has been marked as Exhibit

23   23, which is a letter addressed to you at 415 Liberty

24   Lane, do you recognize this letter?
```

1      A.    Yes.  Let me refer to it here to make sure.

2      Q.    Sure.

3      A.    Yes.

4            MR. WHITCOMB:  Let's go off the record again.

5            (Pause in proceedings.)

6   BY MR. WHITCOMB:

7      Q.    So I've placed before you what has been

8   marked as Exhibit 23, and you were reviewing the letter

9   to see whether you recognize it.  Do you recognize the

10  letter?

11     A.    Yes.

12     Q.    Did you receive this letter?

13     A.    Yes, I believe I did.

14     Q.    This exhibit says the letter was sent on

15  January 15th, 2010.  Does that seem accurate to you?

16     A.    I do not recall receiving it in the mail

17  before February 8th.

18     Q.    So you received -- this says your employment

19  would be terminated effective February 10th.  Is it

20  your testimony that you believe you received it two

21  days before the 10th?

22     A.    Yes.

23     Q.    And just so there's no confusion, in the

24  upper right-hand corner, there's a date of July 14th,

1   2010.  Do you see that?

2       A.   Yes.

3       Q.   Are we in agreement that that date is not an

4   accurate date?  I believe that was just a print date

5   probably in response to the charge of discrimination.

6   You received this in February, correct?

7       A.   Yes.

8       Q.   When you were out on your leave while you

9   were looking for a position, were you receiving

10  temporary disability pay?

11      A.   Yes.

12      Q.   Do you remember how much you were receiving

13  in temporary disability pay?

14      A.   I don't remember the dollar amount, but it

15  was -- I believe it was 70% of my regular income,

16  regular pay.

17      Q.   How long did you receive temporary disability

18  pay?

19      A.   I believe I received -- I'm trying to

20  remember.  I believe that I received the temporary

21  disability payments up through the end of December.

22      Q.   When did you begin receiving that?

23      A.   I began receiving it -- it would have started

24  when I started my leave, when I stopped working night

1   shift.

2       Q.   When you say you received 70% of your regular

3   pay, were you receiving 70% of your gross pay or 70% of

4   your net pay?

5       A.   I'm not sure.

6       Q.   So this letter indicates that your temporary

7   disability pay ended December 29th, 2009, and I believe

8   you said that was your recollection it ended end of

9   December; is that right?

10      A.   Yes.

11      Q.   Do you know why it ended at the end of

12  December?

13      A.   I'm not entirely sure why.

14      Q.   The letter then indicates that any remaining

15  TAP will be paid.  Did you have additional TAP time?

16      A.   I don't believe I did.

17      Q.   It indicates that if you're enrolled in

18  OhioHealth's medical, dental and vision benefits, they

19  will remain effective through the end of the month you

20  are terminated.  Do you see that?

21      A.   Yes.

22      Q.   So, in fact, it looks like this has a

23  termination date in February.  Did you have benefits

24  then through the end of February 2010?

1       A.   I believe so.

2       Q.   Did you elect Cobra?

3       A.   I do not recall receiving a Cobra benefits

4   package.

5       Q.   So does that mean you did not elect Cobra?

6       A.   I did not elect -- I don't believe I elected

7   Cobra.  It was because I didn't actually have the

8   option, the opportunity.

9       Q.   Because you don't remember receiving a

10  packet?

11      A.   No, I did not receive a packet.

12      Q.   It says here, "If you have not received your

13  Cobra information for benefit coverage within two

14  weeks, please contact the benefits department," and it

15  gives a phone number.  Did you contact the benefits

16  department?

17      A.   Yes.

18      Q.   What did they tell you?

19      A.   They told me to give it some time and call

20  back if I still haven't received it I believe they said

21  by the end of the month.

22      Q.   Did you ever call them back?

23      A.   Yes.

24      Q.   How many times did you call them back?

```
 1        A.    Just the once, because I was told that there
 2   really wasn't anything they could do.
 3        Q.    Who did you speak to in benefits?
 4        A.    I believe her name was Marjorie.  I'm not
 5   sure what her last name was off the top of my head.
 6        Q.    When your benefits ended at the end of
 7   February, did you have health insurance?
 8        A.    No.
 9        Q.    When did you next have health insurance after
10   February 2010?
11        A.    I believe the next time that I had health
12   insurance was towards the end of June 2010.
13        Q.    And who did you get health insurance through?
14        A.    Through MedVet.
15        Q.    Between the time that you lost -- I shouldn't
16   say lost, but stopped receiving health benefits from
17   OhioHealth and the time that you picked up health
18   benefits through MedVet, did you incur any medical
19   expenses?
20        A.    I'm not sure.
21        Q.    Sitting here today, you don't recall any?
22        A.    As of right now, no.
23        Q.    The next paragraph of the letter indicates
24   that "We also encourage you to contact your Associate
```

1   Relations representative to assist you in reapplying

2   for a position that will match your education,

3   training, interests and abilities."  Do you see that?

4       A.   Yes.

5       Q.   After your employment with OhioHealth ended,

6   did you stay in contact with Associate Relations to

7   inquire about positions?

8       A.   I continued to make attempts to contact Nancy

9   Miller.

10      Q.   Did you apply for any positions after your

11  employment ended with OhioHealth?

12      A.   I don't recall having any applications

13  available on my profile when I did check.  I continued

14  to check and look for positions, and checked to see if

15  I was able to apply for anything.

16      Q.   You understood looking at the next paragraph

17  that if you obtained a position within 90 days of the

18  termination date of February 10th, that you would

19  retain all your seniority, your TAP accrual rate, et

20  cetera, correct?

21      A.   I do not remember that detail.  So at the

22  time, I did not understand that.  When I received this

23  letter, basically the gist of what I got out of it was

24  "You're fired."

1        Q.    Do you remember going in and talking to

2   Associate Health and Wellness and telling them in early

3   February you didn't need their help anymore because you

4   had found a job at MedVet?

5        A.    No.

6        Q.    You deny doing that?

7        A.    Yes, I deny doing that.

8        Q.    Did you tell someone in Associate Health and

9   Wellness that you had received a job at MedVet?

10       A.    No.

11       Q.    Do you know how they knew you had a job at

12   MedVet?

13       A.    No, I don't know how Associate Health and

14   Wellness would know that.

15                       - - -

16            LETTER TO LAURA STONE FROM NANCY

17            MILLER, DATED FEBRUARY 8, 2010,

18            BATES-STAMPED 161 WAS MARKED AS

19            STONE DEPOSITION EXHIBIT 24.

20                       - - -

21       Q.    Showing you what has been marked as Exhibit

22   24, this is a letter dated February 8th to you from

23   Nancy Miller, correct?

24       A.    Yes.

1      Q.   Is this the letter you received on

2    February 8th and not Exhibit 23, or is your testimony

3    that they both came on February 8th?

4      A.   I received this letter after the letter that

5    I received on February 8th, which was Exhibit 23.

6      Q.   So do you remember when you received the

7    letter from Nancy Miller?

8      A.   I do not remember specifically which date

9    that I received this.

10     Q.   Even though your Exhibit 23 indicated your

11   termination date would be effective February 10th,

12   2010, isn't it true that Associate Health and Wellness

13   made it clear to you that they would continue to work

14   with you after that date to help you find a job?

15     A.   I don't believe that that was made clear to

16   me.

17     Q.   Well, if you look at Exhibit 24, didn't

18   Ms. Miller send you a note indicating she was going to

19   be out of the office from February 15th to March 12th?

20     A.   Yes.

21     Q.   Which were dates after your termination date,

22   correct?

23     A.   Yes, but it was generated before my

24   termination date.

1          Q.    Isn't it true that Ms. Miller gave you a

2    contact person that you could work with during that

3    time period that she was out of the office?

4          A.    Yes.

5          Q.    And didn't she indicate to you during that

6    time period from February 15th to March 12th while she

7    was out of the office, didn't she ask you to review the

8    OhioHealth job board?

9          A.    Yes.

10          Q.    And didn't she ask you to contact Amy with

11    any job leads that you wished to pursue?

12          A.    Yes.

13          Q.    Did you ever contact Amy with any job leads

14    that you wished to pursue?

15          A.    I do not believe so.

16          Q.    Looking back at Exhibit 3, this is your

17    accommodation request form which you submitted on

18    September 18th, 2009, correct?

19          A.    Yes.

20          Q.    Are you aware of any positions on

21    September 18th, 2009 that were open on that date that

22    you believe you were qualified for?

23          A.    I'm not aware of any specific -- I wouldn't

24    be able to give a job posting number or anything, but I

116

1    recall during my conversation with Ms. Miller that

2    there were several open positions that she was going to

3    contact about my case.

4        Q.   But looking at Exhibit 7, the first time you

5    actually applied for a job was on October 3rd, 2009,

6    correct?

7        A.   That is correct.

8        Q.   Exhibit 24 indicates that Ms. Miller was

9    going to be out of the office until March 12th.  Did

10   you have any communications with her after March 12th?

11       A.   As far as I can remember, no.  I do not

12   recall at this moment any.

13           (Short recess taken.)

14                     - - -

15           Thereupon, at 1:08 p.m. a luncheon

16            recess was taken until 1:55 p.m.

17                     - - -

18

19

20

21

22

23

24

```
 1                              Wednesday Afternoon Session
                                June 18, 2014
 2                              1:55 p.m.

 3                       - - -

 4                  CROSS-EXAMINATION (CONT'D.)

 5   BY MR. WHITCOMB:

 6       Q.   Before we took our lunch break, you indicated

 7   that while you were employed at OhioHealth on leave,

 8   you had sought employment outside of OhioHealth.  Where

 9   did you seek employment?

10       A.   Can you repeat that?

11       Q.   Sure.  While you were on your leave of

12   absence at OhioHealth, your termination date in that

13   letter was February 10th?

14       A.   Yes.

15       Q.   So between the time you went out on leave in

16   I believe it was August until February 10, did you seek

17   employment outside of OhioHealth?

18       A.   Yes.

19       Q.   Where did you seek employment?

20       A.   I applied for a position with Tim Hortons.

21       Q.   Anywhere else?

22       A.   Before I received the termination letter, no.

23       Q.   Did you work at Tim Hortons?

24       A.   Yes.
```

1      Q.   When did you begin your work at Tim Hortons?

2      A.   I believe I was hired, offered and accepted

3   the position on December 29th.

4      Q.   You were working as a cashier?

5      A.   Cashier, drive-thru window associate.

6      Q.   Do you remember your rate of pay?

7      A.   I believe it was 8.25 an hour.

8      Q.   At some point, you also applied for a

9   position in MedVet; is that correct?

10      A.   Yes.

11      Q.   When did you get hired at MedVet?

12      A.   I was hired at MedVet I believe roughly

13   around March 24th or 25th.

14      Q.   Didn't you start working in MedVet part time

15   while you were still employed by OhioHealth?

16      A.   No.

17                   - - -

18           PLAINTIFF EQUAL EMPLOYMENT

19           OPPORTUNITY COMMISSION'S RESPONSES

20           AND OBJECTIONS TO DEFENDANT'S FIRST

21           SET OF INTERROGATORIES WAS MARKED

22           AS STONE DEPOSITION EXHIBIT 25.

23                   - - -

24      Q.   Showing you what has been marked as Exhibit

1    25, which are Plaintiff Equal Employment Opportunity

2    Commission's Responses and Objections to Defendant's

3    First Set of Interrogatories, have you seen this

4    document before?

5        A.   No.

6        Q.   If you look at page 8 of this document,

7    Interrogatory No. 10, it asks to "Explain all efforts

8    that Laura Stone made to find employment since she

9    separated from employment with Defendant, including any

10   jobs that she has applied for, interviewed for, been

11   offered or accepted."

12          The second paragraph in the response says,

13   "Ms. Stone obtained a part-time position at MedVet on,

14   or around, January 26th, 2010."  Does that refresh your

15   memory as to whether you accepted a part-time position

16   at MedVet before February 10th?

17          MS. LAWS:  Objection; argumentative.

18       A.   Do you want me to go ahead and answer still?

19       Q.   Yes.

20       A.   I'm sorry.  That does not change my memory of

21   what happened.

22       Q.   Okay.  You indicated you worked at Tim

23   Hortons while you were employed at OhioHealth, and your

24   testimony is you were not employed anywhere else prior

1   to February 10th, 2010?

2        A.   Correct.

3        Q.   So earlier we looked at the positions you

4   applied for, and the last position you applied for was

5   on December 29th, 2009, and you indicated to me that

6   you received your letter informing you that your

7   employment would be terminated effective

8   February 10th -- you indicated you received that letter

9   on February 8th.

10            Is there anything that you recall occurring

11  between December 29th and February 8th with respect to

12  your attempts to find other positions at OhioHealth?

13       A.   I was -- I believe I interviewed for an

14  intern position at the McConnell Joint and Spine

15  Center.

16       Q.   Was that the position we talked about earlier

17  where you found out it was only for a couple weeks or

18  something?

19       A.   Yes.

20       Q.   Any other events that occurred between the

21  end of December and February 8th?

22       A.   I'm not sure.

23       Q.   When you received your letter, from Associate

24  Health and Wellness, which is Exhibit 23, indicating

121

1    that your employment would be terminated effective --

2    when you received your letter from Associate Health and

3    Wellness indicating that you're reaching the end of

4    your six-month, 180-day leave of absence, did you ask

5    anybody if they would be willing to extend your leave

6    of absence?

7        A.   I do not recall who I spoke with; but, yes, I

8    recall calling in and asking somebody about what my

9    options were to extend.

10       Q.   Who do you think you talked to?

11       A.   I believe it was either my human resources

12   rep or whoever it got forwarded to at Employee Health

13   and Wellness.

14       Q.   What were you told?  What did you ask them,

15   and what were you told?

16            MS. LAWS:  Objection; compound question.

17       A.   I asked what I needed to do to avoid

18   termination, and I was told that I should have applied

19   for an extension a long time ago.

20       Q.   Did you specifically ask somebody if you

21   could extend your leave of absence?

22       A.   I believe so, yes.

23       Q.   You believe so?

24       A.   Yes.

122

1      Q.   Does that mean you don't have a specific

2   recollection of that?

3      A.   I asked what I needed to do to extend the

4   timeframe to search for positions and to extend my

5   employment.

6      Q.   But you don't know who you talked to?

7      A.   No.

8      Q.   And you didn't do that in writing?

9      A.   No.

10      Q.   And it's not documented anywhere that you did

11   that?

12      A.   Not to my knowledge.

13      Q.   Even though you had 90 days after

14   February 10th to continue to look for positions and

15   bridge your service, you didn't apply for any

16   additional positions, correct?

17      A.   At the time I received this letter, I did not

18   realize I had 90 days to do that.  When I called asking

19   what I needed to do next and what I needed to do asking

20   for the extension, I was basically told there was

21   nothing I could do.

22      Q.   Do you know Jeannie Gray?

23      A.   No.  The name does not ring a bell.

24      Q.   Do you know Ms. Evans at Employee Health and

1    Wellness?

2         A.   Not that I can recall, no.

3         Q.   Do you recall stopping by Associate Health

4    and Wellness to let Amy and Nancy know that you were no

5    longer needing help finding a position because you had

6    found a position outside of OhioHealth?

7         A.   No.

8         Q.   So are you saying that didn't happen, or you

9    just don't recall doing that?

10        A.   To the best of my knowledge, it did not

11   happen.

12        Q.   And so if somebody had written that, that's a

13   false statement?

14             MS. LAWS:  Objection.

15        A.   I'm not sure.

16        Q.   So earlier today, you indicated that you sent

17   an e-mail to Nancy Miller, and I want to look at a

18   document and see if this is the e-mail you're

19   discussing.

20                        - - -

21             LETTER TO MS. MILLER FROM MS.

22             STONE, BATES-STAMPED EEOC 158 WAS

23             MARKED AS STONE DEPOSITION EXHIBIT

24             26.

1                          - - -

2          Q.   Showing you what has been marked as Exhibit

3    26, which appears to be some sort of correspondence

4    addressed to Ms. Miller from you; is that accurate?

5          A.   This is a copy of a draft of an e-mail.

6          Q.   Did you send this e-mail?

7          A.   Yes.

8          Q.   From what e-mail address would you have sent

9    this e-mail?

10         A.   From my employee e-mail.

11         Q.   Do you have the original?

12         A.   This is the original that I typed; but as of

13   February 10th, I was not able to access my e-mail to

14   print it off from my e-mail.

15         Q.   So why were you able to have this draft?

16         A.   This draft was typed on a Word document on my

17   personal computer at home.

18         Q.   When did you send this e-mail?

19         A.   I believe this e-mail was sent at the

20   beginning of December.

21         Q.   What was the purpose of sending this e-mail?

22         A.   To convey to Ms. Miller and Human Resources

23   that I did not feel that my case was being handled in a

24   timely fashion, my request, and to encourage more

1   proactive handling of my request.

2        Q.   Was this to let them know the frustration

3   that you were experiencing?

4        A.   It was not for that sole purpose, but it did

5   serve that purpose.

6        Q.   Have you read this recently?

7        A.   Not word for word, no.

8        Q.   I'm going to give you an opportunity to read

9   it now, and I'm going to ask you after you read it,

10  whether there's anything in here that indicates that

11  you're not able to apply for more than two positions at

12  a time.

13       A.   Okay.

14       Q.   So can you read this and let me know whether

15  you ever expressed that in this document to Ms. Miller?

16       A.   Okay.

17       Q.   Is there anywhere in this e-mail that you

18  informed Ms. Miller that you were not able to apply for

19  more than two positions at a time?

20       A.   No.

21                        - - -

22            FIVE-PAGE DOCUMENT WITH THE "JOB

23            INFORMATION" TAB FOR PATIENT

24            SUPPORT ASSISTANT POSITION

```
 1              APPEARING WAS MARKED AS STONE
 2              DEPOSITION EXHIBIT 27.
 3                      - - -
 4      Q.   Showing you what has been marked as Exhibit
 5   27 --
 6              MS. LAWS:  Excuse me.  Before you ask a
 7   question, I just note that my copy at least doesn't
 8   have a Bates stamp on it.
 9              MR. WHITCOMB:  I think that's accurate.
10              MS. LAWS:  Has this document been produced?
11              MR. WHITCOMB:  It's being produced right now.
12              MS. LAWS:  No.  We'll take a break and take a
13   look at this document.
14              MR. WHITCOMB:  Okay.  I don't believe it's
15   been asked for.
16              MS. LAWS:  Well, it's a document that has
17   Laura Stone's name on it, and I believe we've asked for
18   all personnel information relating to Ms. Stone, so it
19   does --
20              MR. WHITCOMB:  I'm not objecting to you
21   taking a break.
22              MS. LAWS:  We'll take a break.  I'm just
23   saying it does appear to be responsive, but we'll take
24   a look at the document in more detail and be back in a
```

1    few minutes.

2             (Short recess taken.)

3             MR. WHITCOMB:  Just so you're clear, I hadn't

4    seen this before today either.  In response to an

5    answer this morning, I tracked something down.

6             MS. LAWS:  Okay.  Well, thank you for

7    advising me of that, but it does appear the document is

8    responsive.  I, of course, don't know what you're going

9    to use it for.  It could just be for refreshing

10   recollection, but the document certainly is responsive

11   to at least one of our document requests and should be

12   produced.

13            MR. WHITCOMB:  Well, now it's been produced,

14   so you have it, but we will Bates stamp it and give you

15   another copy as well.

16   BY MR. WHITCOMB:

17        Q.   The reason I'm pulling this out is because

18   when we talked earlier today, you told me your job was

19   a 32-hour position, and I notice on the front page of

20   this document it indicates your standard hours are 32;

21   but if you turn to the second page of this document, it

22   indicates that effective May 31, 2009, you had a change

23   in scheduled hours and you went to 16 hours.  Do you

24   remember that happening?

1      A.   No, I do not.

2      Q.   Is it your testimony in May, end of May, you

3  continued to be a 32-hour position?

4      A.   Yes, I believe I was still working 32 hours a

5  week at that time.

6      Q.   Was there ever a time during your employment

7  that you requested a reduction to 16 hours?

8      A.   I do not recall requesting a reduction.

9      Q.   Did you ever request a reduction because of

10  your school schedule or internships or other

11  opportunities you were pursuing?

12      A.   No.

13      Q.   Was your goal in pursuing your degree as a

14  vet tech to ultimately get a job working with a

15  veterinary care provider?

16      A.   Not immediately, no.

17      Q.   So following the end of your employment at

18  OhioHealth, you indicated you did become employed at

19  MedVet; is that correct?

20      A.   Indicated to who?

21      Q.   To me.

22      A.   Oh, yes.

23      Q.   Did you start as a part-time employee or a

24  full-time employee?

1       A.    Initially I believe the position I was hired

2  for was part-time position.

3       Q.    When did you become a full-time employee?

4       A.    I'm not entirely sure how long I worked part

5  time before I switched to full time.

6       Q.    You indicated to me that you believe you

7  began receiving health benefits in June of 2010,

8  correct?

9       A.    Yes, I believe so.

10      Q.    I take it you were a full-time employee

11 before you received those health benefits; is that

12 accurate?

13      A.    I believe I was full time before starting,

14 yes.

15      Q.    Were you paid an hourly rate or salary?

16      A.    Hourly.

17      Q.    Do you remember what your hourly rate was at

18 MedVet when you began?

19      A.    I started at 12.75.

20      Q.    Did your rate change when you went from part

21 time to full time?

22      A.    No.

23      Q.    How many hours were you working when you were

24 part time?

1     A.    Maybe eight to sixteen a week.

2     Q.    How many hours were you working when you were

3  full time?

4     A.    Probably closer to 40.

5     Q.    You indicated you had health insurance

6  benefits.  Did you have to pay an employee share of the

7  health premium?

8     A.    Yes.

9     Q.    Do you remember what you had to pay?

10     A.    No, I don't.

11     Q.    Was it similar to what you paid at

12  OhioHealth?

13     A.    I know it was more than what I paid at

14  OhioHealth, I believe.

15     Q.    Did you receive other types of benefits, like

16  dental or vision?

17     A.    I think I did.

18     Q.    How long did you work at MedVet?

19     A.    I worked at MedVet for two years.

20     Q.    When was your last day at MedVet?

21     A.    I think March 24th or 25th of 2012.

22     Q.    Why did you leave MedVet?

23     A.    I left to return to school.

24     Q.    You did that voluntarily?

1     A.    Yes.

2     Q.    When you were working at MedVet, that was a

3  day shift position; is that right?

4     A.    Yes.

5     Q.    So you were returning to school full time?

6     A.    Yes.

7     Q.    And you didn't want to work while you were in

8  school; is that accurate?

9     A.    They were not -- the hours were not able to

10  work around my class hours and keep me still on day

11  shift.

12     Q.    While you were employed at MedVet, were you

13  employed anywhere else?

14     A.    You mean during the whole two years?

15     Q.    Yes.

16     A.    Yes.

17     Q.    Where else were you employed?

18     A.    I also worked for Cryan Veterinarian

19  Hospital.

20     Q.    How do you spell Cryan?

21     A.    C-r-y-a-n.

22     Q.    When did you work at Cryan?

23     A.    At this moment I cannot recall my actual hire

24  date with them, but I believe it was sometime in

1    January 2013.

2        Q.   Had you done an internship at Cryan while you

3    were pursuing your vet tech degree?

4        A.   Yes, I did do an internship there.

5        Q.   When did you do your internship?

6        A.   That was, I believe, sometime during March

7    and April of 2009 maybe.

8        Q.   What was your rate of pay at Cryan?

9        A.   When I started -- I'm not entirely sure.  I

10   can't remember at the moment.

11       Q.   Did you have any benefits from Cryan?

12       A.   No.

13       Q.   How long did you work at Cryan?

14       A.   I worked there up through March of 2013.

15       Q.   So you worked there for three months, is that

16   correct, or do I have my dates wrong?

17       A.   I believe I may have misspoke on the hire

18   date.  I believe it was actually 2012.

19       Q.   Okay.

20       A.   January 2012.  I'm sorry if I said 2013.

21       Q.   So January 2012 through March 2013 is when

22   you worked at Cryan?

23       A.   Yes.  To the best that I can remember, yes.

24       Q.   How many hours were you working at Cryan?

133

1       A.   It varied throughout my employment.  I was

2  contingent for a while, and then went to part time.

3       Q.   Roughly how many hours a week would you

4  average?

5       A.   While I was contingent, I was really only

6  working maybe one or two eight-hour shifts every three

7  months, which is what they required to remain

8  contingent; and while I was part time, I believe it was

9  roughly eight to twelve hours a week.

10      Q.   What shift were you working?

11      A.   Day shift.

12      Q.   Is there anywhere else that you worked while

13 you worked at MedVet?

14      A.   While I worked at MedVet, no.

15      Q.   So after your employment ended with MedVet in

16 March of 2012, correct --

17      A.   Yes.

18      Q.   -- you continued to work at Cryan for a year,

19 correct?

20      A.   Yes.

21      Q.   During that year, between the time you left

22 MedVet and the time you left Cryan, did you work

23 anywhere else?

24      A.   Yes.

1    Q.    Where else did you work?

2    A.    I worked at Rod's Western Palace.

3    Q.    What did you do there?

4    A.    Sales associate.

5    Q.    What was your rate of pay there?

6    A.    I believe 8.25 an hour.

7    Q.    How many hours a week were you working?

8    A.    Eight to twelve.

9    Q.    How long did you work at Rod's Western

10   Palace?

11   A.    Seasonal for the summer.

12   Q.    So that would have been the Summer of 2012,

13   or do you still work there?

14   A.    I don't work there anymore.  That would have

15   been the Summer of 2013.

16   Q.    Have you worked anywhere else since you left

17   OhioHealth?

18   A.    Yes.

19   Q.    Where else?

20   A.    Pet Medical Center of Westerville.

21   Q.    When did you begin working there?

22   A.    It was also during the Summer of 2013.

23   Q.    What position did you hold there?

24   A.    Registered veterinary technician.

1       Q.   What was your rate of pay?

2       A.   As far as I remember, I believe it was $12 an

3   hour.

4       Q.   How long did you work there?

5       A.   During the summer, maybe two or three months.

6       Q.   Is there anywhere else you've worked since

7   you left OhioHealth?

8       A.   Besides my current job, no.

9       Q.   And you mentioned that at the beginning of

10   the day, Health Pets of Wedgewood?

11       A.   Healthy Pets.

12       Q.   Healthy Pets of Wedgewood?

13       A.   Yes.

14       Q.   I have, if my notes are accurate, you started

15   there in October of 2013.

16       A.   Yes.

17       Q.   And you continue to work there; is that true?

18       A.   Yes.

19       Q.   What is your rate of pay?

20       A.   $10 an hour.  I apologize.  I'm getting 2012

21   and 2013 extremely confused right now.  The Summer of

22   2012 was when I worked at Rod's and Pet Medical Center.

23   The Summer of 2013, I was not -- it was not the right

24   summer.  I'm sorry.

1     Q.   That's okay.  So you continue to work part

2   time at Healthy Pets in Wedgewood?

3     A.   Yes.

4     Q.   And you're working 12 to 20 hours per week?

5     A.   Yes.

6     Q.   I just asked you this, but your rate of pay?

7     A.   $10 an hour.

8     Q.   Do you have any benefits?

9     A.   No.

10     Q.   You are currently in school?

11     A.   Yes.

12     Q.   Taking a full load?

13     A.   Yes.

14     Q.   During the day?

15     A.   Yes.

16     Q.   And that position made it impossible for you

17   to continue at MedVet; is that accurate?

18     A.   Can you rephrase that?  I'm not sure I'm

19   understanding you.

20     Q.   You chose to go back to school full time.

21   That's a day program, correct?

22     A.   Yes.

23     Q.   Okay.  That obviously interferes with your

24   ability to work during the day, correct?

1        A.   Yes.

2        Q.   Do you currently have health insurance?

3        A.   Yes.

4        Q.   How do you have health insurance?

5        A.   I have health insurance through school.

6        Q.   Have we covered all the places you've been

7   employed since you left OhioHealth?

8        A.   I believe so.

9        Q.   Did you ever receive any unemployment

10   benefits?

11        A.   From?

12        Q.   From the state?

13        A.   No.

14        Q.   Have you ever received any disability

15   payments?

16        A.   No.  From the state you mean, correct?

17        Q.   Correct, other than the temporary disability

18   you were receiving at OhioHealth until the end of

19   December.

20        A.   Other than the temporary disability, no.

21        Q.   The lawsuit the EEOC filed on your behalf

22   indicates that you have suffered emotional pain,

23   suffering inconvenience, mental anguish, embarrassment,

24   frustration, humiliation, loss of enjoyment of life.

1   Can you explain in what way you've suffered?

2       A.   During the time period that I was -- are you

3   referring to like from the time I went on my leave of

4   absence to current, or are you referring to a

5   specific --

6       Q.   Let's talk about from the time you went on

7   your leave of absence to current.

8       A.   Okay.  During the time that I was on my leave

9   of absence, initially I was -- you know, had a very

10  positive outlook on when I would be back to work.

11  After all the failed efforts to get back to work as

12  soon as possible, I did start to feel discouraged, had

13  issues with feeling depressed.

14          I'm the type of person that likes to be

15  productive and stay busy, and I wasn't able.  I wasn't

16  working.  I felt pretty much worthless.  And after

17  receiving the letter of termination, I felt like I had

18  been completely disregarded as an individual and --

19  sorry.  I felt like I had been treated like a lesser

20  person than I deserved, and just the stress from that

21  was overwhelming.

22          After continuing forward from there, I was

23  able to try and put my life back together and my goals.

24  When I was terminated from OhioHealth, my goal was to

1    work there until I retired; and based on their

2    retirement policies, I had estimated that I believe I

3    would have retired around 45 and hoped to after that

4    use my vet tech degree to have more of like a hobby

5    after retirement.

6            Losing my employment with OhioHealth

7    completely threw my entire plan for my career out the

8    window, and so it was very stressful trying to figure

9    out what my new goals were going to be and what

10   direction I was going to take my life in.  I'm not

11   sure --

12       Q.   Did anybody ever say anything negative about

13   you having narcolepsy?

14       A.   Not directly to me, no.

15       Q.   When you say "not directly to me," what does

16   that mean?  Do you think someone said something

17   indirectly?

18       A.   Honestly, I have no way of knowing if anybody

19   said anything negative about me.

20       Q.   Do you have any reason to believe that Nancy

21   Miller wasn't trying her best to find you a position or

22   work with you to help you find a position?

23            MS. LAWS:  Objection.

24       A.   From my personal experience, I don't think

1   she was trying.

2        Q.   What makes you say that?

3        A.   Because ultimately it was due to my

4   reasonable accommodation request and her commitment to

5   me to make it a priority, I was supposed to be placed

6   into a day shift position, and I wasn't, and I was

7   never granted any interviews for any of the positions I

8   applied for, which was also something that I was told

9   was something that would happen.  I mean she didn't --

10  OhioHealth did not fulfill my reasonable accommodation

11  request.

12       Q.   Did you ever seek any treatment or counseling

13  for any emotional issues, suffering inconvenience,

14  mental anguish, embarrassment, frustration, humiliation

15  or loss of enjoyment of life?

16       A.   I did not seek any professional treatment,

17  no.

18       Q.   How long did those feelings that you

19  expressed last?

20       A.   I still struggle with some of the emotional

21  aspects of it today.  It's obviously an emotional issue

22  for me.

23       Q.   What is the current status of your

24  narcolepsy?

1       A.   I am managing it through schedule management

2    and medication.

3       Q.   You indicated that you had been diagnosed

4    sometime around August of 2009 by Dr. Jones?

5       A.   Yes.

6       Q.   Do you continue to see Dr. Jones?

7       A.   Yes.

8       Q.   How often do you see Dr. Jones?

9       A.   I believe I've currently -- over the last few

10   times I've seen him, it's been roughly six to twelve

11   months between visits, because he no longer accepts my

12   health insurance.  My insurance doesn't cover my visits

13   with him.

14      Q.   Did your MedVet insurance cover visits to

15   Dr. Jones?

16      A.   I don't know if it did or not.

17      Q.   Have you looked for a neurologist that

18   accepts your insurance?

19      A.   I believe I discussed with Dr. Jones finding

20   a new doctor, but I have not found one.

21      Q.   Has he made some recommendations for you?

22      A.   Do you mean for other doctors I could see?

23      Q.   Yes.

24      A.   No, he has not.

1       Q.   So what is the treatment that you are

2   undergoing for narcolepsy right now?

3       A.   I'm on a prescription medication for it.

4       Q.   What is that prescription?

5       A.   Adderall.

6       Q.   Any other medications you take for the

7   narcolepsy?

8       A.   No.  Not right now, no.

9       Q.   Do you have any restrictions on you at this

10  particular time?

11      A.   I'm still not allowed to work night shift.

12      Q.   Is that the only restriction on you?

13      A.   Yes.

14      Q.   When is the last time you saw Dr. Jones?

15      A.   About two months ago.

16      Q.   Since you left MedVet, have you been seeking

17  any other employment other than the employment that

18  you've described to me?

19      A.   No.

20      Q.   If you can look back at Exhibit 25, which

21  were the interrogatory answers, we had been looking at

22  Interrogatory No. 10, which asked about efforts to find

23  employment; and on page 9, part of the answer to that

24  interrogatory indicates that in the first full

1   paragraph at the end that you remained employed by

2   Cryan, "on either a part-time or as-needed basis, until

3   May 2013 when an illness unrelated to her disability

4   resulted in her inability to return to work."  Can you

5   tell me what happened?

6       A.   It was actually March of 2013, I was

7   hospitalized during the summer.

8       Q.   What were you hospitalized for?

9       A.   I was hospitalized three times.  In March, I

10  was hospitalized for multiple chronic massive pulmonary

11  embolisms.

12      Q.   All three hospitalizations were for the

13  chronic pulmonary --

14      A.   No.

15      Q.   Okay.  Sorry.  So that was one

16  hospitalization?

17      A.   Yes.

18      Q.   What were your other hospitalizations?

19      A.   In May, I was hospitalized for osteomyelitis.

20  I had MRSA in the bone of my heel.  In July, I was

21  hospitalized for a Staph A blood infection.

22      Q.   Do you have any restrictions on your

23  employment as a result of any of those conditions?

24      A.   Right now?

1      Q.   Yes.

2      A.   My doctor has instructed me to remain part

3   time.

4      Q.   And I presume there was a period of time

5   where you were not able to work at all?

6      A.   Yes.

7      Q.   How long did that period of time last?

8      A.   It was roughly about six months.

9      Q.   What months were those?

10     A.   Starting with my March hospitalization up

11  until the end of September.

12     Q.   Of 2013?

13     A.   Yes.

14     Q.   The complaint that the EEOC filed on your

15  behalf indicated either it or you were seeking damages

16  for job search expenses and medical expenses.  So let

17  me break those in half.  Have you incurred any job

18  search expenses?

19     A.   I mean I have.  I can't give you specific

20  amounts.

21     Q.   Did you incur any expenses in applying for

22  the position with MedVet?

23     A.   MedVet?  I don't believe so.

24     Q.   Then it says you've incurred medical

1    expenses.  Can you tell me what medical expenses you've

2    incurred since you left OhioHealth?  I just want to

3    know expenses that you would not have incurred had you

4    continued at OhioHealth.

5          A.    My medical expenses refers to the

6    hospitalizations in 2013.  My insurance that I have

7    right now is -- I mean it's student health insurance.

8    It's not great insurance; and had I still been working

9    at OhioHealth, I would have had a good -- I had great

10   insurance when I worked there.  I also after -- from

11   March 2012 through until the end of 2012, I believe

12   were the dates, I had Cobra.  I had to pay for Cobra

13   benefits.

14         Q.    Any other medical expenses?

15         A.    At this time, not that I can think of.

16         Q.    So let's start with the Cobra benefits that

17   you had to pay for March 2012 to December 2012.  Those

18   are Cobra benefits to continue the insurance that you

19   had at MedVet; is that correct?

20         A.    Yes.

21         Q.    And you left MedVet voluntarily, correct?

22         A.    Yes.

23         Q.    They were providing you health insurance at

24   the time you left, correct?

146

```
 1        A.    Yes.

 2        Q.    The student health insurance, that's

 3   insurance that -- you left MedVet to go back to school,

 4   correct?

 5        A.    Yes.

 6        Q.    Okay.  And, again, you did that voluntarily,

 7   correct?

 8        A.    Yes.

 9        Q.    And the student health insurance is to

10   replace the health insurance that you had while working

11   at MedVet, correct?

12        A.    Yes.

13        Q.    Then the hospitalization in 2012, the costs

14   you incurred there, those are -- you were on Cobra at

15   that particular time, correct?  I'm sorry.  You had

16   insurance through school at that particular time,

17   correct?

18        A.    Yes.

19        Q.    So the costs that you incurred in 2013, those

20   were the costs, the medical expenses that were not

21   picked up by insurance, correct?

22        A.    Yes.

23        Q.    And you would agree that if you had been

24   employed at OhioHealth and had OhioHealth insurance,
```

147

1    you would have also had to pick up certain costs of

2    your hospitalization, correct?

3        A.   Yes, but I believe it would have been

4    significantly less.

5        Q.   Have you calculated the difference?

6        A.   I don't know what they would have covered for

7    sure, so no.

8        Q.   If you had remained at MedVet, you would have

9    had insurance, but you still would have had to pay your

10   deductible, correct?

11       A.   Yes.

12       Q.   Was MedVet's insurance better than the

13   student health insurance?

14       A.   I'm not sure.  I didn't have anything really

15   to compare it to.

16       Q.   The complaint alleges that OhioHealth acted

17   maliciously towards you.  Do you have any evidence that

18   OhioHealth did anything maliciously towards you?

19            MS. LAWS:  Objection.

20       A.   I feel that their actions, the way I was

21   treated was malicious because they did not meet my

22   reasonable accommodation request and fired me because

23   of it; and as a person with a disability, it's -- I

24   mean it was out of my control what my accommodation --

```
 1    I needed the accommodation, and because they failed to

 2    fulfill it and fired me because of it, I believe that

 3    they knew what they were doing, and that that was

 4    malicious.

 5         Q.   When you walked in in either August or

 6    September and asked for an accommodation, they didn't

 7    fire you at that particular time, did they?

 8         A.   No.

 9         Q.   And, in fact, they set you up with a

10    caseworker, didn't they?

11         A.   Yes.

12         Q.   And, you know, we can dispute how many

13    contacts you had with the caseworker, but you had

14    several interactions, many interactions, with the

15    caseworker over the period of time that you walked in

16    there and the time your employment was terminated,

17    correct?

18         A.   I had a few.  I wouldn't characterize it as

19    many communications.  I made attempts to contact her

20    many times.

21         Q.   Well, we know from what your sister

22    transcribed that Nancy Miller at least left six

23    voicemail messages for you after November 5th.

24         A.   There were five on that that she left.  I'm
```

149

1    sorry.

2         Q.   That's okay.  I thought there were six, but

3    if there are five, there are five, but we know that

4    Nancy Miller contacted you from November 5th through

5    the end of December at least five times, correct?

6         A.   I believe the dates were different also.  I

7    mean I would have expected her to contact me more.

8         Q.   And when she was out of the office for an

9    extended period of time, she sent you a letter giving

10   you a contact person to work with, correct?

11        A.   Yes.

12        Q.   And she called you about a couple jobs that

13   weren't even posted, correct?

14        A.   Yes.

15        Q.   And she tried to set you up with an

16   internship, correct?

17        A.   Yes, but it was not even within OhioHealth.

18        Q.   So she went above and beyond the jobs at

19   OhioHealth and tried to find you something even outside

20   of the organization; is that true?

21             MS. LAWS:  Objection.

22        A.   I don't think so, no.

23        Q.   And she offered you a job trial at one point,

24   correct?

```
 1        A.   A job trial?

 2        Q.   I think one of the notes indicated there was

 3   a job trial.

 4        A.   I don't recall that.

 5             MS. LAWS:  Dave, I apologize for

 6   interrupting, but if we could take a few minutes.

 7             (Short recess taken.)

 8                        - - -

 9             OHIO CIVIL RIGHTS COMMISSION CHARGE

10             OF DISCRIMINATION, BATES-STAMPED

11             EEOC 18 WAS MARKED AS STONE

12             DEPOSITION EXHIBIT 28.

13                        - - -

14   BY MR. WHITCOMB:

15        Q.   Showing you what has been marked as Exhibit

16   28, is this the charge of discrimination you filed with

17   the Ohio Civil Rights Commission and the Equal

18   Employment Opportunity Commission?

19        A.   Yes, it is.

20        Q.   And you filed this on May 25th, 2010; is that

21   correct?

22        A.   Yes, that does sound correct.

23        Q.   In this document in the middle where it says

24   the particulars are, it says, "I applied and
```

1    interviewed for open positions that I qualified for."

2    What positions did you interview for?

3         A.   The only position I interviewed for was the

4    internship.

5         Q.   If you want to look back at Exhibit 25, which

6    is the interrogatory responses, I want to walk through

7    these.  On page 2, Interrogatory 1 asks about positions

8    that you applied for and in the response, the response

9    identifies five positions, but then talks about at the

10   bottom of the page the internship at McConnell Heart

11   Health Center in January 2010.  Do you see where I am?

12        A.   Yes.

13        Q.   And it indicates that "Mr. Mansur told

14   Ms. Stone that the internship was for a nursing student

15   or a State-Tested Nursing Assistant; however, Ms. Stone

16   was neither a nursing student nor a State-Tested

17   Nursing Student."  Do you see that?

18        A.   Yes.

19        Q.   Did Mr. Mansur tell you that you had to be

20   one of those two people to qualify for the position?

21        A.   He did say the internship was intended for an

22   STNA or nursing student.

23        Q.   So you were not qualified for that position?

24             MS. LAWS:  Objection; argumentative.

```
 1        A.   He told me that he had been told I was

 2   qualified for it.

 3        Q.   But based on your discussion with Mr. Mansur,

 4   was it your understanding that you didn't meet the

 5   qualifications for the position?

 6        A.   Yes, that's correct.

 7        Q.   So your current position at Healthy Pets is a

 8   rehabilitation department assistant; is that correct?

 9        A.   Yes.

10        Q.   What does that mean you do?

11        A.   I perform rehabilitation therapy, exercises

12   as prescribed by the rehabilitation therapy

13   practitioner.

14        Q.   On what type of animals?

15        A.   Canines, dogs.

16                       - - -

17             PLAINTIFF EQUAL EMPLOYMENT

18             OPPORTUNITY COMMISSION'S RESPONSES

19             AND OBJECTIONS TO DEFENDANT'S FIRST

20             SET OF REQUESTS FOR PRODUCTION WAS

21             MARKED AS STONE DEPOSITION EXHIBIT

22             29.

23                       - - -

24        Q.   Showing you what has been marked as Exhibit
```

1    29, which is "Plaintiff Equal Employment Opportunity

2    Commission's Responses and Objections to Defendant's

3    First Set of Request for Production."  Have you seen

4    this document before?

5        A.   This, I believe I have seen, yes.

6        Q.   Have you read the request before?

7        A.   I have not read all of them, no.  I'm not

8    familiar with them.

9             MS. LAWS:  Actually, excuse me.  I'll

10   represent to the Defendant this document has not been

11   presented in any way to Ms. Stone.

12            MR. WHITCOMB:  Thank you for doing that.

13       A.   I may be getting this one confused with --

14            MS. LAWS:  -- some other document that she

15   may have reviewed in anticipation for today, but I'll

16   represent to counsel that she has not been presented

17   with this document.

18       Q.   I want to talk through each of the requests

19   to see whether you have any documents responsive to the

20   request and whether you provided them to the EEOC,

21   because I just want to make sure we have everything

22   that's in your possession as well as the EEOC's

23   possession.  I think most of what we got in response to

24   our discovery request was simply the EEOC file, case

1    file.

2          Let me ask you this:  Have you provided all

3    the documents you have in your possession related to

4    your employment with OhioHealth to the EEOC?

5          A.   To the best of my knowledge, yes.

6          Q.   Do you have any documents in your

7    possession -- and when I say your possession, documents

8    would include information that you may have had in

9    e-mails or stored electronically on a computer.  Let me

10   sidetrack.  Do you have a computer that you use?

11         A.   Yes.

12         Q.   Is it a laptop?

13         A.   Yes.

14         Q.   Is that a computer that you've had since

15   2009?

16         A.   No.

17         Q.   Did you have a computer back in 2009 and '10

18   that you used?

19         A.   I believe so, yes.

20         Q.   Did you have any information related to your

21   employment at OhioHealth on that computer?

22         A.   Not that I can remember.

23         Q.   Do you have a personal e-mail account?

24         A.   Yes.

1      Q.   What is your personal e-mail account?

2      A.   Lstone5984@gmail.com.

3      Q.   Have you used that personal e-mail account to

4   communicate with anybody about your employment at

5   OhioHealth?

6      A.   I'm not sure I understand what all is

7   encompassed by reference to my employment at

8   OhioHealth.

9      Q.   Well, let's -- anything that would -- I'm

10   really interested in things that would relate to your

11   lawsuit.

12      A.   Okay.

13      Q.   So, for example, this is just an example.

14   Did you send any e-mails to any friends or family

15   members talking about your efforts to find employment

16   at OhioHealth?

17      A.   No.

18      Q.   Or anything else to do with what you say is

19   your frustration with the process?

20      A.   No.  I don't think so, no.

21      Q.   Did you send any text messages to friends or

22   relatives about the allegations in your lawsuit?

23      A.   No, I don't believe so.

24      Q.   Did you talk with anybody, any friends or

1    family members, about the allegations in your lawsuit?

2        A.   About the allegations?

3        Q.   Right.

4        A.   Only -- I've only discussed what has been

5    publicly -- what's in public record.

6        Q.   And let me make sure we're talking using the

7    terms the same way.  I don't just mean what the

8    complaint says is the allegation but the underlying

9    facts in terms of your attempts to seek an

10   accommodation from OhioHealth and what you think

11   OhioHealth did in response to that and what you think

12   you did.

13            Have you communicated with anybody in either

14   e-mail or text message or any other format about those

15   facts?

16       A.   No.

17       Q.   Have you had any discussions with anybody

18   about those facts?

19       A.   Yes.

20       Q.   Who have you had discussions with?

21       A.   My mother and my grandparents during the time

22   that it was all happening.

23       Q.   What are your grandparents' names?

24       A.   Harold and Bernice Stone.

157

```
 1        Q.    Where do they live?

 2        A.    Columbus.

 3        Q.    Do you have any documents in your possession

 4   related to jobs that were open at the time you were

 5   seeking an accommodation?

 6        A.    Not to my knowledge.

 7        Q.    Do you have any documents with respect to any

 8   of the applications you submitted?

 9        A.    Not to my knowledge.

10        Q.    So if I understand correctly, when you

11   applied for jobs, you just would complete what was on

12   the computer, and you didn't save it to your computer

13   or print a copy for your records?

14        A.    No, I would -- no.

15        Q.    Did you use a password to log onto the

16   OhioHealth system?

17        A.    Yes, I believe so.

18        Q.    I take it that password is no longer -- do

19   you know whether that password works anymore?

20        A.    No.

21        Q.    What was it?

22        A.    I don't remember what it was.

23        Q.    You don't know what it was?

24        A.    No.
```

1          Q.   Last night I received some medical

2    documentation related to your narcolepsy; but at least

3    in my experience, it doesn't look like it's a complete

4    record.  Do you have medical records in your possession

5    rather than what you described this morning?

6               MS. LAWS:  Objection; asked and answered.

7          A.   No.

8          Q.   In your complaint, you allege that in

9    January 2010 you attempted to engage in an interactive

10   process with Defendant that was rebuffed.  Let me just

11   quote accurately the paragraph that I'm speaking of.

12              MS. LAWS:  You said her complaint.  Are you

13   referring to the complaint or the charge?

14              MR. WHITCOMB:  The EEOC complaint, the

15   lawsuit.  I'm sorry.

16              MS. LAWS:  That's okay.

17              MR. WHITCOMB:  I apologize.

18   BY MR. WHITCOMB:

19         Q.   In the lawsuit that was filed, paragraph

20   16 -- let's just mark it.

21                         - - -

22              COMPLAINT WAS MARKED AS STONE

23              DEPOSITION EXHIBIT 30.

24                         - - -

159

1      Q.   To make this easier, I've had the complaint

2  that the EEOC filed in Federal Court marked as Exhibit

3  30; and if you turn to page 4 of the complaint, if you

4  look at paragraph 16, it says, "In or around

5  January 2010, Ms. Stone attempted to engage in the

6  interactive process with Defendant regarding her

7  medical leave of absence and reassignment to a vacant

8  position as a reasonable accommodation.  Defendant

9  rebuffed Ms. Stone's efforts and failed to offer any

10  reasonable effective alternatives."  Do you see that?

11      A.   Yes.

12      Q.   So tell me what interactive process you were

13  engaging in or attempting to engage in in January of

14  2010?

15          MS. LAWS:  Objection; calls for an improper

16  lay opinion.

17      A.   Since I didn't write this, really, I don't

18  know what it's referring to.

19      Q.   Okay.  We've already discussed earlier today

20  what events took place in January of 2010, correct?

21      A.   Yes.  I believe we covered everything as far

22  as I can remember, yes.

23      Q.   I'm looking back to the document request

24  where we had requested all documents regarding your

1    termination from Defendant.  Did you receive any

2    documents other than the letter stating that effective

3    February 10th, your employment would be terminated?

4         A.   Not that I know of.

5         Q.   We had asked for any documents related to

6    your efforts to obtain employment with employers other

7    than OhioHealth.  Do you have documents related to your

8    efforts to find employment outside of OhioHealth?

9         A.   Not that I know of, no.

10        Q.   You don't have any applications you submitted

11   for jobs?

12        A.   No.

13        Q.   You have no letters you received back either

14   saying we're interested in you or we're not interested

15   in you?

16        A.   No.

17        Q.   Did you keep any calendars or diaries of

18   events as they were transpiring?

19        A.   No.

20        Q.   Other than not being able to work at night,

21   what type of limitations does your narcolepsy place on

22   you?

23        A.   Do you mean just in every day life?

24        Q.   Yes.

1        A.    Like how it affects my everyday life?

2        Q.    Yes.

3        A.    When I am not managing my narcolepsy, it's

4    just an overwhelming constant feeling of exhaustion.  I

5    could sleep and sleep and sleep and I wake up and feel

6    like I've not had any rest at all.  Fatigue.  I

7    experience when I wake up in the morning what's called

8    sleep paralysis, which is where you're conscious and

9    awake, but you just can't move, which is quite

10   terrifying when it happens.  It's just a constant

11   struggle to focus, pay attention to things.  It's hard

12   to put into words how overwhelmingly exhausting

13   everything is.

14       Q.    In listening to you and watching you, it

15   seems like it's been an emotional experience having to

16   deal with your narcolepsy.

17       A.    It is difficult to deal with, yes.

18       Q.    And it's emotional?

19       A.    It can be sometimes.

20       Q.    I think you indicated it can be terrifying

21   when you wake up in the morning and have some of these

22   feelings.  Is that true?

23       A.    Um-hmm.

24       Q.    You have to answer audibly.

162

1        A.    I'm sorry?

2        Q.    You have to answer yes or no.

3        A.    Oh, I'm sorry.  Yes.

4        Q.    That's okay.  So when you were on your leave

5    between the end of August or early September and

6    February before you picked up your employment at

7    MedVet, what would you be doing during the day?

8        A.    Reading books, trying to stay busy.  I would

9    try and wake up early in the morning with the sun and

10   try and keep a schedule as if I were working day shift.

11   Help run errands for friends or family.  I just made

12   every attempt possible to stay busy.

13       Q.    In an intake questionnaire you completed with

14   the EEOC, you were asked of any witnesses to the

15   alleged discriminatory incidents, and you listed Donna

16   Dalton, and that's your mother, correct?

17       A.    Yes.

18       Q.    She's a nurse; is that accurate?

19       A.    Yes.

20       Q.    Where does she work?

21       A.    She was at the time -- at the time she was a

22   registered nurse at Riverside Hospital.

23       Q.    Does she still work there?

24       A.    I believe she's still employed there, but

1    not -- I think she's contingent.

2        Q.   What type of nurse is she?

3        A.   Do you mean like department --

4        Q.   Yes.

5        A.   -- degree?  Department?

6        Q.   Yes.

7        A.   Behavioral health.

8        Q.   Another person listed was Jessica Moran.

9        A.   Yes.

10       Q.   Who is Jessica Moran?

11       A.   A friend of mine.

12       Q.   What would she know about the alleged

13   discriminatory incidents?

14       A.   During the course of the process of trying to

15   get back to a day shift position, I was in contact with

16   her, and she witnessed my frustrations and my attempts.

17       Q.   Did she witness them or -- did she work at

18   OhioHealth?

19       A.   She did, yes.

20       Q.   Did she personally witness stuff, or is that

21   stuff you talked about with her?

22       A.   I'm not sure what the difference would be if

23   she was witnessing my frustration.

24       Q.   Is that a friend that you would go do stuff

1    with during this time period?

2        A.   I mean we may have occasionally met, but not

3    frequently.

4        Q.   Is that somebody you would be talking to on

5    the phone?

6        A.   Yeah.

7        Q.   I'm just trying to figure out how she would

8    know about stuff, so whether it was because you guys

9    hung out together or because you called her on the

10   phone or because she worked with you.  That's what I'm

11   trying to figure out.  So is this somebody who would

12   know about stuff because you told her in telephone

13   conversations?

14       A.   I mean I told her in conversation, whether it

15   be in person or over the phone.

16       Q.   Are there other people like Jessica Moran who

17   you were talking to about what was happening in your

18   life at that time period?

19       A.   I mentioned before my grandparents.

20   Specifically, I can't really think of anyone else that

21   I discussed it with.

22                        - - -

23            "U.S. EQUAL EMPLOYMENT OPPORTUNITY

24            COMMISSION INTAKE QUESTIONNAIRE,"

```
 1              BATES-STAMPED EEOC 187-195 WAS

 2              MARKED AS STONE DEPOSITION EXHIBIT

 3              31.

 4                        - - -

 5        Q.   Showing you what has been marked as Exhibit

 6   31, the first four pages is an EEOC intake

 7   questionnaire; is that correct?

 8        A.   Yes.

 9        Q.   Is this your handwriting on the form?

10        A.   Yes, it is.

11        Q.   Is that your signature on the fourth page?

12        A.   Yes.

13        Q.   Then the rest of the exhibit says "RMH

14   Outline/Timeline of Events."  Is this your handwriting

15   as well?

16        A.   Yes.

17        Q.   Is this something that you attached to your

18   intake questionnaire or something unrelated to your

19   intake questionnaire?

20        A.   I'm not sure if I attached it with the intake

21   questionnaire initially or not.

22        Q.   Is this timeline a timeline you prepared for

23   the EEOC?

24        A.   Yes.
```

166

1      Q.   If we look at your timeline, which is your

2  handwriting, does this refresh your memory?  Was

3  September 10th, 2009 your first meeting with Nancy

4  Miller?

5      A.   Yes.

6      Q.   And then on the 18th, you submitted the

7  reasonable accommodation form; is that correct?

8      A.   To Ms. Miller, yes.

9      Q.   And then October 14th, you applied for two

10  positions, right?

11      A.   Yes.

12      Q.   And it says "per N.M."  Do you see that?

13      A.   Yes.

14      Q.   Is that per Nancy Miller?

15      A.   Yes.

16      Q.   So you did that at her suggestion or request;

17  is that correct?

18      A.   At her suggestion, yes.

19      Q.   Then it indicates you also applied for a

20  third position per N.M.  Do you see that?

21      A.   Yes.

22      Q.   And then, again, that's per Nancy Miller?

23      A.   Yes.  I believe when I was writing per Nancy

24  Miller, I was writing per our plan, according to our

1   plan, the plan that we had discussed for me.

2       Q.   The plan was for you to look for jobs that

3   you were interested and qualified for and apply for

4   them?

5       A.   As I was able to, yes.

6       Q.   If you go up to the next page, it indicates

7   that on November 5th, you received a phone message from

8   Nancy, correct?

9       A.   Yes.

10      Q.   And on the 16th of November, you received a

11  phone message from Nancy, correct?

12      A.   Yes.

13      Q.   Then on the 17th of November, you applied for

14  two more positions, correct?

15      A.   Yes.

16      Q.   Then it looks like -- reading your notes, it

17  says on or around the 16th of November you made

18  arrangements to meet with Nancy Miller, correct?

19      A.   Yes.

20      Q.   It looks like you were scheduled to meet on

21  the 23rd?

22      A.   I believe that's correct.

23      Q.   But Nancy had to cancel that because of

24  personal reasons; is that right?

168

```
 1      A.   Yes.

 2      Q.   If we flip to the next page of the document,

 3  it says in December, December 2009.  Do you see that?

 4      A.   Yes.

 5      Q.   And it says, "1st week e-mailed Nancy

 6  Miller."  Is that the one e-mail that you said you sent

 7  and we had a draft of?

 8      A.   Yes, I believe that is in reference to that.

 9      Q.   Now, you say "Re: Hospital Policy and my

10  case/rights."

11      A.   Yes, because I mentioned hospital policy and

12  also mentioned since she was my caseworker, I mentioned

13  my case referring to my accommodation request.

14      Q.   Continuing to look at this document, it looks

15  like on December 14th, you received a message from

16  Nancy Miller, correct?

17      A.   Yes.

18      Q.   And on December 17th, you received a message

19  from Nancy?

20      A.   Yes.

21      Q.   And then on the 29th of December, you

22  submitted an application, correct?

23      A.   Yes.

24      Q.   In December -- and I think you mentioned
```

1    this -- you got hired by Tim Hortons; and then in

2    January of 2010 on the 18th, you received a message

3    from Nancy Miller, correct?

4         A.   Yes.

5         Q.   And you indicate below that, it says, "By

6    this point, I had interviewed for and been offered a

7    part-time position with MedVet."  Do you see that?

8         A.   Yes, I see that.

9         Q.   Does that refresh your memory as far as when

10   you were offered employment with MedVet?

11        A.   No.  I was offered employment with MedVet in

12   March.  I may have mistakenly wrote that out of order

13   on this.

14        Q.   Okay.

15        A.   This was just a summary of what I was writing

16   up real quick.

17        Q.   Is it fair to say your recollection of the

18   events is not very clear in your mind?

19             MS. LAWS:  Objection.

20        A.   No.

21        Q.   Well, you certainly have some of your facts

22   incorrect.  You'd agree with that, wouldn't you?

23             MS. LAWS:  Objection.

24        A.   My recollection is that I applied for and

1    started working for MedVet in March.  As of right now,

2    that is my recollection, and that is the fact as I know

3    it to be true.

4         Q.   And then on January 20th, you received a call

5    about the McConnell position, correct?

6         A.   The internship, yes.

7         Q.   Then this document that you provided to the

8    EEOC says on January 20th, you received a certified

9    letter of termination effective February 10th, 2010.

10   Do you see that?

11        A.   Yes, I see that.

12        Q.   Does that change your recollection as to when

13   you received that letter?

14        A.   I believe January 20th was maybe the first

15   attempt that the post office had made to deliver the

16   certified letter.  I referenced that date when I wrote

17   this up, because that was the date written on the

18   envelope, but I did not receive it that day.

19        Q.   Turning to the next page, it indicates that

20   on the 8th -- is that February 8th you received the

21   communication in writing from Nancy Miller stating

22   she'd be away from the office?

23        A.   I mean that was -- I was using the date on

24   the letter to reference.

1      Q.    Looking at your notes, is Marjorie Seagraves

2   the individual that you spoke with about Cobra?

3      A.    Yes, I believe so.

4                      - - -

5           INTAKE NOTES, DATED MAY 10, 2010,

6           BATES-STAMPED EEOC 186 WAS MARKED

7           AS STONE DEPOSITION EXHIBIT 32.

8                      - - -

9      Q.    I'm showing you what has been marked as

10  Exhibit 32, which appears to be an intake note from a

11  conversation you had with the EEOC.  Do you recognize

12  this document?

13     A.    No, I do not.

14     Q.    In the fourth paragraph, it indicates that on

15  October 14th, 2009, it says, "Nancy suggested that I

16  apply for the position for scheduling coordinator and

17  clinical receptionist."  Does that refresh your memory

18  as to whether Nancy was the one who identified those

19  positions for you?

20     A.    No.  I identified those positions online.

21  She had suggested I search positions and apply for ones

22  that I found online.

23     Q.    So it's your testimony that Nancy did not

24  suggest you apply specifically for these two positions?

1        A.   She did not identify these two positions to

2   me as positions I should apply for, no.

3        Q.   And you indicate you have no interest in

4   working at OhioHealth; is that accurate?

5        A.   As of right now, or at what point?

6        Q.   Well, the note says you have no interest.  Do

7   you have interest in working at OhioHealth?

8        A.   Can you ask me that again?  I still didn't

9   catch --

10       Q.   So whenever this note was prepared, it says,

11   "At this point, I have no interest in working at

12   OhioHealth."  Do you see that?

13       A.   Yes.

14       Q.   As of today, is your position still the same,

15   that you have no interest in working at OhioHealth?

16       A.   Yes, that's true.

17                         - - -

18            LETTER TO PAT SINTIC FROM LAURA

19            STONE, BATES-STAMPED EEOC 150-156

20            WAS MARKED AS STONE DEPOSITION

21            EXHIBIT 33.

22                         - - -

23       Q.   Showing you what has been marked as Exhibit

24   33, which is a letter that I believe you drafted to the

1    EEOC investigator on your case; is that accurate?

2         A.   Yes, as best I can tell.

3         Q.   If you look at the sixth page of this

4    document, it has a number in the lower right-hand

5    corner, EEOC 00155.

6         A.   Okay.

7         Q.   Is that your signature?

8         A.   Yes.

9         Q.   Looking back to the first page of this

10   document, in the second paragraph at the bottom, you

11   say, "I made diligent efforts to maintain

12   communications with my case manager, Nancy Miller, as

13   well as personally contacting hiring managers for the

14   positions I had applied for when Nancy Miller failed to

15   do so herself."

16             Can you tell me what hiring managers you

17   contacted?

18        A.   I contacted I believe her name was Joan in

19   medical records.  I mentioned to her that I had

20   applied.

21        Q.   Any other hiring managers you contacted?

22        A.   Not that I can think of at the moment.

23        Q.   What did Joan tell you when you talked to

24   her?

1         A.    She told me that she did not know that I --

2    didn't even know that I had applied for the position.

3    She told me that she would have offered -- she would

4    have interviewed and offered it to me had she known,

5    because I had worked with her before.  She also said

6    that she should have been notified by Employee Health

7    and Wellness that I had an application transfer request

8    in with her.  She said they should have let her know

9    that I had a reasonable accommodation request and

10   needed day shift and had an application in.

11        Q.    You don't know why Joan didn't receive your

12   application, do you?

13        A.    No, I do not.

14        Q.    How did you contact Joan?  By your cell

15   phone?

16        A.    No.

17        Q.    How did you contact her?

18        A.    In person.

19        Q.    At the hospital?

20        A.    Yes.

21        Q.    Do you know when you met with her?

22        A.    I don't remember.

23        Q.    Did you meet with anybody else at the

24   hospital when you were looking for positions?

1        A.    Not that I can remember.

2        Q.    If you look at page 4 of 7 of your letter, in

3    the first full paragraph that begins "Next," the second

4    sentence says, "I had a total of seven active

5    applications during the six-month period."  Do you see

6    that?

7        A.    Yes.

8        Q.    And then it says, "I consistently try to

9    maintain two active transfer requests at all times in

10   accordance with Riverside transfer policy."  Do you see

11   that?

12       A.    Yes.

13       Q.    I don't see anything in here that indicates

14   that you weren't able to have more than two active

15   requests at any one time.  Did you ever --

16       A.    No.

17       Q.    You didn't write that, did you?

18       A.    No.

19       Q.    You say "I tried to maintain two active

20   transfer requests at all times."  That seems to suggest

21   to me that there were times when you didn't have two

22   active transfer requests.  Is that fair to say?

23             MS. LAWS:  Objection; argumentative.

24       A.    I don't feel it would be fair to say for the

1  simple fact that, to the best of my knowledge, I had

2  two active requests at all times.  If maybe a couple

3  hours elapsed where I didn't, where I was unaware --

4      Q.   You mentioned that the policy says you can

5  only have two, but you don't say that the system would

6  only allow you to have two.  Because you prepared this

7  closer in time than this deposition, I'd just ask if

8  that refreshes your memory as to whether you only

9  submitted two because you thought you could only submit

10  two or whether the system would only allow you to

11  submit two.

12      A.   No.  I believe that the reason the system

13  would only allow you to submit two was because of the

14  policy.

15      Q.   Are you aware that the policy says generally

16  you can only submit two but doesn't say absolutely you

17  can only submit two?

18      A.   No, I am not.

19                      - - -

20          OHIOHEALTH TRANSFER POLICY,

21          BATES-STAMPED EEOC 167-169 WAS

22          MARKED AS STONE DEPOSITION EXHIBIT

23          34.

24                      - - -

1       Q.   If you look at Exhibit 34, is this the

2   transfer policy that you're referring to?

3       A.   I believe so.

4       Q.   And just for clarification, your letter says,

5   "See transfer policy, Exhibit H," and if you look at

6   the top right-hand corner, it says, "Exhibit H," and

7   this was a document provided to us by the EEOC.  Does

8   that give you greater comfort that this is the transfer

9   policy that you were referencing in your --

10      A.   Yes.

11      Q.   And if you look at Section IIB, do you see

12  where it says, "Generally associates will be limited to

13  no more than two active transfers?"

14      A.   Yes, I see that, but that doesn't change that

15  the website would not allow any more than two.  I

16  wouldn't have any reason to believe that there was any

17  way to do more than two.

18      Q.   And if, in fact, you had more than two at any

19  one time, you'd agree with me that that means that you

20  were submitting more than is generally permitted for an

21  associate, correct?

22      A.   I don't understand the question.  Can you

23  rephrase it?

24      Q.   That's okay.  I'll ask you a different

1    question.

2           You submitted a letter to the EEOC

3    investigator saying that you were seeking $635,000 in

4    compensation from Riverside Methodist Hospital and "if

5    requested, I can verify a breakdown of factors

6    defending said dollar amount."  Can you explain to me

7    how you calculate damages of $635,000?

8        A.   Am I able to view the letter?

9        Q.   Sure.

10                        - - -

11           LETTER TO MR. SINTIC FROM MS.

12           STONE, BATES-STAMPED EEOC 149 WAS

13           MARKED AS STONE DEPOSITION EXHIBIT

14           35.

15                        - - -

16       Q.   Showing you what has been marked as Exhibit

17   35, which is the letter I was referencing in my

18   previous question.

19       A.   Do you mind repeating the question for me?

20       Q.   You said in your letter that you're seeking

21   $635,000 from Riverside Methodist Hospital and you're

22   saying "If requested, I can provide a breakdown of

23   factors defending said dollar amount."  My question is,

24   can you provide the breakdown of the factors defending

1    said dollar amount?

2        A.    Yes.  Do you want --

3        Q.    Yes, please.

4        A.    The way the calculations I base this on were

5    at my current hourly rate at the time of termination,

6    my plan was to continue working at Riverside full time

7    until retirement, which was an additional 20, 22 years,

8    I believe; and just based on the hourly rate working

9    full time, that would have been my wages until I

10   retired, not including any, like, medical benefits or

11   anything like that, or retirement plan or anything.

12       Q.    So this is just what you believe is lost

13   wages?

14       A.    Yes.

15       Q.    Did you subtract the wages that you were

16   making at MedVet?

17       A.    When I calculated this, I did not, no.

18       Q.    By the way, looking back at Exhibit 33, which

19   is this letter, the previous exhibit, on page 4 of 7,

20   in the last paragraph, there is a -- in the middle of

21   the paragraph, it talks about on October 14th, you

22   attempted to contact Ms. Miller to see if she had heard

23   from the Behavioral Health Department, and then it said

24   you proceeded to contact the hiring manager yourself

1    leaving a message.  Who was the hiring manager that you

2    contacted at Behavioral Health?

3         A.   I do not recall her name.  She was the day

4    shift supervisor.

5         Q.   Refresh my memory.  What position was in

6    Behavioral Health?

7         A.   I believe it was a unit coordinator position.

8         Q.   And then you indicate a conversation with

9    Ms. Miller where she hung up because she thought she

10   was receiving information from Behavioral Health, and

11   then the very last line says, "I was eventually

12   informed by the hiring supervisor after contacting her

13   myself that they could not hire me for the position

14   since my relative was contingent and had the potential

15   for working on day shift."  So did you contact -- who

16   is the hiring supervisor who you subsequently

17   contacted?

18        A.   I do not recall her name.

19        Q.   Is it the same person you originally tried to

20   contact?

21        A.   The same supervisor?

22        Q.   Yes.

23        A.   Yes.

24        Q.   How did you contact that person?  By phone?

1       A.   By phone.

2       Q.   Do you know what phone number you would have

3  called that person at?

4       A.   I believe it was 566-2808.

5       Q.   Who is the relative who works contingent?

6       A.   My mother.

7                         - - -

8            DOCUMENT PREPARED BY SABRINA

9            AUSTIN, INVESTIGATOR, OCTOBER 4,

10           2011, BATES-STAMPED EEOC 8 WAS

11           MARKED AS DEPOSITION EXHIBIT 36.

12                        - - -

13      Q.   I'm showing you what has been marked as

14  Exhibit 36, which appears to be some information that

15  you provided to the EEOC investigator.  Have you seen

16  this before?

17      A.   No.

18      Q.   Let me ask you just about some of this.  It

19  says here that your medical expenses are approximately

20  $500 for narcolepsy and diabetes insulin.

21      A.   Yes.

22      Q.   And is that your out-of-pocket expense, or is

23  that the expense that gets billed to the insurance

24  company?

1          A.    I am not sure.

2          Q.    The next entry indicates that you had student

3    loans and monthly car payments.  Those are expenses you

4    have irrespective of your employment at OhioHealth,

5    correct?

6          A.    Yes.

7          Q.    Then it says you took out a personal loan for

8    $6,000 to pay for medical purposes.  What was that for?

9          A.    I believe -- I'm not sure what that -- I'm

10   not sure what it's for.

11         Q.    Do you not recall taking out a loan?

12         A.    For medical purposes, no, I do not.

13                         - - -

14               PHONE RECORDS OF LAURA STONE,

15               BATES-STAMPED EEOC 30-140 WAS

16               MARKED AS STONE DEPOSITION EXHIBIT

17               37.

18                         - - -

19         Q.    I'm showing you what has been marked as

20   Exhibit 37.  These are phone records that we received

21   from the EEOC in response to some document requests.

22   Did you provide these documents to the EEOC?

23         A.    I believe so.

24         Q.    There's a lot of information that's blocked

1    out in these documents.  Did you provide them to the

2    EEOC with the information blocked out?

3        A.   No.

4        Q.   You said that these documents would verify

5    the phone calls that were made to and from -- the

6    communications to and from you, correct?

7        A.   Yes.

8        Q.   So I'm looking at Stone Exhibit 6.  The first

9    entry on Stone Exhibit 6 is a transcription that your

10   sister made of a voice message you received on

11   November 5th, 2009, correct?

12       A.   Yes.

13       Q.   And I'm looking at your phone records, and

14   maybe I'm missing something here; but if I look at the

15   page that's Bates-stamped EEOC 78, it appears to be

16   where November 5th is in these phone records, and they

17   continue on page 79.  The first question is, do you see

18   any calls on your phone records that indicate a call at

19   10:55 a.m. on November 5th?

20       A.   No.

21       Q.   Do you see any call on here from Ms. Miller?

22       A.   On November 5th?

23       Q.   Correct.

24       A.   No.

```
 1      Q.   Isn't it fair to say that your phone records

 2   don't accurately reflect all the phone calls that you

 3   received from Ms. Miller?

 4           MS. LAWS:  Objection.

 5      A.   I believe they reflect the phone calls.  I'm

 6   not an expert on how voicemail works, but my incoming

 7   and outgoing calls are here, and this is a direct

 8   transcription of the voicemails that I received from

 9   her.

10      Q.   And it's not reflected in your phone records,

11   correct?

12      A.   No, and I mean I'm not an expert on how that

13   can happen.

14           MR. WHITCOMB:  Let's take a break.

15           (Short recess taken.)

16                     - - -

17           OHIOHEALTH CORPORATION PAY RECORDS,

18           REDACTED, BATES-STAMPED EEOC V. OHC

19           357 WAS MARKED AS STONE DEPOSITION

20           EXHIBIT 38.

21                     - - -

22   BY MR. WHITCOMB:

23      Q.   I'm showing you what has been marked as

24   Exhibit 38, because earlier this afternoon, I had shown
```

1    you a document that you took a break to review, which

2    was Exhibit 27, that appears to indicate that you had

3    asked to reduce your hours from 32 per week to 16 per

4    week, and you didn't recall that, but I want to -- do

5    you recognize 38 as your pay records or a portion of

6    your pay records beginning in April of 2009?

7        A.   Yes, they do appear to be some of my pay

8    stubs.

9        Q.   Okay.  And these are pay records, and you

10   would be paid every two weeks, correct?

11       A.   Yes.

12       Q.   So, for example, the fifth one is for pay

13   period beginning on April 5th, 2009 and ending on

14   April 9, 2009.  Do you see that?

15       A.   Yes.

16       Q.   If you look at your hours and earnings, the

17   total hours that you worked during this two-week period

18   was 46.25 hours.  Do you see that?

19       A.   Yes.

20       Q.   So for that two-week period, you averaged

21   approximately 23 hours a week, correct?

22       A.   I guess that's what it would divide out to

23   be, yes.

24       Q.   If you turn to the next page, which is pay

1   records for April 19th through May 2nd, correct?

2        A.   Um-hmm.

3        Q.   Your hours for that two-week period total

4   were 46.25, correct?

5        A.   Yes.

6        Q.   Which means per week, you were working

7   approximately less than 24 hours a week, correct?

8        A.   Yes.

9        Q.   If you look at the next pay period for

10  May 3rd through 16th, your total hours were 25.60,

11  correct?

12       A.   Yes.

13       Q.   Which would be less than 13 hours per week,

14  correct?

15       A.   Yes.

16       Q.   And if you look at the next pay period for

17  May 17th through May 30th, your total hours were 40.50,

18  correct?

19       A.   Yes.

20       Q.   Which would be 28.25 hours per week, correct?

21       A.   Yes.

22       Q.   If you look at the next pay period for

23  May 31st through June 13th, your two-week total hours

24  is 29.33, correct?

1     A.   Yes.

2     Q.   And that would mean your per week average was

3  slightly under 15 hours per week, correct?

4     A.   Yes.

5     Q.   If you look at the next pay period from

6  June 14th through June 27th, your total hours were 32,

7  correct?

8     A.   Yes.

9     Q.   And that would be an average of 16 hours per

10  week, correct?

11     A.   Yes.

12     Q.   If you look at the next pay period for

13  June 28th through July 11th, your total hours were

14  39.95, correct?

15     A.   Yes.

16     Q.   Which would be an average of less than 20

17  hours per week, correct?

18     A.   Yes.

19     Q.   And if you look at the next pay period from

20  July 12th through July 25th, the total hours is 32.27,

21  correct?

22     A.   Yes.

23     Q.   Which is roughly 16 hours per week, correct?

24     A.   Yes.

1      Q.   If you look at July 26th through August 8th,

2   the total hours is 26.23, correct?

3      A.   Yes.

4      Q.   And the average would be roughly 13 hours per

5   week, correct?

6      A.   Yes.

7      Q.   If you look at the next pay period, which is

8   August 9th through August 22nd, the total hours is 36,

9   correct?

10      A.   Yes.

11      Q.   Which would average out to be 18 hours per

12   week, correct?

13      A.   Correct.

14      Q.   The next pay period is August 23rd through

15   September 5th, and the total hours is 43.75, correct?

16      A.   Yes.

17      Q.   Which would average out to be slightly under

18   22 hours per week, correct?

19      A.   Yes.

20      Q.   The next document -- I'm not sure what it is,

21   because it says beginning and ending the 12th, and it

22   has no hours; but if you look at the following page,

23   it's September 6th through September 19th, and it has

24   the total hours of 29.30, correct?

1      A.   Yes.

2      Q.   Which averages out to be slightly under 15

3   hours per week, correct?

4      A.   Yes.

5      Q.   Then the next pay period is September 20th

6   through October 3rd, 2009, correct?

7      A.   Yes.

8      Q.   And the total hours for that two-week period

9   is 32, correct?

10      A.   Yes.

11      Q.   Which averages out to 16 hours per week,

12   correct?

13      A.   Yes.

14      Q.   And then I believe if you look -- and this is

15   while you're on leave; but if you look at the remaining

16   time cards, your two-week hours for the remaining time

17   cards is 32 hours for that two-week period, correct?

18      A.   Yes.

19      Q.   Which would be 16 hours per week, correct?

20      A.   Yes.

21           MR. WHITCOMB:  I have no further questions

22   right now.  We do have some outstanding issues with

23   respect to some documents that we don't have, and so

24   I'm going to leave the deposition open with respect to

190

1    the issues that we have with respect to outstanding

2    documents.

3              MS. LAWS:  Well, the EEOC has produced

4    everything in its possession that's relevant and

5    non-privileged; but if you want to leave it open, go

6    ahead.

7              She will read and sign.

8              (Signature not waived.)

9                        - - -

10             Thereupon, at 4:57 p.m., on Wednesday, June

11   18, 2014, the deposition was concluded.

12                       - - -

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE

2    STATE OF OHIO      :
                                 SS:
3    COUNTY OF FRANKLIN  :

4

5         I, LAURA M. STONE, do hereby certify that I

6    have read the foregoing transcript of my cross-

7    examination given on June 18, 2014; that together with

8    the correction page attached hereto noting changes in

9    form or substance, if any, it is true and correct.

10                    _____
                        LAURA M. STONE

11

12         I do hereby certify that the foregoing

13   transcript of the cross-examination of LAURA M. STONE

14   was submitted to the witness for reading and signing;

15   that after she had stated to the undersigned Notary

16   Public that she had read and examined her

17   cross-examination, she signed the same in my presence

18   on the  22  day of    July         , 2014.

19

20                    _____
                        NOTARY PUBLIC - STATE OF OHIO

21

22   My Commission Expires:

23    MAY 28 , 2017

24

Karen Higgins
Notary Public, State of Ohio
My Commission Expires 05-28-2017



**Fraley Cooper**
**Professional Court Reporters**

June 23, 2014

ERRATA SHEET

Re:    Equal Employment Opportunity Commission vs. OhioHealth
Corporation, D/B/A Riverside Methodist Hospital
Case No. 2:13-CV-00780
USDC/SDO/ED

**PLEASE DO NOT WRITE ON THE TRANSCRIPT.** Any changes in form or substance you wish to make should be entered on this sheet.

**TO THE REPORTER:** I have read the transcript taken on June 18, 2014, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the same to the original transcript.

| Page | Line | Change/correction and reason |
|------|------|------------------------------|
| p. 83 | 17 | "September" to "July" typographical error |

DATE: 7/22/14      Signature: *Laura M. Stone*

LAURA M. STONE

222 East Town Street, 2nd Floor
Columbus, Ohio 43215
fraleycooper@fraleycooper.com

(614) 228-0018 – (800) 852-6163
Fax – (614) 224-5724
www.fraleycooper.com

Page 192

                              CERTIFICATE

STATE OF OHIO          :
                              SS:
COUNTY OF FRANKLIN   :

        I, Carol A. Kirk, a Registered Merit Reporter
and Notary Public in and for the State of Ohio, duly
commissioned and qualified, do hereby certify that the
within-named LAURA M. STONE was by me first duly sworn
to testify to the truth, the whole truth, and nothing
but the truth in the cause aforesaid; that the
deposition then given by her was by me reduced to
stenotype in the presence of said witness; that the
foregoing is a true and correct transcript of the
deposition so given by her; that the deposition was
taken at the time and place in the caption specified
and was completed without adjournment; and that I am in
no way related to or employed by any attorney or party
hereto or financially interested in the action; and I
am not, nor is the court reporting firm with which I am
affiliated, under a contract as defined in Civil Rule
28(D).

        IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Columbus, Ohio on
this 20th day of June 2014.


                    _____
                    CAROL A. KIRK, RMR
                    NOTARY PUBLIC - STATE OF OHIO
My Commission Expires:  April 8, 2017.
                         - - -