1

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                        - - -

5  EQUAL EMPLOYMENT OPPORTUNITY:
   COMMISSION,                  :
6                              :
            PLAINTIFF,          :
7                              :
       VS.                     : CASE NO. 2:13-CV-780
8                              :
   OHIOHEALTH CORPORATION d/b/a:
9  RIVERSIDE METHODIST         :
   HOSPITALS,                  :
10                             :
            DEFENDANT.         :
11

12                       - - -

13        Deposition of DANIEL A. JONES, M.D., a Witness

14  herein, called by the Defendant for examination under

15  the applicable Rules of Civil Procedure, taken before

16  Diane L. Schad, a Professional Reporter and Notary

17  Public in and for the State of Ohio, taken pursuant to

18  notice, at the offices of the Deponent, 1699 West Lane

19  Avenue, Upper Arlington, Ohio 43221, commencing on

20  Thursday, August 28, 2014, at 10:25 a.m.

21                       - - -

22          FRALEY, COOPER & ASSOCIATES
          222 East Town Street, Second Floor
23          Columbus, Ohio  43215-4620
          (614) 228-0018 - (800) 852-6163
24             Fax - (614) 224-5724
                     - - -
```

2

```
 1              DEPOSITION OF DANIEL A. JONES, M.D.

 2                      APPEARANCE

 3                        - - -

 4  U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    KEYANA C. LAWS, ESQUIRE
 5  801 Market Street
    Penthouse, Suite 1300
 6  Philadelphia, Pennsylvania 19107
    (215) 440-2642
 7  keyana.laws@eeoc.gov

 8           On behalf of the Plaintiff.

 9  DAVID A. WHITCOMB, ESQUIRE
    LINDSEY D'ANDREA, ESQUIRE
10  BakerHostetler
    65 East State Street, Suite 2100
11  Columbus, Ohio 43215-4260
    (614) 228-1541
12  dwhitcomb@bakerlaw.com
    ldandrea@bakerlaw.com
13
             On behalf of the Defendant.
14                        - - -

15

16

17

18

19

20

21

22

23

24
```

```
 1

 2                          Thursday Morning Session

 3                          August 28, 2014

 4                          10:25 a.m.

 5                   - - -

 6                   STIPULATIONS

 7           It is stipulated by and among counsel

 8   for the respective parties that the deposition of

 9   DANIEL A. JONES, M.D., a Witness herein, called by the

10   Defendant under the applicable Rules of Civil

11   Procedure, may be taken at this time in stenotype by

12   the Notary; that said deposition may thereafter be

13   transcribed by the Notary out of the presence of the

14   witness; that proof of the official character and

15   qualification of the Notary is waived; that the witness

16   may sign the transcript of his deposition before a

17   Notary other than the Notary taking his deposition;

18   said deposition to have the same force and effect as

19   though signed before the Notary taking it.

20                   - - -

21

22

23

24
```

4

```
 1              DEPOSITION OF DANIEL A. JONES, M.D.

 2                    INDEX TO WITNESS

 3                       - - -

 4   DANIEL A. JONES, M.D.                        PAGE

 5   EXAMINATION BY MR. WHITCOMB                    5

 6   EXAMINATION BY MS. LAWS                      101

 7                       - - -

 8              DEPOSITION INDEX TO EXHIBITS

 9   EXHIBIT   DESCRIPTION                        PAGE

10   1         C.V. OF DANIEL A. JONES, M.D.        6

11   2         SUBPOENAS                            7

12   3         18 PAGES OF MEDICAL RECORDS          8

13   4         DR. JONES' NOTES                    10

14   5         DECLARATION OF DANIEL A. JONES, M.D.  97

15                       - - -

16

17

18

19

20

21

22

23

24
```

```
 1                          - - -

 2                    DANIEL A. JONES, M.D.

 3  being by me first duly sworn, as hereinafter certified,

 4  deposes and says as follows:

 5                       EXAMINATION

 6  BY MR. WHITCOMB:

 7       Q    Good morning, Dr. Jones.  I'm David Whitcomb

 8  and with me is Lindsey D'Andrea.  We're both lawyers

 9  who work at a law firm called BakerHostetler and we

10  represent OhioHealth in a lawsuit that the EEOC has

11  brought against OhioHealth on behalf of Laura Stone,

12  who I understand is a patient of yours.  Is that

13  correct?

14       A    That is correct.

15       Q    Okay.

16       A    Good morning.

17       Q    Good morning.

18            So, just for the record can you state your

19  name.

20       A    My name is Daniel Jones, M.D.

21       Q    Okay.  And you've brought what appears to be

22  a CV or resume of yours?

23       A    Yes.

24       Q    Can we mark this as Exhibit 1?  Do you mind
```

```
 1    if we mark these copies?

 2        A    Oh, that's fine.  Yeah, they're yours.

 3    (DEPOSITION EXHIBIT NO. 1 MARKED FOR IDENTIFICATION.)

 4        Q    I'm just placing in front of you what's been

 5    marked as Exhibit 1.  Does this accurately identify

 6    your educational background?

 7        A    Yes, it does.

 8        Q    And your board certifications and licensures?

 9        A    Yes, it does.

10        Q    And your position held?

11        A    Correct.

12        Q    Okay.  Did you bring with you a file of

13    Laura Stone's?

14        A    I did not.

15        Q    Okay.  I just want to get an understanding of

16    what documents you have with respect to Laura Stone.

17    What would be in the file that you have on Laura Stone?

18        A    Office notes.

19        Q    Okay.

20        A    Studies that were performed.  And that's

21    about it.

22             Now, we've switched over to electronic

23    medical record; so there are certain things that are

24    not there that weren't scanned, extraneous insurance
```

1    forms and whatnot that we chose not to scan into a

2    document into her file, and so what you have is what

3    the staff printed from her medical record.

4         Q    Would you have correspondence with her

5    primary care physician?

6         A    That would be the office notes.  All office

7    notes are sent to the primary care doctor.

8              MR. WHITCOMB:  We'll mark this as Exhibits 2

9    and 3.

10   (DEPOSITION EXHIBIT NOS. 2 AND 3 WERE MARKED FOR

11   IDENTIFICATION.)

12        Q    I'm going to show you two exhibits.

13             The first is marked as Exhibit 2 and it is

14   two subpoenas that we had served on you.  Do you

15   recognize that document?

16        A    Yes.

17        Q    Okay.  So the first page is a subpoena to

18   testify at deposition and it asks you to bring medical

19   records, but you did not bring -- you do not have your

20   file with you?

21        A    I don't have it in this room.  I'm in my

22   office so I could go get those documents.

23        Q    We'll look at some documents and if it turns

24   out there are additional documents other than what we

1    have, could you let me know?

2           And the purpose of showing you the subpoena

3    is making sure we have everything.

4       A    That's fine.

5       Q    But the second subpoena which begins on the

6    fourth page of this exhibit was a subpoena to produce

7    all documents related to Laura Stone as set forth in

8    the release?

9       A    Correct.

10      Q    And I'm showing you what's been marked as

11   Exhibit 3 as well, and Exhibit 3 is 18 pages that was

12   faxed to us by your office yesterday in response to our

13   subpoena?

14      A    Correct.  That's what I'm told by my staff.

15      Q    So you did not --

16      A    Did I personally copy documents for you, no.

17      Q    But this Exhibit 3 is not a complete set of

18   the documents you have with respect to Ms. Stone,

19   correct?

20      A    That was printed from the electronic medical

21   record.

22          Like I said, we did not copy her entire chart

23   into the electronic medical record when we went through

24   the scanning process of converting from paper chart to

 1    electronic medical record.

 2         Q    So what is your understanding, if you have

 3    any, of what was produced to us in Exhibit 3?

 4         A    Progress notes and procedures performed,

 5    which primarily are what we scanned into electronic

 6    medical record documents.

 7         Q    Is this everything that's in your electronic

 8    medical records?

 9         A    I believe it is.

10         Q    Okay.  And she has a separate paper file?

11         A    I don't know if we still have that.

12         Q    Okay.  Have you provided the EEOC with

13    Ms. Stone's medical records?

14         A    Everything that you have is everything we

15    sent her is what my staff said.

16         Q    Okay.

17         A    So the same documents should be in both

18    camps.

19         Q    Okay.

20         A    Because what she did was she took what she

21    had printed off for this attorney, Keyana, and took

22    that same pile and faxed it to you guys.

23         Q    Okay.

24         A    That's a printout from an electronic medical

1   record.

2           This is all -- Believe me, this is all new

3   for every physician in the U.S., so my apologies for

4   that.

5       Q    And I'm not trying to cast blame or anything.

6   I'm just trying to get an understanding, because we got

7   different records from the EEOC or some different

8   documents from the EEOC than we got from your office.

9       A    I was not the guy at the copying machine.

10      Q    Understand.

11          Okay.  Do you know when you first began

12  treating Ms. Stone?

13      A    Approximately eight years ago.

14      Q    And how did she become a patient of yours?

15      A    She became a patient of mine after I believe

16  leaving Neurological Associates, Dr. Arce, and seeking

17  assistance with migraines, as well as observation

18  regarding her seizures -- or her seizure.

19      Q    Was she referred to you by a particular

20  doctor?

21      A    I don't recall.

22  (DEPOSITION EXHIBIT NO. 4 MARKED FOR IDENTIFICATION.)

23      Q    I'm going to show you what I've had marked as

24  Exhibit 4, and I will represent to you that these are

1    documents that we received from the EEOC that appear to

2    be from your office.

3         A    These are all my notes, uh-huh.

4         Q    I thought it might be helpful for you to have

5    them in front of you --

6         A    Sure.  Thank you.

7         Q    -- when I was asking questions.

8              The first entry here is from May 17, 2006.

9    It's the earliest document that we received.  Is that

10    your understanding of when you would have first seen

11    Ms. Stone?

12         A    Probably.

13         Q    When a patient comes to you do you take a

14    health history of the patient?

15         A    I do.

16         Q    What does that form look like?

17         A    Oh, that's dictated.  So what I do is I take

18    notes on a piece of paper and then I dictate it into

19    the -- I just dictate it.  At that time I was dictating

20    into a microcassette.  I send that off to the

21    transcriptionist and then I get back this type of

22    document (indicating.)

23         Q    Okay.  If you look at --

24         A    But those documents then are pitched.  In

1    other words, my notes, my scribbles, once I dictated

2    the case I pitch that.  I shred it.

3         Q     Does the health history -- Is a document

4    created that has the health history?

5         A     Well, I'm a specialist so it's a neurological

6    history that I've obtained.

7               It's not, for instance, a document that an

8    internist or a family practitioner might dictate; it's

9    a neurologically-focused consultation.  So I'm not sure

10   what you're asking.  Maybe --

11        Q     Well, my problem is, we've been having

12   difficulty obtaining a complete set of your records, so

13   I don't know what I have and I don't have.

14              MS. LAWS:  Objection.

15              THE WITNESS:  I don't know what you're

16   asking.  When you say do I obtain a health history,

17   what you're seeing or what you presented to me today

18   are my dictations.  So when I obtain a history from a

19   patient, I take that information and I put it into a

20   document form and that serves as my encounter.

21   BY MR. WHITCOMB:

22        Q     Are you able to get your file since we're in

23   your office and we have subpoenaed it?

24        A     This is what I have from the staff that has

1    been scanned into the electronic medical record.  I can

2    go get my computer.  That's what we have.

3        Q    Just to walk through these documents that we

4    have in front of you as Exhibit 4.  When she came to

5    you in 2006 the issue that she was seeking treatment

6    for was what?

7        A    I believe it was migraine.

8             She had brought me a disk and said can you

9    review this disk for me and give me an opinion on it.

10   So this letter just represents, you know, I've reviewed

11   the scan of your brain and there is a small stroke

12   there.

13            So this is just a courtesy that I don't bill

14   the patient for.  I say if you have any scans I'll take

15   them, I'll review them for you and I'll render an

16   opinion.  Another set of eyes looking at that film.

17   And that's something I do for every single patient.

18            If a patient has a history of stroke or brain

19   tumor or a concussion -- A radiologist is one set of

20   eyes.  Well, they're not always correct, so I always

21   tell the patient when they walk through the door, bring

22   your CD.  I'll take a look at it.  If I can offer you

23   any opinion that's different, if I can identify

24   something else that somebody missed, that's another set

1   of eyes.  That's good for the patient.

2        Q    What's on the CD?

3        A    This was an MRI of the brain.

4        Q    If you flip to the next document, the note

5   dated September 12th, 2006.

6        A    Yeah.

7        Q    I notice in the clinical background it says,

8   "She denies any excessive daytime sleepiness" at the

9   last line?

10       A    Uh-huh.

11       Q    Is there a reason that you would have been

12  talking to her at that time about whether she had

13  excessive daytime sleepiness?

14       A    I'm a sleep specialist so that's part of the

15  questions, yeah.

16       Q    I just want to make sure we walk through

17  these in order.

18            The next document is a note from

19  October 10th, and then the next one is a note from

20  October 29th, correct?

21       A    November 29th.

22       Q    I'm sorry.

23       A    Yeah.  I see those.  Those are mine.

24       Q    Okay.  And then the next note appears to be a

1    note of yours from January 3rd, 2007, correct?

2         A    That's correct.

3         Q    And in the Impressions you noted in the fifth

4    line down that, "She is sleeping eight to ten hours

5    each night."  Do you see that?

6         A    I do.

7         Q    And, again, is that something you would ask

8    her because you're a sleep specialist and you're

9    interested in her sleep patterns?

10        A    No.  From a standpoint of seizure we have to

11   make sure that our patients are getting enough sleep

12   because one of the triggers of seizure is sleep

13   depravation.

14        Q    So this note is from January 3rd, 2007, and

15   if you flip to the next page it's the next note that I

16   have from your office which is -- and if you want to

17   take the clip off, that's fine.  It's just to keep them

18   in order.

19        A    All right.

20        Q    So the next note I have appears to be a note

21   from your office of June 10th, 2009?

22        A    That's correct.

23             Yeah, I changed format.  At this point with

24   an Excel document I was just typing everything in, so I

1    quit the transcription thing.

2         Q    Did you see Ms. Stone between January 3rd,

3    2007 and June 10th, 2009?

4         A    I don't believe I did.

5         Q    Okay.  Do you know why she came to your

6    office on June 10th, 2009?

7         A    She was still having headaches.  So I don't

8    know if she had gone to see someone else in the interim

9    or not.

10        Q    On this note I see at the top there's a

11   column for R.O.S.

12        A    Review of systems, correct.

13        Q    And what is a review of systems?

14        A    Those are questions that I might ask the

15   patient outside of the typical questions for the

16   problem that they came in.  So it could be a scattered

17   group of questions I might ask regarding

18   cardiovascular, respiratory, g.i., bowel or bladder.

19             Typically if it's problem-focused I'll just

20   stick to things that might be affecting her complaint

21   as she comes in.

22        Q    The first entry says, "Sleep is poor."  Do

23   you recall anything about her conversation with you?

24        A    I do not.  But that's part of my questioning

1    for headaches.  So if an individual comes in and they

2    say I'm having headaches, then there's a certain number

3    of triggers that we go through that might contribute to

4    a headache syndrome.

5        Q    The second entry says, "Work and school."  Do

6    you know what that refers to?

7        A    She listed problems that would be

8    contributing to an issue with poor sleep.

9        Q    And when you say, "she listed them," she

10   listed them in, what, verbally or --

11       A    Yeah, verbally.  She would say work and

12   school are contributing to my poor sleep.

13       Q    Do you remember anything about what her work

14   was?

15       A    As pertaining to this document I don't see

16   that I wrote anything regarding that other than she was

17   only getting four hours of sleep per night.

18       Q    Did she explain why she was only getting four

19   hours of sleep per night?

20       A    She was studying and then she had to go to

21   work, yeah.  So in her 24 hours a day of activity, work

22   and school were taking up large chunks of time.

23       Q    Under four hours per night it says,

24   "Hypersomnia 8/10"?

1      A    Eight out of ten severity.

2      Q    What does that mean?

3      A    Well, back then -- and currently we use an

4  Epworth scale.  But back then I would say on a scale of

5  one to ten how sleepy are you.  Ten is the worst

6  sleepiness you've ever experienced.  So she listed that

7  as an eight out of ten.

8           There is no meter on her head that says this

9  is how sleepy I am, so I can't read that.  I just ask

10  patients how sleepy are you and they give me a number.

11      Q    And on the left side where it has severity it

12  has six to seven out of ten.  What does that refer to?

13      A    Her headaches.

14      Q    Okay.

15      A    Yeah.  Headache pain is a six to seven on a

16  sale of one to ten.

17      Q    Gotch you.

18           And then at the bottom of the form you have

19  Impressions and can you explain what Impression No. 4

20  is.

21      A    Hypersomnia, which means excessive daytime

22  sleepiness.

23           So it's a general term.  Rather than writing

24  excessive daytime sleepiness, you know, sort of letter

1    economy, I just wrote hypersomnia.  "Rule out apnea and

2    narcolepsy."

3         Q    Is there any testing to get the impression of

4    hypersomnia or is that based upon her self-reporting?

5         A    Oh, no, there's plenty of testing for that.

6              And, in fact, over in Plan I listed

7    polysomnogram, which is a sleep disorder, with MLST,

8    which is a Multiple Sleep Latency Test where we test

9    the individual with a few naps after they've had a

10   sleep study the night before.

11        Q    Okay.  I understand that.  But at least when

12   you wrote this impression that was before testing?

13        A    That's correct.

14        Q    Okay.

15        A    Yeah.

16        Q    The next page where it says D.O.S. at the top

17   left hand --

18        A    Oh, Date of Service.

19        Q    Yea.  So this is also 6/10/09, correct?

20        A    Correct.

21        Q    So in that first box it says, "Slept poorly

22   in the sleep lab due to cold temps but diagnosis made

23   of UARS."  Can you explain that to me.

24        A    I'm wondering -- and I didn't notice that

```
 1   before, but I'm wondering if that -- because I have to
 2   type in the date of service every time and when I open
 3   up an old document on a patient or the previous visits
 4   document I need to type in the new date of service.  So
 5   this is -- this is obviously a time after she had her
 6   sleep study 7/2/09.
 7        Q    So is it your understanding that the 6/10/09
 8   would not accurately reflect the date of service of
 9   this record?
10        A    Yes.  This would have to be immediately after
11   her sleep study.
12        Q    Okay.
13        A    And it could have been the morning of.  I'm
14   not sure.
15        Q    Okay.  I'm just trying to determine so we can
16   follow along.
17        A    These are triplicate.
18        Q    I know, but we produced everything to you
19   that the EEOC produced to us and we got triplicates
20   from them.  So you are going to have to keep them in
21   order because otherwise we'll get off-track.
22        A    Sorry.
23        Q    That's okay.  I should have explained that at
24   the beginning.
```

1        A     My bad.  I apologize.

2        Q     So do you see the entry I'm looking where it

3    says, "Slept poorly in the sleep lab due to cold temps

4    but diagnosis is made of UARS"?

5        A     Correct.

6        Q     Can you explain that to me.

7        A     Yeah.  Sometimes and regardless of the lab

8    I've had patients come back to me after sleeping at lab

9    X, Y and Z and say, well, the techs were talking, I

10   couldn't sleep.

11            In this situation she was sleeping here and

12   she apparently told the technician that it was a cold

13   room, and I took note of that.

14            Her sleep was somewhat disruptive from

15   respiratory arousals, so I ran with -- at that point in

16   time I ran with upper airway resistance syndrome as a

17   potential cause of her sleepiness.

18       Q     And what is upper airway -- I'm sorry, is it

19   upper airway resistance syndrome?

20       A     That's correct.

21       Q     Okay.  What is that condition?

22       A     This is sleep disorder breathing that is in

23   between snoring and obstructive sleep apnea.

24            So this is a -- and it can be just as

1   incapacitating as obstructive sleep apnea as far as its

2   impact on the individual's wakefulness.

3           So upper airway resistance syndrome refers to

4   a patient's response to some type of disruption of air

5   moving through the -- between the point of the lips and

6   the trachea.

7           So there's some issue with movement and as

8   the patient inspires or takes a deep breath while

9   they're sleeping there is a disruption of the sleep

10  that triggers the brain to alertness.

11          So that triggering of alertness causes them

12  to then have a disruption of the stage of sleep they're

13  in and it might actually cause them to wake up,

14  particularly what we call microarousals.  And

15  microarousals over and over again throughout the night

16  disrupt the pattern of sleep, disrupts the depth of

17  sleep and it causes the person to have excessive

18  daytime sleepiness.

19          Did I explain that well?

20      Q   Yes.

21      A   Okay.

22      Q   In the Impression section of this document

23  you indicate a follow-up with Dr. Koelling.  Did I say

24  that right?

1      A      Yeah.  That's an optometrist or

2   ophthalmologist.  She had seen that individual.

3           I couldn't see her fundus at the previous

4   exam very well.  She was going to follow up with that

5   individual.

6           These are notes to myself to make sure that

7   I'm keeping track of her eye problem even though it's

8   really not my primary problem, because it can affect

9   headaches.

10     Q    On this document then there's a plan and what

11  the plan for?  Is that a plan to treat the UARS?

12     A    That's correct, yes.

13          So the primary approach to upper airway

14  resistance syndrome we try to approach that without

15  using any pressure treatment or CPAP.  So putting

16  gravity to work for the patient we ask them to elevate

17  the head of their bed typically with a couple of two by

18  fours or a brick or something, and I explain that to

19  the patient at the time.

20          But elevating the head two to four inches

21  allows the tissues of the neck to be on the incline and

22  that can reduce the breathing problem.  Then I also add

23  Flonase nasal spray, which opens up the pipes.  It

24  decreases swelling of the nasal mucosa.  You get a

1    better flow of air.  So sometimes that's enough to

2    resolve the breathing issue.

3        Q    And there is an entry under Plan that says,

4    "Keep same sleep hours."  Can you explain that to me.

5        A    Yeah.  The explanation that I actually have

6    with the patient that refers to that topic is with

7    regard to sleep hygiene.  So I'll go through and I'll

8    describe please keep the same bedtime, the same waking

9    time if you possibly can.  That would reduce the impact

10   of some type of diurnal cycle issue in maintaining

11   wakefulness.

12       Q    And for treatment of UARS does it matter

13   whether the patient, the individual, is sleeping a

14   normal schedule during the day or sleeping a normal

15   schedule at night?

16       A    No.

17       Q    As long it's a normal schedule it's --

18       A    No.  I'm just asking her to obtain sleep

19   hygiene in this situation just to make sure that her

20   sleep, the efficiency of her sleep is as good as it can

21   be.

22       Q    Okay.  And just turning back to the previous

23   page, and they have numbers in the bottom right-hand

24   corner.

1    A    Yeah.

2    Q    362.

3    A    362, yeah.  Got it.

4    Q    You had indicated that you wanted to rule out

5  apnea and narcolepsy?

6    A    Yes.  Common things are common, so those

7  would be common causes of hypersomnia.

8    Q    And how do you rule those out?

9    A    Well, the obstructive sleep apnea we ruled

10  out with a baseline study.  That was the sleep study

11  that I'm sure you'll show me later on here.

12         So her apnea hyponea index was 4.7, which

13  falls below 5.

14         5 is the acceptable cut-off for a normal

15  human being over the age of 16.  So we basically ruled

16  out obstructive sleep apnea.

17         The diagnosis of narcolepsy we like to do a

18  multiple sleep latency test to rule out.

19         Clinically if you look at the sleep medicine

20  criteria from the American Academy of Sleep Medicine,

21  you could either rule it out, you can approach the

22  patient from a clinical standpoint, or you can throw in

23  the testing, or you can do a spinal tap and get a CSF

24  hypocretin level.  There are a number of ways you can

1    approach the diagnosis of narcolepsy.

2        Q    And so for Ms. Stone what did you do?

3        A    I believe we did an MSLT in her case.

4             Okay.  So that was from 8/6/09.  Typically we

5    do them the day after, but in this situation, probably

6    a scheduling issue, we ended up doing that about a

7    month later.

8        Q    Okay.  So we'll get to that record.  I want

9    to continue to go chronologically because it's easiest

10   for me.

11       A    Sure.

12       Q    So just turning to page 7 and 8.  Page 8

13   appears to be a duplicate.

14            I'm sorry.  740 appears to be a duplicate.

15   So then --

16       A    Okay.

17       Q    So I'm up to page 365 and this appears to

18   be -- can you explain what this is because it looks

19   like some type of typewritten --

20       A    Oh, this is actually a technician note.

21            The technicians who performed the sleep

22   studies will go through -- at the end of the study

23   they'll give their paragraph description of how the

24   night went and what they observed.

1     Q     What is a baseline PSG?

2     A     A baseline basically defines whether the

3  sleep study is performed as an initial study or whether

4  it's performed as a follow-up study or as a study

5  associated with CPAP titration.  So typically we'll

6  describe baseline versus CPAP titration study.

7           Basically, it means there is no oxygen given

8  and no CPAP given for that study.  Sorry about that.

9     Q     Thank you.

10          So are the patients told whether they should

11  sleep before coming in or not?

12    A     Yeah, they're asked -- they're just asked to

13  do their regular routine the day before a sleep study

14  but to present to the office at 8:00 or so.   That's

15  the drill or the routine for that.

16    Q     And where this note says, "Her sleep is

17  stable with delta wave sleep present," what does that

18  mean?

19    A     The technician has looked through the sleep

20  study and he is stating that slow wave sleep, which is

21  N3, is present and stable.  In other words, there

22  wasn't a lot of disruption in his or her opinion -- let

23  me see who did this one -- okay, her opinion that that

24  delta sleep was very disruptive.

```
 1      Q    Then it says, "Her REM onset latency is a
 2   little quick but within normal limits."  What does that
 3   mean?
 4      A    She's just describing -- again, this is
 5   another individual's verbiage, and I do take this into
 6   account as I look through a study, but I don't base any
 7   interpretation on the notes of a technician.
 8           So just I want to say that this is not my
 9   document.  It's in my chart but this is a technician
10   note.
11           So her description she's just saying she
12   thought that the REM sleep came on quickly but she felt
13   it was within normal limits.
14      Q    Okay.  And where it says, "Her EKG remained
15   without" --
16      A    "Ectopy."
17      Q    "Ectopy," thank you, what does that mean?
18      A    Ectopy is extra heartbeat.  PVCs, PACs, PJCs.
19      Q    So in terms of reading this note is there
20   anything unusual about her sleep that would cause you
21   concern by reading the note?
22      A    Well, I mean, any time an individual is
23   experiencing apnea or fragmentation of sleep then I
24   would say that's an issue, yeah.
```

1          So, remember, she does have 4.7 apneas per

2     hour, so she is having -- she is experiencing apneas.

3     It just doesn't qualify her for an aggressive

4     management with CPAP.

5          Q     Is there anything in this note that reflects

6     or would help diagnose narcolepsy?

7          A     Well, the REM interval that seems to be a

8     little quick in onset, you know, that might be helpful.

9          Q     So moving on I'm going to skip 366.

10         A     These are all technician notes, by the way.

11         Q     Okay.  And I will skip 367.

12         A     368 is a hypnogram.  It's a description of

13    the architecture of the patient's night.

14         Q     Okay.  We'll skip that.  And then I'm going

15    to skip 369.  I think that get us to 370, and there's a

16    handwritten note on 370?

17         A     Correct.

18         Q     Is that your writing?

19         A     That is.

20         Q     Okay.  And so what does that say?

21         A     Those are just quick notes to myself that the

22    patient is exhibiting certain problems with their sleep

23    diagnoses related to -- that I felt were uncovered by

24    this sleep study.

1    Q    And what are the diagnoses that you thought

2    were uncovered by this sleep study?

3    A    So Upper Airway Resistance Syndrome is the

4    URAS, and RBD is REM Behavior Disorder, which are

5    paradoxical which means they shouldn't really be there

6    but they're their movements during dream sleep.

7         So REM sleep equals dream sleep.  Typically

8    during dream sleep we are paralyzed.  In this case

9    during dream sleep -- and you can see this on the

10   hypnogram on 368 and the hypnogram where it shows limb

11   movements.  The large hatches across the top are dream

12   sleep intervals where it says REM cycles.  So there are

13   three of those.  And during those REM cycles if you

14   then follow the vertical down, you'd find that she has

15   limb movements during those intervals.

16        Typically, all limb movements stop during

17   dream sleep.  And so that displays paradoxical or it

18   shouldn't be there type of jerky movements of her

19   extremities during REM sleep.

20   Q    The next page then is 371.

21   A    Okay.

22   Q    And this appears to be a note that's from

23   July 2nd, 2009.  Is that accurate?

24   A    Correct.

1       Q     So your impressions then are the two

2    diagnoses that you indicated, the UARS and the mild REM

3    behavior disorder?

4       A     Correct.

5       Q     So at this point am I correct that you did

6    not or had not diagnosed narcolepsy?

7       A     That's correct.

8       Q     Had you ruled out narcolepsy yet?

9       A     No.

10       Q     So what is the plan -- is that first bullet

11    point is that some sort of medication?

12       A     Yeah.  Amitriptyline was what she was taking

13    as a prophylactic against migraine headaches and so I

14    thought I'm going to continue that.

15             When we treat Upper Airway Resistance

16    Syndrome, because of the different arousals that are

17    present during that disorder, Amitriptyline or

18    Trazodone can be used in that scenario, so I said

19    continue Amitriptyline.

20             The bullet point elevate head of bed three to

21    four inches and the steroid nasal spray we already

22    talked about.

23       Q     So the next page is 776 and it appears to be

24    a duplicate?

1       A      That's true.

2       Q      777 is the next page and it appears to be a

3   duplicate?

4       A      Correct.

5       Q      778 I'm going to skip.  It may be a

6   duplicate.

7              779 I'm going to skip.

8              780 I will skip.

9              781 I will skip.

10              782 it's a duplicate and I will skip it.

11              742 is a duplicate.

12              743 is a duplicate.

13              That brings us up to 744.

14       A      Okay.

15       Q      So what is this document?

16       A      These are, again, technician -- This is a

17   note that is generated by a technical review, what we

18   call scoring.

19              So when a technician looks at a sleep study,

20   at the end of the night they have to count the number

21   of arousals, the number of apneas, the number of

22   awakenings, the number of limb movements and whatnot

23   and they tally all of those scores.  So this is in some

24   ways a tally sheet.

1      Q    Okay.  And this was the tests that were run?

2      A    This is the baseline sleep study.

3      Q    Okay.  So let's go ahead and then skip down

4    to 786.

5      A    Uh-huh.  I'm there.

6      Q    Okay.  Perfect.

7           So this appears to be the next time you saw

8    Ms. Stone?

9      A    That's correct.

10     Q    And this is on July 17, 2009?

11     A    Correct.

12     Q    Okay.  So I paused because it looked very

13   familiar to me.  And this appears to be the same

14   document that -- or similar to a document we looked at

15   earlier, which was 787 that had the date of service of

16   6/10/09?

17     A    Right.

18     Q    But is this the accurate date of -- it would

19   have been July 17, '09?

20     A    Correct.

21     Q    Okay.

22     A    Yeah.  We really didn't change anything that

23   visit.

24     Q    Okay.  So because you had indicated you

1    thought that this document, 787, just had the wrong

2    date of service on it?

3         A    No.   No.   That was another document that you

4    showed me.   That was the 6/10/09 type of thing.   Yeah.

5              No, this is 7/17/09, so this is correctly

6    dated.

7         Q    I understand.   But if you look back at page

8    787, do you have it there?

9         A    Yes.

10        Q    Is this the same document, it just has a

11   different date of service?

12        A    Oh, okay, good.   Yeah.

13             So this is that document, the mystery

14   document from before where I had dated it 6/10/09, and

15   then in reviewing I had changed the date on it.

16        Q    Right.

17        A    All right.   So the document where -- the

18   mystery document was actually the 7/17 visit.

19        Q    Okay.   So your plan then on July 17 or a part

20   of the plan was for her to keep the same sleep hours as

21   we discussed earlier?

22        A    That's correct.

23        Q    Okay.   So the next page, which is 363,

24   indicates a date of service of August 6, 2009?

1        A       Correct.

2        Q       So what was happening on August 6, 2008?

3        A       So this was her multiple sleep latency test.

4        Q       And if you turn to page 364, are these your

5   notes from August 6, 2009 then?

6        A       That's correct.

7        Q       And I see under the Impression it says,

8   "Probable etiology."  Did I say that right?

9        A       Yeah, right, cause.  Probable etiology or

10   cause.

11        Q       "Narcolepsy versus upper airway resistance

12   syndrome."  Can you explain that to me.

13        A       Yeah.  So whenever we do a multiple sleep

14   latency test we hope that we'll get a textbook answer.

15   And so in this case she had one sleep onset REM period

16   in nap number two under data at 10.5 minutes and she

17   had a mean sleep latency of 6.9 minutes, which is

18   abnormal.

19               Anything below nine minutes is indicative of

20   objective evidence of excessive daytime sleepiness.

21               So because I had already identified a problem

22   with her breathing at night and upper airway resistance

23   syndrome can cause excessive daytime sleepiness, and

24   because there weren't two naps, which is typically what

1    we like to see with narcolepsy, although we don't

2    always see that, but because at least one nap was

3    present but not two I said it's still open.  It could

4    be narcolepsy, it could be upper airway resistance

5    syndrome.

6          Q    And explain one nap versus two naps.

7          A    Sure.  So the criteria for absolute diagnosis

8    of narcolepsy is clinical history that's supportive,

9    excessive daytime sleepiness, sleep paralysis,

10   hypnagogic hallucinations, cataplexy.

11              I can explain all of those if you want me to

12   but they're available in every textbook.

13              So if we have one nap where the patient

14   experiences during that nap -- and typically the naps

15   are 20 minutes.  If the patient experiences an

16   occurrence of REM sleep then that's considered abnormal

17   in the right clinical setting.

18              If two naps are present where REM sleep

19   occurs -- because the typical REM onset is somewhere

20   over 45 minutes, so if you're just studying a patient

21   for 20 minutes and, boom, they're into REM sleep, you

22   have to ask the question, okay, maybe this is

23   narcolepsy.

24              But could it be delayed sleep phase disorder,

1    yeah.  Could it just be just real crummy sleep,

2    obstructive sleep apnea or upper airway resistance

3    syndrome, you know, not as common but maybe.

4           But because of the patient is in this

5    situation with one nap versus two naps, which is what

6    we want for absolute criteria to meet that, I had to

7    list the differential or the list of possibilities for

8    her sleepiness as narcolepsy versus upper airway

9    resistance syndrome.

10       Q    And when she's taking this test does she have

11   multiple naps?

12       A    She does.  Five total.

13           Yeah, let me explain that multiple sleep

14   latency test.

15           So the patient presents.  They're asked to go

16   to sleep at about 7 a.m.  They are in the bed with

17   lights out for 20 minutes.  That's nap number one.

18   Then they're awake for two hours and they're asked

19   then, lights out, go to sleep or get in bed and try to

20   sleep if you can.  That nap goes 20 minutes and then so

21   on throughout the day.

22           This is a daytime study versus the baseline

23   sleep study which was the all-night study.

24           So in a multiple sleep latency test these

1    individual naps then are studied to see, number one, if

2    the patient can fall asleep.  And if they fall asleep

3    below nine minutes that's pathological.  That means

4    they're excessively tired.

5            And the second thing is do they experience

6    dream sleep during that 20-minute nap.  And if they do,

7    because REM sleep shouldn't come on that quickly, it

8    should come on over that 45-minute interval, then

9    that's considered pathological.

10    Q    Okay.  So what is narcolepsy?

11    A    It's a neurological condition.  It can be

12    primary or secondary.  It can be a disorder that a

13    patient is born with.  It can also be caused by stroke,

14    by metabolic disturbance.  It can be caused by head

15    injury.

16            A lot of military guys are coming home and

17    they're being diagnosed with objective clinical

18    criteria that are consistent with a diagnosis of

19    narcolepsy, even though it's not something they were

20    born with.

21            But narcolepsy it's a sleep-wake disturbance

22    where patients are really never awake and they're

23    really not getting good sleep either.  So they have

24    problems with maintaining daytime wakefulness and their

1   days can be -- you can have sleep intrusions throughout

2   the day.  You can have cataplectic episodes where the

3   patients just lose all muscle tone.  That's REM sleep,

4   that form of sleep where we're supposed to be paralyzed

5   like I discussed earlier.

6          That sleep paralysis can occur during the

7   daytime as an intrusion to alertness and that causes

8   collapse.  Even though they don't fall asleep, they're

9   awake, they're breathing, they're looking around the

10  room, but they can't move.  They slur their speech.  So

11  that's cataplexy.

12         They can experience sleep paralysis where

13  they wake up during the night and they're looking

14  around the room but they're still stuck sort of in

15  dream sleep so their body is still paralyzed.  So

16  they're laying there.  They can't move their muscles

17  until they become fully awake.  So that can be very

18  frightening.

19         And then hypnagogic or hypnopompic

20  hallucinations can occur where when you're going to

21  sleep you're in between dream and wakefulness and you

22  can have hallucinations where you become confused,

23  wait, am I dreaming this or is this really happening.

24  And that can happen when you're going to sleep,

1   hypnagogic hallucinations, or when you're waking up,

2   which is hypnopompic hallucinations.

3       Q    Okay.  And aside from the evidence of the REM

4   sleep during one nap was there any indication in this

5   test that Ms. Stone was exhibiting any of those

6   symptoms of narcolepsy?

7       A    We don't -- Yeah, we didn't describe --

8   that's a good idea, though.  We could have a

9   questionnaire.  We don't describe sleep paralysis,

10  hypnagogic hallucinations, cataplexy, the hypersomnia

11  as part of this technical study.  It's just a study to

12  observe brain activity.

13           So, yeah, that would not be included in this

14  document.

15      Q    Okay.  And do the technicians record that

16  anywhere if they observe those symptoms?

17      A    Well, cataplexy really wouldn't play into

18  this because the patient is supine.  They're laying

19  there in bed.  So that really would not be something

20  we're concerned about.

21           Hypnagogic hallucinations, if the patient has

22  a panic attack because of either sleep paralysis, which

23  they can, or with hypnagogic hallucinations, that would

24  be something that would be recorded in the technical

1    notes.

2            And then the hypersomnia is the reason why

3    the patient is there in the first place, so that would

4    be recorded.

5        Q    If a patient only had one nap revealing

6    evidence of REM sleep, does that give you any -- if

7    this is narcolepsy does that give you any clue as to

8    whether it's a mild form of narcolepsy or a severe form

9    of narcolepsy?

10       A    Well, the confounding factor in this case,

11   unfortunately, is that it's a dirty study.  And that

12   might raise an eyebrow in the legal community but all

13   it means is that the patient was not -- the patient was

14   taking a medication and that medication is

15   Amitriptyline.

16            Unfortunately, Amitriptyline can delay --

17   Fortunately and unfortunately; it's doing what it's

18   supposed to do, but it can delay sleep onset REM.

19            So that you could do a multiple sleep latency

20   test.  It will run 20 minutes and the patient won't

21   experience sleep onset REM because they're on a

22   tricyclic anti-depressant.

23            So the patient was taking 25 milligrams of

24   Elavil or Amitriptyline every night.  So in the best or

1    in a perfect world we could just stop medication

2    abruptly and study a patient with this type of testing.

3    Unfortunately, I would have run the risk of having her

4    had severe migraines, not doing well physiologically if

5    I had done that, so I chose to just go ahead and run

6    the test to try and quantify her sleepiness.  But that

7    may -- that likely contributed to the false negativity

8    of this test.

9        Q     What do you mean the false negativity?

10       A     Well, in other words, if she hadn't been on

11   Elavil she may have gone into REM sleep every single

12   nap.  I just don't know that.

13       Q     Okay.

14       A     So what I'm saying is, she's on the

15   medication that delays REM sleep.  I only got one nap

16   with REM sleep.  Without Elavil on board I might have

17   gotten five.  I won't be able to answer that question

18   unless I perform a multiple sleep latency on her on no

19   medication.

20       Q     And in the plan what is stimulant treatment?

21       A     The stimulants that we use for excessive

22   daytime sleepiness are primarily amphetamines,

23   Adderall, Ritalin, a lot of things that you hear about

24   in the news for ADD, ADHD.  We also use

```
 1   species-specific medications such as Modafinil,

 2   Nuvigil.

 3           Modafinil at this point in time which was

 4   created specifically for narcolepsy.

 5       Q    And --

 6       A    Or oxybate.

 7           Sodium oxybate is the medication that we use

 8   specifically for narcolepsy.

 9       Q    And is the medication successful in treating

10   narcolepsy?

11       A    Not always.

12       Q    And then the second bullet says, "Consider

13   brief daytime naps."

14       A    Right.  We call these power naps.  So

15   individuals will take a 10 to 15 or 15-to 20-minute nap

16   throughout the day if possible.  They don't always have

17   that luxury.

18           But if they are able to do a 15-to

19   20-minute nap at various intervals throughout the day

20   sometimes provides an ability to become alert, although

21   it's typically brief in duration, that alerting

22   mechanism.

23       Q    And then the third bullet is, "Consider

24   oxybate nightly."  What is that?
```

1        A       Sodium oxybate acts by increasing

2   neurotransmitters in the brain that are deficient in

3   narcolepsy, and so it is considered the drug of choice

4   for narcoleptics.

5        Q       Is this plan a plan of treatment for

6   narcolepsy?

7        A       That would be considered good advice for a

8   narcoleptic, yeah.  Yeah, those would be primary

9   considerations.

10       Q       Okay.  Is this a typical treatment plan for

11  narcolepsy?

12       A       Yes.

13       Q       And I see in this plan there's nothing about

14  sleep schedule; is that correct?

15       A       Well, the sleep hygiene I've been letting her

16  know all along.

17              The fact that didn't make this list does not

18  mean that we wouldn't be paying attention to sleep

19  hygiene, because I tend to focus on that all along with

20  the patient as the notes show that we're talking about

21  sleep efficiency.

22       Q       When you're talking about sleep hygiene

23  you're talking about maintaining a regular sleep

24  schedule?

1    A    That's correct.

2    Q    And as you said earlier, it doesn't matter

3  when that sleep schedule is as long as it's regular?

4        MS. LAWS:  Objection.

5        THE WITNESS:  Well -- Okay.  With regard to

6  sleep efficiency, if a patient is keeping regular

7  hours, typically we can get someone through life having

8  them keep regular hours as long as they have -- for

9  instance, if someone's -- if someone is in a normal --

10  and I know this case is about shifts.  So if you and I

11  who are first shifters if we are getting up and going

12  to work every day and we work 9:00 to 5:00, 8:00 to

13  4:00, whatever the situation is, if we can maintain

14  nighttime hours that are reasonable, say, 10:00 to

15  6:00, 10:00 to 7:00 sleep hours, that would be

16  considered efficient sleep maintenance.

17        If an individual is working second shift,

18  11:00 to 7:00, all right, they're getting to bed

19  hopefully between 8:00 and 9:00, they can still

20  maintain nighttime hours.

21        And the reason why I emphasize nighttime

22  hours because the sun is what controls your

23  diurnal cycles, and your ability to maintain alertness

24  depends on how well you can follow the day.

1           The sun coming up, the sun going down that's

2    what adenosine is following, which is a

3    neurotransmitter that brings on sleepiness.  That's

4    what melatonin spikes in your brain.  We all have

5    melatonin in our brain.  That's what melatonin follows.

6    And those are all factors that send us into sleep.

7           So for us to maintain efficient sleep we have

8    to try and follow a diurnal cycle that closely

9    approximates the sun.

10          So if we're able to do that, great.  If we're

11   not -- say I'm cursed and I've got to work 11:00 to

12   7:00, well, then what I'm doing is at 8:00 when the sun

13   is coming up I'm trying to go to sleep.

14          So if I'm not getting to sleep in a very dark

15   room then my brain is going to start getting wonky and

16   I won't be able to follow a real nice diurnal cycle so

17   that my adenosine and my melatonin -- all the

18   neurotransmitters in my brain can't fall into place to

19   put me into deep restorative sleep.

20          Stop me any time just to explain.  But what

21   I want to drill home here is that for me to have

22   efficient sleep I've got to have a light/dark cycle

23   that approximates the normal day with sunshine and

24   darkness.  And if I can't do that, if I don't have a

```
 1   dimly lit room, if I don't have room darkening shades,

 2   then the neurotransmitters in my brain that are

 3   supposed to establish efficient sleep don't function

 4   well.

 5       Q    Are there individuals who suffer from

 6   narcolepsy who are able to maintain sleep hygiene as

 7   you indicated even though they work the third shift?

 8       A    Well, the factor of narcolepsy brings in

 9   another problem because narcoleptics rarely sleep well,

10   especially if they have experienced sleep paralysis in

11   the past, especially if they have experienced

12   hypnagogic hallucinations.  Because that creates an

13   anxiety.  That creates to a degree an anxiety disorder

14   where sleep does not come easily to them.

15          So if you bring in the factor of narcolepsy

16   to this, yes, they could maintain all of those things

17   with room darkening shades and whatnot, but

18   narcoleptics rarely have really good sleep.

19          Even in the most wonderful situation, you

20   know, even if you're living on an island somewhere and

21   you have no responsibilities whatsoever, as a

22   narcoleptic you can still have crummy sleep.

23       Q    Do you recall having any conversations with

24   Ms. Stone in terms of whether she was able to maintain
```

1    a regular sleep schedule while working the third shift?

2        A    Well, and what I -- earlier in the notes I

3    think I described it.  She was -- you know, I wasn't in

4    her house so I don't know, but from the questions she

5    was having trouble maintaining good sleep hygiene

6    because of work and sleep -- or work and school.

7    Excuse me.  Yeah.

8            So she was going to school and working and

9    because of all of those responsibilities I think that

10   her sleep was less than efficient.  Her sleep hygiene

11   wasn't the greatest.

12       Q    So was it your understanding she was working

13   at nights and trying to go to school during the day?

14       A    I don't know what time of day she was going

15   to school.  I don't know if it was mornings or

16   afternoons or whenever, but it was a combination of

17   work and school that was chewing away at parts of her

18   24-hour day.

19       Q    And would she have been able to maintain a

20   better sleep pattern if she was not going to school in

21   your opinion?

22       A    Well, the pattern of sleep, yeah.

23            Well, no, your question is direct so the

24   answer is yes, because if she didn't have school

1  responsibilities, then that would offer her a larger

2  block of the 24-hour day to maintain I would assume a

3  better sleep interval.

4      Q    So we're at 364, and then I'm going to

5  skip -- the next page is a duplicate.

6          I'll skip the next page 747.

7          I'll skip the next page is a duplicate 750.

8          I'll skip 751.

9          That brings me up to 725.  Is that where

10  you're at?

11     A    Yes.

12     Q    So this looks to be a date of service of

13  September 18, 2009; is that correct?

14     A    Correct.

15     Q    Okay.  This would be the next time you saw

16  her after August 6th?

17     A    I believe so.

18     Q    Okay.  So under R.O.S. there's a box that's

19  blacked out.  Do you know why that's blacked out?

20     A    I don't know.  I don't -- I have no idea.

21  But it was scanned into the computer that way.

22     Q    Is that something that's blacked on your end

23  or is that something that the EEOC blacked out, if you

24  know?

1      A    I'm assuming it's me because it's within the

2   Excel spaces there.  And it was scanned.  I can pull it

3   up on the computer.

4         MS. LAWS:  Actually, looking at the document

5   I'll represent to you, counsel, that that was a

6   redaction as a result of a privileged -- I'm sorry -- a

7   privacy issue.

8         It is a medication I believe that -- and you

9   and Lindsey and I have had conversations about this

10  with respect to sensitive medications the charging

11  party has taken in the past with some rather private

12  reproduction issues.  And I told you and offered to

13  produce things unredacted if we could agree on an

14  "Attorneys Eyes Only" designation and as a result when

15  these documents were produced that discussion and we

16  hadn't come to that agreement.

17        MR. WHITCOMB:  Okay.  Well, we can talk about

18  that.  I was just trying to understand at least what it

19  was.

20      Q    So looking at the top section, which is the

21  neurological consultation --

22      A    Yes.

23      Q    -- I see it says, "feels hung over from

24  (as read) Elavan."

1      A    Elavil is Amitriptyline, correct.

2      Q    Okay.  "But has not been keeping regular

3    hours."

4      A    Correct.

5      Q    So do you remember anything about why she

6    wasn't keeping regular hours?

7      A    This is a typical -- a typical comment made

8    by individuals who are working different shifts.

9           So, in other words, on the weekends they

10   don't want to spend their whole day doing nothing so

11   they might get up at 8:00 or 9:00 in the morning, and

12   then when they have to go back to work they might

13   sleep, you know, differently.  But that's a common

14   thing.  On weekends they might do something different.

15     Q    Do you know whether one of the reasons why

16   she wasn't keeping regular hours was that she was

17   trying to work at night and go to school during the

18   days?

19     A    It's not clear by this.  I'm not sure.  But

20   that certainly could be the case.

21     Q    Okay.  Now, I see it says, "Working 3:00 to

22   11:00 shift work but wants first shift."

23     A    That's what she said.

24     Q    Okay.  So she is the one who told you she

1    wanted to work first shift?

2        A    That's correct.

3        Q    Okay.  Do you remember why she told you she

4    wanted to work first shift?

5        A    I don't recall.  I don't know if it was

6    because of school hours schedule or what.

7        Q    And is the consultation, neurological

8    consultation, is that a discussion that you have at the

9    beginning of a session with the patient?

10       A    Yeah.  As I walk into the room I say what's

11   new?  How are things going?  How are medications

12   treating you?  It's just general banter with some

13   focused neurological questions and sleep questions.

14       Q    And up until this time you hadn't put any

15   restriction on her work shifts, correct?

16       A    I don't believe so.

17       Q    Okay.  So going to the bottom of this form

18   then it says under the Impressions and I see number two

19   says, "Shift work sleep disorder."  I hadn't seen that

20   before.  Can you explain what that is.

21       A    Shift work sleep disorder is a -- typically

22   it's when individuals are tossed around from one shift

23   to another.

24                But any time you have a situation where a

 1  patient is battling the sun in their 24-hour interval,

 2  I will define that as -- well, I don't personally

 3  define it but I will list that as playing into the

 4  situation.

 5        So it's not just a pristine case of, well,

 6  I've got a patient who's awake all day and trying to

 7  sleep at night and I'm trying to treat narcolepsy or

 8  upper airway resistance syndrome or whatever the cause

 9  of their excessive daytime sleepiness is.  It's telling

10  me that there's another factor and that is that the

11  individual has to work nights.  So it can put a cog in

12  the wheel of sleep efficiency, sleep hygiene.

13     Q    And under No. 4 this hypersomnia, again it

14  says the narcolepsy versus upper airway resistance

15  syndrome?

16     A    Correct.

17     Q    Do I understand you correctly that it was

18  your belief that both of those issues were contributing

19  factors?

20     A    Well, again, we just had one nap that was

21  positive in that study.  So I really didn't have a

22  textbook presentation by the patient in that study that

23  says I'm definitely a narcoleptic.  I just had one

24  test -- or one nap, excuse me, that was positive for

1    sleep onset REM.

2            So because I only had one of those positive,

3    but she was on Elavil and she might have it, I have to

4    keep reminding myself in my notes this might be a

5    narcoleptic.  So I listed that in her assessment.

6        Q    So when you say "she might be a narcoleptic,"

7    she also might not be a narcoleptic.  Is that a fair

8    statement?

9        A    Absolutely.

10        Q    Is it fair to say that you --

11        A    Something's causing her to have excessive

12    daytime sleepiness, whether it's a smelly teddy bear

13    or narcolepsy or upper airway resistance syndrome.

14    Whatever it is she is excessively tired.

15            So with hypersomnia if I've got a multiple

16    sleep latency test that shows one nap, there is a

17    possibility that could be narcolepsy.  But there are a

18    few other causes of that too, including the fact that

19    she was on Amitriptyline.

20        Q    So is it fair to say you were not able to

21    make a definitive diagnosis of narcolepsy?

22        A    That's correct.

23        Q    Okay.  And so you couldn't say with medical

24    certainty that she is a narcoleptic; is that true?

1          A     Well, I mean like I said, you can have cases

2     where you don't do any testing.  But she's behaving

3     like a narcoleptic.  She's got crummy sleep.  She's

4     excessively tired.  She's got a history of sleep

5     paralysis, hypnagogic hallucinations and cataplexy.  I

6     mean, she has a clinical presentation that looks like

7     narcolepsy.

8               So, you know, even though she wasn't born

9     with it and I can't say, well, this might not be

10    primary narcolepsy, she's had a stroke that can cause

11    narcolepsy.  She's got a metabolic disturbance.  She's

12    got diabetes.  So that could contribute to excessive

13    daytime sleepiness and sort of trigger an underlying

14    propensity for excessive sleepiness associated with a

15    mild form of narcolepsy.

16              There's enough going on here that I have to

17    list it as a possibility.

18         Q     Right.  But you couldn't say with medical

19    certainty that she's a narcoleptic?

20         A     Well, I can state that she clinically has

21    narcolepsy.

22         Q     Based upon?

23         A     Based on clinical history and the fact that

24    she had a single nap sleep onset REM period, and she

```
 1    was on Amitriptyline which delays REM sleep.

 2         Q     Would you agree with me that most people who

 3    work at night and go to school during the day have

 4    crummy sleep?

 5              MS. LAWS:  Objection.

 6              THE WITNESS:  I don't know if that's your

 7    personal experience.  No.  I don't know.

 8    BY MR. WHITCOMB:

 9         Q     What tests could you have run to determine

10    more definitively whether she had narcolepsy?

11         A     A spinal tap for CFS hypocretin.  She was not

12    interested in that.

13         Q     If you had done a spinal tap would you have

14    been able to say with more certainty then whether she

15    had narcolepsy or not?

16         A     Yes.  But it wouldn't have changed my

17    treatment, so then that's why I did not pursue that.

18              The treatment is still stimulant therapy and

19    maintenance of sleep hygiene as best as we can.

20         Q     Okay.  So going back at during the

21    neurological consultation, you know, she said she

22    wanted to work first shift.  Then I see in your plan

23    your plan was a work slip to work first shift.  Do you

24    see that?
```

1      A    Yes.

2      Q    And so was that work slip prepared at her

3   suggestion that she work first shift?

4      A    That is correct.

5           Let me clarify that statement.  I mean, she

6   wants to work first shift so she says to me, hey, one

7   thing that I could do to feel more alert would be to

8   get better sleep at night, so one way that I can get

9   better sleep at night is I could work first shift.

10          So she's working with me trying to do

11  everything she can to get on a schedule where she's

12  getting more efficient sleep.

13     Q    But you hadn't recommended that as part of

14  your plan until she suggested that; is that correct?

15     A    Yeah, that's correct.

16     Q    Then it says "Power naps as needed."  Can you

17  explain.

18     A    Yeah.  That's what we were talking about

19  earlier, the 15-to 20-minute naps spread throughout the

20  day, if that's a possibility, just to provide -- to

21  quench the thrist for sleep that excessive daytime

22  sleepiness causes.

23     Q    By the way, we had looked at some of the

24  notes earlier from 2006 where it indicated that she was

    1    getting eight to ten hours of sleep a night?

    2        A    I do recall that, yeah.

    3        Q    And I thought there was another note that I

    4    was trying to find.

    5             Do you know whether she -- back in 2006 do

    6    you know whether she was going to school as well as

    7    working?

    8        A    I don't recall.

    9        Q    Are there certain things that trigger

    10   narcolepsy?

    11       A    Yeah.  That's what I said earlier.  You can

    12   have a trigger from stroke.  You can have a trigger

    13   from head injury.  I've seen cases associated with Lyme

    14   disease.  Normal pressure hydrocephalus can give you a

    15   narcolepsy-like picture.

    16            But, yeah, there's primary and secondary

    17   narcolepsy.  There's narcolepsy with cataplexy,

    18   narcolepsy without cataplexy.

    19            There's a bunch of different disorders that

    20   hover around this diagnosis of narcolepsy.

    21       Q    Were you ever able to establish a triggering

    22   event for Ms. Stone?

    23       A    She did have a stroke, a history of stroke, a

    24   basal ganglia stroke.  I'm not sure what the time stamp

1   was on that.

2       Q    If the stroke triggered narcolepsy would the

3   narcolepsy appear, express itself shortly after the

4   stroke, or is there a delay?

5       A    I can't answer that.

6       Q    Also on the plan it says, "Dc Elavil due to

7   next day hypersomnia."  Can you explain what that

8   means.

9       A    Yes.  She was using Provigil, which is a

10  species-specific drug.  When I say that I mean the drug

11  was created for narcolepsy.  And so despite using that

12  she was experiencing daytime sleepiness.  So I thought,

13  well, maybe the Elavil, which is a sedating tricyclic

14  anti-depressant, perhaps that was contributing to her

15  daytime sleepiness and so I chose to discontinue that

16  crossing my fingers that her headaches would not get

17  worse.

18      Q    I want to skip I believe it's two pages

19  further to the page before you --

20      A    753.

21      Q    753, thank you.  And also 754.

22      A    Okay.

23      Q    Is this a form that you completed or is any

24  of the writing --

1       A     It's a form I -- Oh, actually, yeah, I did

2    write, "First shift work only due to narcolepsy," and

3    then I signed it.

4       Q     Okay.  Is that the only writing on here that

5    is yours?

6       A     That's correct.

7       Q     Okay.  And just so I'm clear looking at this

8    page, the top box with the name and the location and

9    the date and the supervisor that's not your

10   handwriting, correct?

11      A     Well, now, I'm noticing here that the date --

12   the Laura Stone and the date is mine but nothing else

13   is mine.

14      Q     Okay.  Thank you.

15            And then in the next box down --

16      A     That is not my handwriting.

17      Q     That is not your handwriting?

18      A     No, sir.

19      Q     Do you know whose handwriting that is?

20      A     I do not.

21      Q     Okay.

22      A     My staff they do help me fill out forms, so

23   it's possible that they helped out.

24      Q     Then if you look at the next page is the

1    handwriting where it says, "First shift work only due

2    to narcolepsy," 347.000 is that your handwriting?

3        A    That is my handwriting, yes.

4        Q    And that's your signature?

5        A    Correct.

6        Q    What is 347.000?

7        A    Oh, that is an ICD-9 code for narcolepsy.

8        Q    Are there different levels of narcolepsy?

9        A    Well, like I was saying, there is narcolepsy

10   with cataplexy, narcolepsy without cataplexy.

11            There's primary narcolepsy, which is

12   something you're basically born with a predisposition

13   for that.  And then there's secondary narcolepsy, which

14   is due to head injury, stroke, things like that.

15       Q    And how would you categorize Ms. Stone?

16       A    I'd have to categorize her as secondary

17   because she wasn't apparently born with this problem.

18       Q    And then are there severities of narcolepsy?

19       A    Absolutely, yeah.

20       Q    And do those get graded any way in the

21   medical field?

22       A    I don't personally do that.  There may be

23   researchers who do that.

24            But there are patients who you sneak up

1    behind them and say boo and they drop to the ground in

2    a cataplectic event.

3              Good examples in the animal community where

4    you have goats who will do that or dogs that will do

5    that.

6              So there are severe forms of narcolepsy.  The

7    severity can be described as someone who just can't

8    stay awake or the severity could be described as

9    someone who has this cataplectic type of response to

10   high emotion.

11        Q    And do you know whether Ms. Stone had any

12   cataplectic events?

13        A    I believe she did have cataplectic events.

14        Q    Do you know how many?

15        A    I don't remember the details or how many, no.

16             Again, her primary issue was excessive

17   daytime sleepiness, hypersomnia.

18             Shall I repeat that?

19        Q    Say that again.

20        A    Yeah.  Again, her primary problem was

21   excessive daytime sleepiness and not collapse.

22             MR. WHITCOMB:  Off the record.

23             (A recess was taken.)

24   BY MR. WHITCOMB:

1       Q     The next page, which is 726, has a date of

2   service of March 30 --

3       A     Wait.  I have the next page.  Oh, I'm sorry.

4   Yeah, number 726, March 30th, 2010.

5       Q     Okay.  So would that have been the next time

6   you saw Ms. Stone after September 18?

7       A     I believe so.

8       Q     Okay.  If you're treating somebody for

9   narcolepsy would it be common to have a span of six

10  months between treatments?

11      A     If they're doing all right, yes.

12      Q     And how would you know if they're doing all

13  right if you don't see them?

14      A     They would call.  They would call or email or

15  have some type of communication.

16            And I never boast and I'm not boasting, but I

17  mean it might be six months before she could make it in

18  again.  So I don't know the specifics about this.

19      Q     Okay.  If somebody was having issues, though,

20  you would expect them to call and to try to schedule an

21  appointment?

22      A     If they were having emergencies I tell them

23  to go to the emergency room.

24            If they're having, yeah, significant

1    problems, yeah, that's the typical drill, they either

2    email or call.

3       Q    Do you know what brought her in on this day?

4       A    This was probably just a routine follow-up.

5            You know what, I'm noticing this -- If I may

6    just speak?

7       Q    Yes.

8       A    She wanted to try Accutane again and so the

9    question was -- The initial cause of this seizure that

10   she had before was felt to be related to Accutane, an

11   idiosyncratic reaction to medication which sometimes

12   occurs.

13           So she was hoping to try Accutane again

14   because of acne, pitting acne vulgaris of the face, and

15   so she was hoping to be put on something to stop her

16   from having seizure so that she could try the Accutane

17   again.

18           That's the gist of this visit.  So

19   Lamictal was the cortical stabilizer that I prescribed.

20      Q    And then flip to the next page.  It appears

21   to be the same.  And then the next entry on page 727

22   looks like a date of service of November 5th, 2010?

23      A    Yes, sir.

24      Q    And would that have been her next visit after

1    March 30th?

2        A    It appears, yeah.

3        Q    Do you have patients that you treat for

4    narcolepsy that you see on a more regular basis than

5    Ms. Stone?

6        A    This is a regular, pretty regular basis,

7    yeah.  This -- And, again, it could just be in 2010.  I

8    don't know what the nature of the practice was, but

9    this might have been the next available.

10           But, yeah, this would be considered -- you

11   know, two or three times a year would be considered a

12   typical neurological sleep medicine follow-up.

13       Q    Okay.

14       A    I will say that some physicians will make the

15   patient come back, will require the patient to come

16   back every month to get a new prescription.

17           Psychiatrists and some sleep medicine doctors

18   will do that.  I don't do that.  That's overkill.

19           And if I may just say, this box I don't

20   believe is mine.  Is this the medication?

21           MS. LAWS:  Yes, that's another instance of

22   that.

23           THE WITNESS:  Thank you.

24   BY MR. WHITCOMB:

1      Q      Under the neurological follow-up where it
2    says, "No napping with Nuvigil," what does that mean?
3      A      So, Provigil or Modafinil was the first drug
4    in this class that we have that provides an alerting
5    mechanism for narcoleptics.  It was replaced by Nuvigil
6    probably just because of the copyright.
7             But, anyway, so Nuvigil 250 milligrams was
8    felt to be giving her enough daytime alertness so that
9    she did not require the naps.
10     Q      And under the Impressions you indicate that
11   "She has an excellent response to Nuvigil."  Do you see
12   the impressions?
13     A      I do see that.
14     Q      Okay.  Under the plan it says, "Asa daily."
15   what is that?
16     A      Aspirin daily.
17     Q      Back up at the neurological follow-up I see
18   the Epworth sleepiness score is a two?
19     A      Yes.
20     Q      That's a pretty good score; is that correct?
21     A      It is.  Anything below ten is good.
22     Q      Is that a self-reporting type test?
23     A      It is.  Well, actually, it's me asking the
24   questions, and her responses dictate the scoring, yeah.

1    Q    Did she do an Epworth sleepiness score when

2    she came to you in July of 2009?

3    A    I'm not sure.  I didn't see it in here.  But,

4    again, it's just a subjective I'm sleepy or I'm not

5    sleepy-type thing.

6         When I say are you sleepy, what's the worst

7    sleepiness you've ever been, an eight out of ten, you

8    could extrapolate that and say, well, that's

9    equivalent to maybe 16, 18 out of 24, which is the

10   Epworth.  It's all very subjective.

11   Q    If you skip two pages ahead to 728.  This

12   looks like a visit of January 18, 2012; is that

13   correct?

14   A    Yes.

15   Q    So is it accurate that she went about 14

16   months between visits?

17   A    Possibly.

18   Q    And do you know can you tell from this note

19   why she came to you on January 18, 2012?

20   A    She probably needed to come back and see me

21   because she hadn't been to my office for more than a

22   year, and in order for me to prescribe in the State of

23   Ohio I have to see the patient at least once a year.

24   So that was probably a necessary follow-up.

1       Q      There is a note here about the Nuvigil not

2   working and switching to a different medication?

3       A      Correct.  Vyvanse is an amphetamine.

4       Q      And her Epworth sleepiness score is a two at

5   this point; is that correct?

6       A      Uh-huh, with medication.

7       Q      Is that a common score for somebody who has

8   narcolepsy?

9       A      That's a common score after treatment.  Like

10  potentially you could have two's, four's, anything

11  below ten if you're responding to treatment.

12          No.  But I mean narcoleptics when they

13  present and they're pristine and they're not being

14  treated with anything you would expect their scores to

15  be over ten.

16      Q      But when they are being treated a score of

17  two is common?

18      A      I would consider any score below ten to be

19  effective treatment.  You would expect that to be an

20  effective response to medication, a good response to

21  medication.

22      Q      But do most patients get as low as two?

23      A      Sometimes.  I don't know about most, but

24  yeah, sometimes we get lucky with our treatment and

```
 1    patients feel like they're alert.

 2            It's a pretty good dose of Vyvanse,

 3    40 milligrams twice a day.

 4        Q    I'll skip the next page.  It appears to be

 5    the same.  That brings us up to 729, which looks a

 6    little different form?

 7        A    Yeah.  So the format changed when I switched

 8    over to electronic medical record in June of 2012.

 9        Q    Okay.  So this appears to be a visit from

10    November 7 of 2012?

11        A    Correct.

12        Q    And would this have been her first visit

13    since January of 2012?

14        A    Could be.

15        Q    Okay.  And do you know why she came to see

16    you in November of 2012?

17        A    Again, it could have been related to

18    necessity for a follow-up or I wouldn't prescribe

19    medication for her because of the State of Ohio's

20    regulation, which is a good one.

21        Q    And where it says "CC" what does --

22        A    That's chief complaint.

23        Q    Okay.  And her chief complaint it says,

24    "School is killing me.  Having to get up so early,
```

1   6 a.m."?

2        A    Right.

3        Q    Do you remember anything more about that

4   complaint other than what is written here?

5        A    I don't.

6        Q    And then if you'd flip two pages ahead to

7   375.

8        A    Yes.

9        Q    This is an Epworth sleepiness score

10  questionnaire, correct?

11       A    Correct.

12            So she was in on November 7, and this one is

13  dated December 14, 2012.

14       Q    Do you know why she completed this

15  questionnaire roughly a month after her November visit?

16       A    Yeah.  This is her -- She was asked by the

17  sleep technician at the time of her sleep study to fill

18  this out.  This is a sleep study of 12/14.

19       Q    So is there a reason she had another sleep

20  study on December 14, 2013?

21       A    Yeah.  Periodically we'll reassess patients

22  and see how they're changing, see if there's been any

23  difference in the pathology of their sleep or in the

24  architecture of their sleep that would be something

1   else that might be complicating their treatment.

2       Q   And is this the first time in December of

3   2012 that you did a study on her since 2009?

4       A   Correct.

5       Q   And you had described the 2009 test as a

6   dirty test?

7       A   Because of the Amitriptyline, right.

8       Q   Do you know in 2012 was this also a dirty

9   test or not?

10      A   She was on medications, yeah.  But none of

11  those would affect her dream sleep.

12         So she was on Lisinopril and she was on

13  Vyvanse during the daytime, melatonin, Tylenol.  And

14  the Synvisc is an injection that she had received for

15  her knees.

16         I have them listed in case the patient has a

17  bad reaction to it and then I'm keen to that.

18      Q   And if you skip to 378, which is that page.

19  There's a handwritten note.  Is that your handwriting?

20      A   It is.

21      Q   What does that say?

22      A   It says, "Normal baseline."

23      Q   And then what is under "baseline"?

24      A   "Maintenance of wakefulness test."

1      Q    So can you explain that to me.

2      A    Absolutely.

3           A maintenance of wakefulness test is

4   performed in an individual typically who is complaining

5   of excessive daytime sleepiness despite treatment.  And

6   so the method is that the patient will be placed in a

7   similar setting as the multiple sleep latency test,

8   they'll be placed in a reclined positioning, the lights

9   go out and they're asked to stay awake.

10          So now in this situation whereas in the

11  multiple sleep latency test we say go ahead and go to

12  sleep.

13          In a maintenance of wakefulness test

14  basically the lights go out and we say you can sleep,

15  you can stay awake, whatever it is.

16          But she had this test after receiving the

17  Vyvanse, the stimulant.  So the question is, is there

18  objective evidence that after receiving Vyvanse she's

19  still having sleepiness.

20     Q    And what does normal baseline mean?

21     A    Oh, it didn't show evidence -- this

22  particular sleep study did not show evidence of sleep

23  apnea.  She had an HI of point eight.

24          It did not show evidence of periodic limb

 1   movements of sleep.  It was not a terribly disruptive

 2   sleep study.

 3            The typical cut-off is 85 percent for sleep

 4   efficiency.  She was at 82.4.  So she really wasn't

 5   quite as good as we'd like.  But in narcoleptics, like

 6   I said, we typically see problems with sleep efficiency

 7   anyway.

 8       Q    Is this a test that would indicate whether or

 9   not she was still experiencing -- would indicate

10   whether or not she had narcolepsy?

11       A    No.  No, a sleep study is not.

12            This particular sleep study is not -- or any

13   sleep study is not diagnostic for narcolepsy.

14       Q    So what is the diagnostic for narcolepsy?

15            And I know I may be asking you to repeat

16   yourself, but --

17       A    Oh, no, I'm fine.  You can ask me all day.

18       Q    -- I'm learning.

19       A    So we looked for a clinical history that's

20   consistent and we'd like to see -- you'd like to have

21   the textbook, right?  You'd like to have excessive

22   daytime sleepiness, a history of sleep paralysis, a

23   history of hypnagogic hallucinations --

24       Q    I have to ask you to slow down.

1      A    Yeah.  So a history of excessive daytime

2  sleepiness or hypersomnia, a history of sleep

3  paralysis, a history of hypnagogic hallucinations and

4  cataplexy, and in order to satisfy those criteria you

5  have to have two of those to satisfy the criteria for a

6  clinical diagnosis of narcolepsy.

7           Supportive testing for narcolepsy would

8  include spinal tap for CFS hypocretin, HLA-DR2, DQ1.

9           HLA-DR2, DQ1 those are blood tests that can

10  be performed.  I may or may not check those.  I really

11  don't find them very useful.

12           But the primary diagnostic criteria is

13  clinical, and then if you can have a supportive test

14  such as a sleep study with next day MSLT.

15           You really have to look at that as one unit

16  because you want to interpret what does their sleep

17  look like, what does their nap study look like and do

18  those two together provide support.

19      Q    Okay.  And so in Ms. Stone's case what

20  histories -- You gave me several different things you

21  would look for a history of and you said you needed at

22  least two to do.  So what was she --

23      A    The clear clinical that I recall in her case

24  would be the sleep paralysis and the excessive daytime

1    sleepiness.  Those would be the two absolutes in her

2    case.

3              The cataplexy -- I don't recall her

4    specifics.  I know she had episodes of slurred speech

5    throughout the day.  That can be a form of cataplexy.

6              Just simple zig-zag walking where you're

7    walking down the hall and you kind of, okay, what was

8    that.  Intermittent disequilibrium, things like that

9    can also be minor forms of cataplexy.  And I don't

10   remember specifically in her case.  But the sleep

11   paralysis and the hypersomnia are clear.  And all you

12   need is two of those to --

13        Q    And the hypersomnia is a self-report?

14        A    Well, no.  No.  In her case with the multiple

15   sleep latency test she came in under that nine-minute

16   mark.  She was at 6.9 minutes as I recall.  So she

17   satisfies objective criteria for narcolepsy -- I'm

18   sorry -- for excessive daytime sleepiness.

19        Q    Okay.  Because that is something that's

20   measured on that test?

21        A    That's correct.

22        Q    Okay.  And the sleep paralysis is that

23   something that is also indicated on the test?

24        A    We don't measure that on the test.

1        Q     How is sleep paralysis measured?

2        A     Sleep paralysis is a question that you would

3    simply ask the patient.

4        Q     So that is a self-report?

5        A     That is correct.

6        Q     Now, how does a patient know they have sleep

7    paralysis?

8        A     The clinician has to ask them.  And most of

9    the time -- I don't know many patients that will come

10   into the office -- and I've been doing this 20 years.

11   I don't think I've ever had a patient come in and go

12   you know what, I wake up in the middle night and I

13   can't move.  It's more so in the questions that we go

14   through to try to work up a sleep disorder that we'll

15   say, well, do you ever wake up in the middle of the

16   night and you can't move anything, and then they'll

17   say, hey, I've had that happen.

18       Q     Is that indicated in the notes we've looked

19   at so far that she reported --

20       A     I don't recall if I have that anywhere in the

21   notes, yeah, that we have here.

22       Q     So how do you remember that she had reported

23   sleep paralysis?

24       A     Because, I mean, she's fairly vivid in my

1    mind, but I can't show you with what the paperwork that

2    we have in front of us.

3        Q    Okay.

4        A    But I would have no reason to bring that up,

5    you know, outside of the fact that --

6        Q    And, again, excessive daytime sleepiness was

7    on that test that you described as a dirty test,

8    correct?

9        A    The multiple sleep latency testing was dirty

10   because the tricyclic anti-depressant can delay REM

11   sleep.  That was the only reason that test was dirty

12       Q    But that's the same test where she had

13   indicated excessive daytime sleepiness?

14       A    Well, I was doing you a favor in saying that

15   because I could go into saying that tricyclic

16   anti-depressants cause a delay in REM sleep and that's

17   another factor that's involved.

18            That test, like I said, could have showed

19   four or five naps where she went into REM sleep.  But

20   it didn't.  It showed one.

21            So the reason why I brought up dirty test --

22   I don't want a dirty test here.  So the reason why I

23   described that as a dirty test was that she was taking

24   a medication that can delay sleep onset REM.

1    Q    Right.  But I just want to make sure that's

2  the test we're talking about.  There's not a different

3  test?

4    A    The multiple sleep latency test that she had

5  performed after her baseline sleep study showed that

6  she has a mean sleep latency below nine minutes.

7    Q    Okay.  I just want to make sure.  And that's

8  the test that you have described that she was on

9  medication when you gave her the test?

10    A    That is correct.

11    Q    Okay.

12    A    And that, if anything, would make it less

13  likely for her to have dream sleep.

14    Q    Okay.  So if you flip to 373.  The page looks

15  like this.  The next page.

16    A    Yeah.  Thank you.

17    Q    So this appears to be from a study date of

18  December 15, 2012.  And I don't know if this is part of

19  the form or not?

20    A    This is a boilerplate sleep study form that

21  is put out by the software makers of the particular

22  Embla system that we use.  And this form gets -- this

23  portion of the form gets printed out regardless of

24  whether or not there's anything on it that the

1    technician or I have added.

2        Q    Would you normally add something under

3    summary statements or is it typical to be blank?

4        A    No.  My dictations satisfy that.

5        Q    Okay.  And then the next page this is a

6    multiple sleep latency test report from December 15,

7    2012?

8        A    Correct.

9        Q    And is that handwritten note at the bottom

10   yours?

11       A    Correct.

12       Q    What it looks like there's a dash with a

13   circle and then it says MWT.  What is that?

14       A    That's negative multiple -- or excuse --

15   maintenance of wakefulness test.

16       Q    What does that mean?

17       A    That means that with the Vyvanse on board she

18   was able to stay awake during this test.  Her mean

19   sleep latency was over nine minutes.

20       Q    Okay.  And then if you flip to page 767,

21   which is I believe one of your electronic notes.

22       A    Okay.  Yeah.

23       Q    So this is from December 19th, 2012, correct?

24       A    That's correct.

1     Q    So your impression I want to talk about that.

2          So when it says, "Normal maintenance of

3    wakefulness testing on Vyvanse 40 milligrams," what

4    does that mean?

5     A    That means that if the patient takes -- and,

6    by the way, I put a line through this at the top.

7    That's not correct.  It's a maintenance of wakefulness

8    test.  It's not an MSLT, if I can just state that.

9     Q    Okay.

10     A    An MSLT was not prepared.  It was a

11   maintenance of wakefulness test.  So that's a clerical

12   issue.

13          But, anyway, so what I'm describing in that

14   situation is that we had the patient take her Vyvanse,

15   which is a stimulant, which is her treatment for

16   excessive daytime sleepiness.  She takes that at 6:30,

17   a 40 milligram dosage of Vyvanse, and then we're asking

18   her to try and stay awake.

19          And so we're saying, well, with the Vyvanse,

20   40 milligrams, it looks like she's able to maintain a

21   certain degree of wakefulness that satisfies the

22   criteria for this test.

23          You know, all it's doing is satisfying the

24   criteria of a test that the results of which have been

1    established by a group of sleep specialists far

2    brighter than me who wrote the textbooks and defined

3    the tests and all these things.

4             So they're saying to have a normal

5    maintenance of wakefulness test you have to have

6    maintenance of sleep such that you're not falling

7    asleep in less than nine minutes.  That's a normal

8    study.

9             So with 40 milligrams of Vyvanse it looks

10   like she can maintain that absolute criteria.  But the

11   problem is in the third period that we're studying her

12   she falls asleep in seven minutes.

13            So that to me from a clinical standpoint even

14   though it doesn't establish for her that this is an

15   abnormal test, it still tells me that there's an issue

16   still.  She is still falling asleep within seven

17   minutes in that nap.

18        Q    So, again, is this where you do five naps?

19        A    This is a four-nap study, yeah.

20        Q    Okay.  And so in the third nap she fell

21   asleep within seven minutes?

22        A    That's correct.

23        Q    Is that how I understand this?

24        A    That's correct.

1            But in this test we're not studying REM

2    onset.  We're studying whether or not they fall asleep.

3            So we're not really ruling in or ruling out

4    specific sleep disorders.  This test is defining

5    daytime sleepiness.

6        Q    And when you wrote that care should be taken

7    from 11:00 a.m. and thereafter regarding hypersomnia

8    effects, what does that mean?

9        A    Well, that was in that nap.  That specific

10   nap was the 11:00 a.m. nap.

11           So the fact that she is, you know, she's

12   showing sleepiness there I have to make a comment as a

13   reminder to myself and the physician I'm sending the

14   note to that she did fall asleep in that 11:00 nap.  So

15   I have to be mindful of that fact and perhaps adjust

16   her medication such that we're covering that interval

17   of sleepiness.

18           Even though the test is negative, I still

19   have to be mindful of the fact she does fall asleep in

20   seven minutes at that point in time.

21       Q    Are there concerns about her doing things

22   like driving, then?

23       A    Not necessarily -- Well, there's always a

24   concern about a sleepy individual who's driving.  But

1    these circumstances are relatively extreme because

2    you're putting a patient into a dark room in a

3    reclining position which really doesn't mimic an

4    11 a.m. driving situation, at least not where I'm from,

5    so yeah.

6        Q    If you flip to the --

7        A    Alaska maybe.

8        Q    If you flip to the next page.  This also

9    appears to be a note from December 19, 2012?

10       A    That's when the document was created.

11       Q    Is there a reason why there are two notes

12   from the 19th?

13       A    Two notes from the 19th?

14       Q    The page before was from the 19th.

15       A    Oh, that's when I dictated both.

16            So, in other words, the study was performed

17   whenever the date was on the study; and then when I get

18   those things on my desk for interpretating, then I go

19   to the computer, I interpret the study, I agree or

20   disagree with what the computer is spitting out, what

21   the technician is saying, and then I make a final

22   dictation on it and put it in the chart.

23       Q    And on this note on page 771 I see there are

24   notes after dash marks?

1        A     Yeah.  There are main areas that we have to

2    look at when we're interpreting a sleep study.  So we

3    have to look at the breathing.  That's comprehensive

4    ventilator monitoring.

5              We have to look at the sleep stage

6    individually, sleep stages individually.  We have to

7    look at how well they maintained efficiency of sleep.

8              Parasomnia just means did they act out their

9    dreams this time or did they sleepwalk or did they

10   sleep talk or did they grind their teeth.  Those are

11   all parasomnias.

12       Q     So she appears -- Or the breathing.  Is the

13   breathing normal?

14       A     It is.

15       Q     And then the next -- The sleep stage summary

16   is that normal?

17       A     Yes.

18       Q     And the sleep --

19       A     Well, she had a slight increase of sleep

20   stage shifts, but the absolute sleep stage percentages

21   were normal.

22       Q     And the sleep continuity --

23       A     Continuity.

24       Q     Continuity is normal, correct?

1      A     Well, with the sleep stage shifts being

2   increased that did cause a little disruption of the

3   architecture.

4      Q     What does it mean where you wrote, "Sleep

5   phase is normal"?

6      A     Oh, I'm sorry.  Yeah.  Let me explain that.

7            Sleep phase is all of us maintain a certain

8   bedtime to waking time.  So if you're a night owl, you

9   would have delayed sleep phase disorder.  You've

10  delayed your sleep phase.

11           So if you always go to bed at midnight or

12  1:00, you get up at 8:00 or 9:00 or something like

13  that, that's delayed.

14           If you're advanced sleep phase disorder and

15  you're a morning lark, you know, you like to get to bed

16  at 8:00 or 9:00 and like to get up at 4:00 or 5:00,

17  that you have advanced sleep phase.

18      Q     Okay.

19      A     So in describing her sleep phase she got to

20  bed at a normal -- she got to sleep at a normal time.

21      Q     And then, again, what is parasomnia?

22      A     Para means around.  Somnia means sleep.  So

23  these are other things that might occur during sleep.

24  Grinding your teeth, talking in your sleep,

1    sleepwalking, confusional episodes, all those things.

2        Q    And there was no abnormalities?

3        A    No, we did not see the REM behavior disorder

4    this time.

5        Q    And in terms of limb movement monitoring

6    there was no abnormalities?

7        A    That's correct.

8        Q    And she had normal sinus rhythms, correct?

9        A    That's correct.

10        Q    So your impression is she had a normal

11    baseline sleep study.  Is that what you would expect to

12    see in somebody who had narcolepsy?

13        A    So "normal" is always a relative term.  There

14    is an increase in number of stage shifts, which she

15    does have.  But this is an adequate study to proceed

16    with the next day testing.

17            So it's not diagnostic of sleep apnea.  It's

18    not diagnostic of periodic limb movement sleep

19    disorder.  It's not diagnostic of a significant

20    parasomnia that would disrupt her sleep and affect the

21    next day study, because what we're looking for is there

22    anything in this baseline study that would cause

23    excessive daytime sleepiness the next day.

24        Q    Okay.  And so if we turn -- Well, it says

1    "Proceed with MSLT."

2       A    Yeah.  It's a relative term.  It was an

3   MWT.

4       Q    Okay.  And do we have that?

5       A    Yeah.  That's the page before.

6       Q    Okay.

7       A    Sorry about that.

8       Q    And so that as we already talked about was

9   within the normal range, correct?

10      A    That is correct.  Yeah, she fell asleep 12

11  minutes on the average.

12      Q    And then the next page is the next note I

13  have from you and it's May 7 of 2013.  Was the next

14  visit you had after December 19th?

15      A    I would assume so.

16      Q    And do you know why she came to see you on

17  this date?

18      A    I think she had a hospitalization for

19  pulmonary embolism and so part of the discharge was to

20  make sure that she followed up with her sleep doctor.

21      Q    And what is pulmonary embolism?

22      A    Well, I'm not a blood doctor, but what a

23  pulmonary embolism is is a -- it's a blood clot that

24  goes to the heart typically from the leg like a deep

```
 1    veinous thrombosis.

 2              A clotting issue in the blood creates a blood

 3    clot.  That blood clot travels through the circulatory

 4    system and lodges in the lungs.

 5              People can die from this problem.  It causes

 6    disruption of -- you know, I'm going to stop there.

 7    I'm not an expert.

 8       Q    That's okay.  You've given me enough.

 9       A    That's not fair.

10       Q    Okay.  So on this form under "S," which what

11    does the "S" stand for?

12       A    That would be subjective.

13       Q    So explain where it says, "Hypersomnia,

14    sleepy in a.m. Coffee sometimes work.  Napping

15    occasionally after coffee for a few hours.  Melatonin

16    trial in the past not effective."

17              Can you explain those comments to me.

18       A    So this is the -- when we sit down to talk I

19    say how are things going?  What's new?  What's

20    different?  Have you had any changes in medication?

21    Have you been in the hospital?

22              You know, it was obvious she had been because

23    I heard about her hospitalization.  So we sit down and

24    I write, "She is status post hospitalization."  And so
```

1    I basically will take my laptop into the room with the

2    patient and she is telling me this is how I've been.

3            So I wanted to make it clear in the

4    documentation that her pulmonary embolism was not

5    related to anything that I had given her.  A little

6    defensive medicine here.  I said this occurred two

7    weeks after stopping Vyvanse.  So she already stopped

8    the Vyvanse.  So I included that in my document.

9            I typed in she was diagnosed with pulmonary

10   embolism and right heart failure and she was having

11   some tachycardia, 150 to 160 beats per minute.

12   Anything over 90 is tachycardia.  And she continued to

13   smoke.  Or she had been smoking at the time of her

14   pulmonary embolism I should say.

15   Q    Is there any significance to the -- next to

16   the hypersomnia it says "napping occasionally after

17   coffee for a few hours."  Does that mean anything to

18   you in terms of what her condition was like?

19   A    Well, sleep will overpower anything.  It will

20   overpower caffeine.  It will overpower pain.  It's a

21   very powerful brain type of phenomenon that occurs.  So

22   I was just listing.

23            She had told me that she had stopped the

24   Vyvanse, so she was telling me that she drinks coffee

1   in the morning and sometimes she can stay awake but it

2   doesn't always work and that sometimes she found

3   herself napping after she had had the coffee to drink.

4           So she was one of those people that you meet

5   that says, oh, I can drink a 20-ounce coke and go right

6   to sleep.

7       Q    If we flip to the next page, which is 731 and

8   the last page, this looks like this is a visit of

9   July 9th, 2013.  Is this the last time you saw

10  Ms. Stone?

11      A    You know what, no.  I did see her this

12  summer.

13          I'll have to find that.  I'll ask my staff to

14  print that off.

15          So I'm assuming this was -- I don't know if

16  this was copied for you guys or for -- that would be

17  before I saw her or not.  But I'll make sure you have

18  that most recent note, because I know I saw her this

19  summer.

20      Q    Okay.  And then so she is off her medicine,

21  the Vyvanse?

22      A    Yeah.  A real tricky situation whenever you

23  get into medical problems that are complicating a

24  patient's physiology, I'll say.

```
 1              I didn't want to give her a stimulant when
 2    she is battling significant tachycardia.  She wasn't
 3    when she came into my office.  Her pulse was 78.  But
 4    if she's having intermittent or paroxysmal
 5    supraventricular tachycardia, then I'm not going to
 6    throw an amphetamine at her because I don't want to
 7    contribute to another pulmonary embolism.
 8         Q    And it indicates that she's taking naps at
 9    10:00 and 3:00.  Do you know are those power naps or
10    what type of naps?
11         A    I don't know the duration of those.
12         Q    And then I see the Epworth sleepiness scale
13    says 14.  Is that a high or low score?
14         A    That's a high score.
15         Q    And so how does that square with in the
16    section that's labeled "O" it says, "Hypersomnia is
17    mild today"?
18         A    Yes.  So she is -- When I say as far as an
19    Epworth goes, I'm not typically asking them how they
20    are today.  I'm saying in general how is your function.
21    So the Epworth kind of gives me an in general how
22    you're functioning type of thing.
23              When she's there under Objective, I'm looking
24    at her.  She's not telling me anything.
```

1           So under Objective I'm saying, well, she

2    appears a little sleepy today, so my comment would be

3    hypersomnia is mild today.

4       Q    And you said you saw her this summer as well?

5       A    Uh-huh.

6       Q    Do you remember how she was doing this

7    summer?

8       A    Am I allowed to say can we go off the record,

9    because I'll go get that note?

10      Q    Sure.

11           THE WITNESS:  Excuse me.

12           (A recess was taken.)

13           THE WITNESS:  So here is a copy from the

14   summer.

15           MS. LAWS:  Thank you.

16           THE WITNESS:  July 30th.

17           MR. WHITCOMB:  And if everybody is in

18   agreement, let's just add it to the end of Exhibit 4.

19           MS. LAWS:  Okay.

20   BY MR. WHITCOMB:

21      Q    Can you tell by looking at this note how she

22   was doing when you saw her this summer?

23      A    Yes.  Basically, she just came back in for

24   prescriptions.

1          And at this point in time her heart problem

2    had -- You know, I didn't list it in here, but her

3    cardiac issues did not recur.  She was not having the

4    tachycardia and she was wanting a stimulant again.

5          Q    And in the section labeled A where it says

6    hypersomnia it says, "Idiopathic versus narcolepsy

7    related."  Can you explain that.

8          A    Idiopathic means -- It's just abbreviated for

9    idiopathic hypersomnia versus narcolepsy related.

10          So I have to continue to write that until the

11    last day I see her in her lifetime, my lifetime,

12    whatever, because of the fact that it's just not

13    completely clear by the testing.

14          Q    So when you filled out this form and gave her

15    work restrictions to first shift, did you have

16    particular hours that you thought she should be

17    confined to working or intended that to reflect?

18          A    I do not have that type of approach to that

19    type of letter, no.

20          First shift to me might be 6:00 in the

21    morning to 2:00 in the afternoon.  It might be 9:00 to

22    5:00.  It might be -- You know, first shift doesn't

23    always mean the same thing.

24          Q    So could she have worked from 6:00 in the

1    morning until 2:00 in the afternoon?

2        A    I don't know.

3        Q    If that was --

4        A    She was very sleepy at 6 a.m. in her

5    maintenance wakefulness test.  So it's trial and error.

6        Q    So first shift didn't have any particular

7    hours associated with it to you?

8        A    That's an interesting question, because what

9    I'm saying is that 6 a.m. to 9 a.m. or so that would be

10   considered a first shift schedule.

11            So if you're asking me if I know what first

12   shift is, then I would say -- I think I'm correct in

13   stating that 6 a.m. to 9 a.m. would be a typical start

14   time for a first shift job, correct.

15       Q    Okay.  Was there a particular hour in the day

16   you thought she should be done working by?

17       A    Well, I would assume it would be typically an

18   eight-hour day.

19       Q    Did she tell you what first shift hours were?

20       A    I don't recall if she did.  Yeah.  I don't

21   know what the shift is that -- the specific shift hours

22   of first shift are in her working situation.

23       Q    Is there any reason she could not have worked

24   a shift that ended at 7 p.m.?

1         A     I have no idea what you're asking.

2         Q     In terms of the work restrictions you've put

3    on her would she have been able to work --

4         A     Well, if it's an eight-hour day, sir, then 11

5    a.m. to 7 a.m. in my book is typically second shift.

6              So I don't know what you're asking.  Are you

7    asking me if I know what first shift is?  Which it's

8    kind of like you asking me to be an HR person.

9              So I don't know what her shifts were.  And

10   I'm telling you that I have no clue what OhioHealth's

11   specific shifts are.

12             I can tell you a lot of times they vary.  If

13   you're a nurse you might work a 12-hour shift.  And I

14   don't know.  It's usually 7:00 to 7:00 as I recall.

15             If you are working for a physician's office

16   at OhioHealth you might be asked to come in to first

17   shift at, say, 6 a.m. to get the office prepared and

18   ready.  I'm assuming you would be done by 2 p.m.  I'm

19   assuming you wouldn't be done by 7 p.m. unless you have

20   some schedule adjustment worked out with that physician

21   where you'd stay on to help them.

22             Could she work until 7 p.m.?  If she was

23   dosed up adequately with a stimulant, perhaps so.

24        Q     No, I'm not asking you to tell me what

 1   OhioHealth's hours are.  I was just trying to --

 2       A    I'm a neurologist.  I don't know.  I don't

 3   know what the shifts are.

 4       Q    I'm trying to understand your restriction.

 5       A    Right.  Well, first shift in my book, like I

 6   said, is a start time between 6:00 and 9:00 I would

 7   assume.

 8       Q    Okay.  Did she ever call you and ask whether

 9   she could work an evening shift?

10       A    An evening shift?  I don't recall that

11   conversation.

12       Q    Okay.

13       A    If she's asking for first shift, if she asked

14   to occasionally work an evening shift to cover for

15   somebody, I don't recall if she called me to ask me if

16   she could or not.

17            I mean, that would be -- If she feels like

18   she could pull that off -- that's usually a stretch for

19   someone who has excessive daytime sleepiness, but if

20   she could pull it off, I suppose she could.

21       Q    Is there any reason based upon your treatment

22   of her that she would not have been able to work a

23   regular shift from 11 a.m. to 7 p.m.?

24       A    Well, I know she gets sleepy at 11:00 by her

```
 1   maintenance of wakefulness test, which would complicate
 2   first and second shift.  So, yeah, I don't know.
 3   (DEPOSITION EXHIBIT NO. 5 MARKED FOR IDENTIFICATION.)
 4       Q    I'm going to show you your declaration.  I'm
 5   not going to spend a whole lot of time on this.
 6       A    Sure.
 7       Q    It's been marked as Exhibit 5.
 8       A    Sure.
 9       Q    Have you seen this document before?
10       A    Yes.
11       Q    And you signed this document?
12       A    I did.
13       Q    Okay.  Did you prepare this document or did
14   somebody prepare it for you?
15       A    I did not.
16       Q    What input did you have into the preparation
17   of this document?
18       A    What input did I have?  Well, this is all
19   from -- I'm not sure how to answer that.  That's from
20   the patient's history and from my understanding of
21   sleep disorders.
22       Q    Did somebody at the EEOC type this up?
23       A    I'm not sure.
24       Q    Did somebody at the EEOC send this to you?
```

```
1        A    I just signed it.

2        Q    How did you receive it?

3        A    I'm not sure.

4        Q    Okay.  Did you see different versions of this

5   document?

6        A    Not that I recall.

7        Q    Okay.  When you got the document did you make

8   any edits to the document before signing it?

9        A    I don't think I did.

10        Q    So under paragraph 10 on page 2 and going

11   over to page 3 it says, "A patient can often tolerate

12   the sleepiness if, with much effort and attention, she

13   makes a strong attempt to stay awake.  Eventually,

14   however, it is impossible to combat the recurrent daily

15   sleepiness without treatment."

16             Do you know where that information came from

17   that was put in here?

18        A    I'm not sure.  That's most likely a textbook.

19        Q    Have you provided the EEOC with any

20   information other than your medical notes?

21        A    No.

22        Q    Have you had telephone conversations with the

23   EEOC?

24        A    Yes.
```

1     Q   And how many conversations do you think

2  you've had?

3     A   I don't recall.  It was primarily when can we

4  or when can you schedule a deposition.

5     Q   Okay.  Did you have any interview in

6  preparation for your declaration?

7         MS. LAWS:  Objection.

8         THE WITNESS:  I did not have an interview

9  when -- You mean today?

10  BY MR. WHITCOMB:

11     Q   Yeah.

12     A   We did speak today.

13     Q   No.  I'm sorry.  In preparation for -- Did

14  you have a conversation with the EEOC that provided

15  information that went into your declaration?

16         MS. LAWS:  Objection.

17         THE WITNESS:  I don't recall, actually.

18  BY MR. WHITCOMB:

19     Q   And what did you speak today with the EEOC

20  about?

21         MS. LAWS:  Objection.

22         THE WITNESS:  I asked her was there an

23  accident on 315.  I said would you like something to

24  drink.  That's about it.

1   BY MR. WHITCOMB:

2       Q    And is the EEOC compensating you for your

3   time?

4       A    No.  I should say, I haven't received any

5   payments, but I don't believe I've invoiced either.  At

6   least I haven't signed off on anything.

7       Q    Are you charging them for your time?

8       A    Absolutely.

9       Q    Okay.  And do you know what the rate of

10  compensation is?

11      A    The rate for any discussion would be $250 an

12  hour.  The rate for any deposition is $450 an hour.

13  And that was a reduction in what's typical.

14      Q    Have you had any written correspondence with

15  the EEOC?

16      A    I have not.

17      Q    Has your office?

18      A    They faxed documents to them, which is the

19  same documents that they say they faxed to you.

20          MR. WHITCOMB:  Okay.  I appreciate your time

21  today and I have no further questions.

22          THE WITNESS:  Okay.

23          MR. WHITCOMB:  You do have the right to read

24  the transcript when it's prepared to make sure it's

```
 1   accurate.

 2             THE WITNESS:  Okay. I'll read it.

 3                      - - -

 4                   EXAMINATION

 5   BY MS. LAWS:

 6        Q    I'm sorry, Doctor, I know you have a patient

 7   waiting.

 8        A    No, we're good.  I've got ten minutes.

 9        Q    I just want to follow up on a few points.

10             Everything that's in your declaration that's

11   now been marked as Defendant's Exhibit 5 is correct and

12   accurate?

13        A    I believe so, yes.

14             So I will state that I have listed that the

15   patient has narcolepsy in my statement, and if I was

16   leaving today and somebody put a gun to my head and

17   said what's she got, I still would say -- I mean I

18   would say narcolepsy.

19        Q    And, Dr. Jones, in your medical opinion

20   without the switch to day shift for Ms. Stone back in

21   September 2009 when you were treating her for

22   narcolepsy in the beginning would she have been able to

23   maintain the sleep hygiene that you repeatedly

24   discussed today that would have been needed to manage
```

1    her narcolepsy?

2        A    I don't know with 100 percent certainty if

3    that would have worked.

4            You know, when you're chipping away at

5    different things that cause people to be excessively

6    tired throughout the day you do everything you can to

7    give the patients the best sporting chance possible;

8    and if that's take certain medications, you know,

9    controlled substances, speed basically, to try and stay

10   awake, whether it's changing shifts, these are all

11   things that we look to do to try to make someone as

12   efficient as possible throughout the day.

13       Q    And one of those things that you just

14   mentioned that gave Laura a sporting chance, so to

15   speak, was having her shift switch to day shift hours,

16   correct?

17       A    That's correct.

18           Ms. LAWS:  No additional questions.  Thank

19   you for your time and for changing your schedule to

20   accommodate the defense attorney.

21           MR. WHITCOMB:  Thanks.

22           MS. LAWS:  As Mr. Whitcomb already mentioned,

23   our recommendation is that you read and sign the

24   deposition transcript.

1              THE WITNESS:  Sure.  I can do that.

2                      - - -

3              Thereupon, at 12:51 p.m. on Thursday,

4    August 28, 2014, the deposition was concluded.

5                      - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                      CERTIFICATE

 2   STATE OF OHIO       :
                                    SS:
 3   COUNTY OF FRANKLIN  :

 4            I, DANIEL A. JONES, M.D., do hereby certify

 5   that I have read the deposition given on Thursday,

 6   August 28, 2014, that together with the correction page

 7   attached hereto noting changes in form or substance, if

 8   any, it is true and correct.

 9                       _____

10                       DANIEL A. JONES, M.D.

11            I do hereby certify that the foregoing

12   deposition of DANIEL A. JONES, M.D. was submitted to

13   the witness for reading and signing; that after he had

14   stated to the undersigned Notary Public that he had

15   read and examined his deposition, he signed the same in

16   my presence on the _____ day of _____, 2014.

17

18                       _____
                         NOTARY PUBLIC - STATE OF OHIO
19   My Commission Expires:

20   _____, _____.

21

22

23

24
```

Page 105

CERTIFICATE

STATE OF OHIO       :
                    SS:
COUNTY OF FRANKLIN  :

        I, Diane L. Schad, a Professional Reporter
and Notary Public in and for the State of Ohio, duly
commissioned and qualified, do hereby certify that the
within-named DANIEL A. JONES, M.D. was sworn to testify
to the truth, the whole truth, and nothing but the
truth in the cause aforesaid; that the deposition then
given by him was by me reduced to stenotype in the
presence of said witness; that the foregoing is a true
and correct transcript of the deposition so given by
him; that the deposition was taken at the time and
place in the caption specified and was completed
without adjournment; and that I am in no way related to
or employed by any attorney or party hereto or
financially interested in the action; and I am not, nor
is the court reporting firm with which I am affiliated,
under a contract as defined in Civil Rule 28(D).

        IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Columbus, Ohio on
this 8th day of September, 2014.


                    DIANE L. SCHAD
                    NOTARY PUBLIC - STATE OF OHIO

My Commission Expires:  June 1, 2015.
                - - -